## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMANDA JIMENEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ARTSANA USA, INC.,<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Amanda Jimenez ("Plaintiff"), individually and on behalf of other similarly situated individuals, alleges the following Class Action Complaint against Defendant Artsana USA, Inc. ("Artsana" or "Defendant") for making, marketing, and distributing Chicco-brand booster seats, upon personal knowledge as to herself and her own acts and upon information and belief – based upon, *inter alia*, the investigation made by her attorneys – as to all other matters, as follows:

### INTRODUCTION

1.      This is a class action on behalf of purchasers of Artsana's Chicco-brand booster seats, including the Chicco KidFit, KidFit 2-in-1, KidFit Zip Plus, KidFit Zip Air Plus, and the KidFit Adapt Plus Booster Seats (collectively the "Booster Seats" or "Products") in the United States.  The Products are sold as booster seats that are safe for children as small as 30 pounds and that offer side-impact protection during vehicle collisions.

2.      Contrary to well-established expert advice, Artsana advertised its Products as safe for children from 30 to 100 pounds, and it touted the company's proprietary "DuoGuard" protection:





**DuoGuard**

Head and torso protection with a rigid shell and energy-absorbing EPS foam throughout 10 height positions

**SuperCinch Tightener**

Premium LATCH connectors and force-multiplying tightener for stability

| | |
|---|---|
| Harness Mode - Rear-Facing | - |
| Harness Mode - Forward-Facing | - |
| Booster Mode - High Back | 30-100 lbs |

3.      Specifically, to gain the trust of consumers, Artsana markets its proprietary "DuoGuard" or "DuoZone" protection, which it claims offers two layers of side-impact protection for the head and torso, and the company advertises this feature on its website and on booster seat packaging.[1]

---

[1] *See, e.g.*, KidFit 2-in-1 Belt Positioning Booster Car Seat – Atmosphere, http://web.archive.org/web/20170530190501/http://www.chiccoshop.com/gear/car-seats/booster-seats/kidfit-2-in-1-belt-positioning-booster-car-seat---atmosphere/05079014570070.html




4.     Unfortunately for consumers and their children, Artsana kept the weight recommendation for its Booster Seats lower than it should have and deceptively marketed the Products as having additional safety features to compete with other manufacturers in the booster seat industry.  In fact, the Products leave children, especially those as small as 30 pounds, vulnerable to severe injury.

5.     There is a consensus amongst experts that booster seats are not safe for any child weighing less than 40 pounds.[2]  As early as 2001, the National Highway Traffic Safety Administration ("NHTSA") warned against the potential dangers of booster seat use by children weighing less than 40 pounds.[3]  According to NHTSA's research, there is a 27% increased risk of moderate to fatal injuries for 3-to-4-year-olds when restrained in booster seats as compared to a fully-harnessed seat.[4]

6.     On December 10, 2020, after a 10-month investigation of the seven leading booster seat manufacturers, including Artsana, the U.S. House of Representatives Subcommittee on

---

[2] *See*, *e.g.*, National Highway Traffic Safety Administration, Booster Seat Effectiveness Estimates Based on CDS and State Data at 1, 11 (July 2010), available at https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811338

[3] National Highway Traffic Safety Administration, Premature Graduation of Children to Seat Belts (Aug. 2001), available at https://one.nhtsa.gov/people/outreach/traftech/TT253.htm

[4] National Highway Traffic Safety Administration, Booster Seat Effectiveness Estimates Based on CDS and State Data at 9 (July 2010), available at https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811338

Economic and Consumer Policy published the results of that investigation: *Booster Seat Manufacturers Give Parents Dangerous Advice: Misleading Claims, Meaningless Safety Testing, and Unsafe Recommendations to Parents About When They Can Transition Their Children from Car Seats to Booster Seats* (the "Congressional Report").[5]

7.     Based on a review of thousands of previously non-public documents produced by seven manufacturers – including Artsana – which were unavailable to consumers, the Congressional Report found that "[d]espite a decades-old expert consensus that booster seats are not safe for children under 40 pounds . . . Artsana . . . marketed booster seats for children as light as 30 pounds."[6] The Congressional Report further found that "Artsana . . . deceptively marketed [its] booster seats with unsubstantiated claims about 'safety features,' while failing to disclose that those features have not been objectively shown to increase child safety."[7]

8.     All in all, the Congressional Report concluded that booster seat manufacturers such as Artsana "endangered the lives of millions of American children and misled consumers about the safety of booster seats by failing to conduct appropriate side-impact testing, [and] deceiving consumers with false and misleading statements and material omissions about their side-impact testing protocols . . . and unsafely recommending that children under 40 pounds and as light as 30 pounds can use booster seats."[8]

---

[5] U.S. House of Representatives, Subcommittee on Economic and Consumer Policy Committee on Oversight & Reform, Staff Report, *Booster Seat Manufacturers Give Parents Dangerous Advice: Misleading Claims, Meaningless Safety Testing, and Unsafe Recommendations to Parents About When They Can Transition Their Children from Car Seats to Booster Seats* (Dec. 10, 2020), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2020-12-10%20Subcommittee%20on%20Economic%20and%20Consumer%20Policy%20Staff%20Report%20on%20Booster%20Seat%20Investigation.pdf.

[6] *Id.* at 2.

[7] *Id.* at 3.

[8] *Id.* at 1.

9.      However, the scientific consensus is that booster seats don't adequately protect toddlers.  Since the early 2000's, the American Academy of Pediatrics has recommended that children should not move to a booster seat until they reach the maximum weight or height of their harnessed infant seats.  Additionally, the American Academy of Pediatrics advised that kids who weigh 40 pounds or less were best protected in a seat with its own internal harness.  The Products do not have an internal harness and Defendant's weight recommendations for the Products do not comport with this standard.

10.      Even further, in Canada, the government has banned the sale of boosters to children under 40 pounds since 1987.

11.      As noted in the Congressional Report, side-impact collisions pose a substantial risk to small children.  In 2018, for example, side-impact collisions accounted for approximately 25% of the fatalities for children under the age of 15.  Moreover, children who survive side-impact collisions often sustain serious injuries such as traumatic brain injuries, concussions, neck injuries, whiplash, broken bones, spinal cord injuries, or paralysis.[9]  Consequently, manufacturers such as Artsana have sought to increase their booster seat sales by proclaiming to parents that their booster seats have special side-impact protection and that the booster seats have been side-impact tested.

12.      The Congressional Report highlighted that "Artsana markets its proprietary 'DuoGuard' protection, which it claims 'offers two layers of side-impact protection for the head and torso,' and the company advertises this feature on its website and on booster seat labels."[10]

---

[9] *Id.*

[10] *Id.* at 24, citing *Artsana, USAKidFit 2-in-1 Belt Positioning Booster Car Seat*—Horizon (available at https://web.archive.org/web/20200925062340/https://www.chiccousa.com/shop-our-products/car-seats/booster/kidfit-2-in-1-belt-positioning-booster-car-seat---celeste/06079014250070.html) (citing a capture dated Nov. 25, 2020).

13.     With respect to this "DuoGuard" protection from side impact collisions, however, the Congressional Report found "***Artsana omits material information. There is no evidence that the DuoGuard feature provides any protection***."[11]   To demonstrate the falsity of Artsana's claims, the Congressional Report went on to reproduce "an image of an Artsana booster seat side-impact test, in which the dummy's head moved beyond the booster seat's headrest:"[12]



14.     The Congressional Report therefore concluded, with respect to this proprietary "DuoGuard" protection, Arstana made "unsubstantiated claims about proprietary safety features in side-impact crashes.  Such features are untested, and their advertisements provide consumers with a

---

[11] *Id.* at 25.

[12] *Id.*, citing Artsana, *KidFit Side Impact Test* (Sept. 4, 2014) (available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/28%20-%20Artsana%20Test%20Image.pdf).

false sense of security. It is unfair and deceptive to advertise a safety feature without evidence that it improves safety."[13]

15.     However, there are no federal regulations requiring that booster seats are side-impact tested.  Nearly 20 years ago, Congress enacted a law requiring NHTSA to implement rules to improve the safety of car seats and boosters and to minimize children's head injuries in side-impact collisions.  However, the regulators never enacted standards for side-impact tests for boosters and other car seats in such crashes, and those seats need only pass a crash test that simulates a head-on collision.  This lack of regulation allowed Defendant to make its own safety standards and pass its Products off as safe for side-impacts with absolutely no oversight.

16.     Despite the recent congressional findings and the decades-long consensus that booster seats are not safe for any child weighing less than 40 pounds, Artsana continued to market its Booster Seats as safe for children as small as 30 pounds, and as offering side-impact protection. In the absence of adequate federal regulation, Defendant ignored the prevailing safety knowledge and put profit over safety, making deceptive recommendations that mislead consumers into thinking its Products are safe for children as light as 30 pounds.  Since their launch, Artsana has sold millions of Products and has likely earned hundreds of millions of dollars in profit.

17.     Plaintiff and consumers have no way of knowing that these representations were false, as Defendant had sole knowledge and control over the testing, development, statements, and marketing of its Products.  As a consequence of Artsana's deceptive marketing and advertising practices, an untold number of children have been harmed and put at risk of harm.  Had Artsana disclosed the results of its side-impact testing, no consumer, parent, or family member would have purchased the Booster Seats.  Safety is indisputably material, if not the most important factor, in a

---

[13] *Id.* at 22.

parent's purchase of a child's car seat.  A parent would read Artsana's claims to mean that the Products were safe for children as small as 30 pounds and increased safety by reducing the risk of injury during side-impact collisions.  Parents were willing to purchase the Products and pay more for the Products due to those claims, but they did not receive the full value of the Booster Seats they were promised.  Defendant's claims are false and misleading, as it has been found that Artsana did not conduct tests under reasonably rigorous simulated crash conditions and did not adequately assess the risk of injury or death.

18.     This is a proposed class action brought by Plaintiff, on behalf of a class of similarly situated individuals, against Defendant for breach of express and implied warranty, unjust enrichment, fraud, and violations of New York consumer protection laws.

## JURISDICTION AND VENUE

19.     This Court has personal jurisdiction over Defendant.  Defendant purposefully avails itself of the New York consumer market and distributes the Products to at least hundreds of locations within this County and thousands of retail locations throughout New York, where the Products are purchased by thousands of consumers every week.

20.     This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.  Plaintiff alleges that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

21.     Venue is proper in this District under 28 U.S.C. § 1391(a).  Substantial acts in

furtherance of the alleged improper conduct, including the dissemination of false and misleading information and omissions regarding the Products, occurred within this District.

## PARTIES

22.     Plaintiff Amanda Jimenez is an individual consumer who, at all times material hereto, was a citizen of Newburgh, New York.  Ms. Jimenez purchased Chicco's KidFit 2-in-1 in or around February 2017.  In purchasing the Product, Ms. Jimenez relied on Defendant's false, misleading, and deceptive marketing of the Products as a safe, "side-impact tested" booster seat suitable for children as small as 30 pounds.  Had Defendant disclosed that the Products are not safe, fit to be used as a booster seat, do not pass side-impact testing, and do not offer side-impact protection, Ms. Jimenez would not have purchased the Product or would have paid less for it.  Ms. Jimenez read and followed the Product's instructions when using it.  Defendant's misrepresentations that the Products offer side-impact protection and are safe for children as small as 30 pounds in the event of a collision were immediate causes of Plaintiff Jimenez's decision to purchase one of the Products.  Plaintiff Jimenez would not have purchased one of the Products, or would have sought materially different terms, had she known the truth.  Defendant's misrepresentations were substantial factors in Plaintiff Jimenez's decision to purchase the Products.

23.     Plaintiff remains interested in purchasing a safe booster seat and would consider the Products in the future if Defendant provided a product that provided appropriate disclosures and would meet all applicable safety standards and recommendations.

24.     Defendant Artsana USA, Inc. is a New Jersey corporation with its principal place of business in Lancaster, Pennsylvania.  Defendant is a wholly-owned subsidiary of the global corporation Artsana, S.p.A.  Defendant manufactures, markets, and distributes the Products throughout New York, and the United States.

## CLASS ALLEGATIONS

25.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products (the "Class").  Excluded from the Class are persons who made such purchases for purpose of resale.

26.     Plaintiff also seeks to represent a subclass of all Class members who purchased the Products in New York (the "New York Subclass").

27.     At this time, Plaintiff does not know the exact number of members of the Class and New York Subclass; however, given the nature of the claims and the number of retail stores in the United States selling the Products, Plaintiff believes that Class and New York Subclass members are so numerous that joinder of all members is impracticable.

28.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

        a.     whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

        b.     whether Defendant's conduct was unfair and/or deceptive;

        c.     whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Defendant by Plaintiff and the Class;

        d.     whether Defendant breached implied warranties to Plaintiff and the Class;

        e.     whether Defendant breached express warranties to Plaintiff and the Class;

        f.     whether Plaintiff and the Class have sustained damages with respect to the common-law claims asserted, and if so, the proper measure of their damages.

29.     Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendant's product and Plaintiff sustained damages from Defendant's wrongful conduct.

30.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel that is experienced in litigating complex class actions.  Plaintiff has no interests which conflict with those of the Class or the New York Subclass.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

32.     The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class and the New York Subclass, thereby making appropriate equitable relief with respect to the Class and the New York Subclass as a whole.

33.     The prosecution of separate actions by members of the Class and the New York Subclass would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant.  For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not.  Additionally, individual actions could be dispositive of the interests of the Class and the New York Subclass even where certain Class members are not parties to such actions.

## FACTUAL ALLEGATIONS

### General Background

34.     Motor vehicle accidents are a leading cause of death among children.  Consequently, the child car seat and booster seat industry is big business.  Indeed, the market size has been valued for 2020 at $7.93 billion worldwide and forecast to grow to $10.87 billion in 2025.[14]

35.     The term "car seat" typically refers to a child restraint seat that is used with an in-built, 5-point harness.  They are designed to be the primary restraining device, and feature shoulder, waist and crotch straps to secure the child inside the restraint.  In contrast, a "booster seat" is a device primarily designed to position the vehicle's adult-sized, 3-point seat belt in the correct location over a child's body.  With a booster seat, it is the vehicle seat belt that is the actual restraining device.

36.     A five-point harness offers better protection than a booster seat in a number of ways. A correctly fitted harnessed seat will result in far less forward excursion, which is how far forward the head, shoulders and chest move in a crash.  It also prevents torso rotation (which is seen in booster seats, which use the vehicle's sash belt as the primary torso restraint).  Reduced excursion can also help prevent the child's head contacting loose items during a crash and ensure the head and torso are in a better position for side impact protection.  Many accidents happen at offset angles, so the less the child is thrown forward, the less chance of impacting the door or window.  The more secure a child is inside their restraint, the more likely a better outcome in the event of a crash.

37.     A harnessed seat can also dissipate more of the energy generated in a crash away from the child.  In a harnessed seat, the child is "attached" to the restraint.  The restraint's top tether

---

[14] *See Baby Car Seat Market Size, Share & Trends Analysis Report By Product (Infant, Booster, Combination, Convertible), By Distribution Channel (Hypermarkets & Supermarkets, Online), And Segment Forecasts, 2019 – 2025* (July 2019), available at https://www.grandviewresearch.com/industry-analysis/baby-car-seat-market

strap, the vehicle seatbelt, the child restraint shell and the child restraint harness all attenuate energy. There is also a larger webbing contact area with the child, spreading that significantly reduced force over a greater area.  In contrast, in a booster seat, the child and the booster seat are essentially independent of one another.  In a crash, the vehicle seatbelt does the vast majority of the energy attenuation.  There is also generally less webbing in contact with the child in a booster seat, which concentrates the energy over a smaller area.

38.     Further, in a harnessed seat there is virtually no chance of a child sliding down and out of the restraint, whereas a child sliding under the lap belt (sometimes called "submarining") can be a problem with booster seats if children are incorrectly fitted.

39.     In the United States, NHTSA has long warned against using any booster seat for any child weighing less than forty (40) pounds, noting that such use can endanger those children. Instead, both NHTSA and the American Academy of Pediatrics ("AAP") have advised that parents should continue to use seats that have an internal five (5)-point harness until their child outgrows the forward-facing harnessed seat, which is, at a minimum, until the child reaches forty (40) pounds.[15]

40.     A 2009 study recognized that "[t]he primary reasons for injuries to children restrained at the time of motor vehicle crashes" included "premature graduation from harnessed safety seats to booster seats"[16] and in 2010, NHTSA issued a report reiterating, "[f]orward-facing (convertible or combination) child seats are recommended for children age 1 to 4, or until they

---

[15] NHTSA, Car Seats and Booster Seats, www.nhtsa.gov/equipment/car-seats-and-booster-seats#find-right-car-seat-age-size-recommendations (last visited June 18, 2021); Am. Acad. of Pediatrics, Policy Statement: Child Passenger Safety (Nov. 2018), available at https://pediatrics.aappublications.org/content/pediatrics/142/5/e20182460.full.pdf

[16] See K.E. Will, et al., "Effectiveness of Child Passenger Safety Information For the Safe Transportation of Children" at 1 (NHTSA 2015), available at https://www.nhtsa.gov/sites/nhtsa.gov/files/812121-safe_transportation_of_children.pdf (citing Arbogast, et al., "Effectiveness of belt positioning booster seats: An updated assessment" (2009)

reach 40 lbs" and finding that "[e]arly graduation from child restraint seats (CRS) to booster seats may also present safety risks."[17]   In line with these findings, numerous U.S. safety organizations advise parents to continue to put their children in forward-facing child seats for as long as possible and at least until the child reaches forty (40) pounds.

41.     Between 1977 and 1985, all fifty (50) states adopted one or more laws aimed at reducing harm to infants and child passengers by requiring the use of some sort of child restraint device.[18]   In the early 1980s, states required crash testing for car seats.[19]

42.     Beginning in the 1990s, the NHTSA, as well as professional associations like the AAP, developed child passenger safety standards and guidelines that cover a wider range of child passenger safety issues and better protect children from injuries.[20]   Among other things, they emphasized the importance of three types of safety practices in protecting child passengers: (1) device-based restraints tailored to the age/size of individual child passengers; (2) rear seating; and (3) seatbelt wearing of minors who have outgrown child restraint devices but are still in need of supervision to comply with seatbelt requirements.[21]

---

[17] *See* NHTSA, "Booster Seat Effectiveness Estimates Based on CDS and State Data" at 1(July 2010), available at https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811338

[18] Child Passenger Safety Laws in the United States, 1978–2010: Policy Diffusion in the Absence of Strong Federal Intervention, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3899584/

[19] *See* Melissa Roy, "Then and Now: 25 Years of Car Seat Safety," available at https://www.sun-sentinel.com/entertainment/sfp-then-and-now-25-years-of-car-seat-safety-20150828-story.html

[20] Child Passenger Safety Laws in the United States, 1978–2010: Policy Diffusion in the Absence of Strong Federal Intervention, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3899584/

[21] Child Passenger Safety Laws in the United States, 1978–2010: Policy Diffusion in the Absence of Strong Federal Intervention, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3899584/

43.     While some child passenger safety guidelines have changed over the years, a key principle has been that parents should not move children to a booster seat until they reach the maximum weight or height of their harnessed seat.[22]

44.     Further, for approximately two decades now, the AAP, NHTSA, and other experts have warned against the dangers of booster seat use by children weighing less than 40 pounds.[23]

45.     In Canada, where Artsana also sells its Booster Seats, the sale of booster seats to children under forty (40) pounds has been prohibited since 1987.

46.     Accordingly, Artsana knew or should have known that it is dangerous for children who weigh less than forty (40) pounds to use its Booster Seats.

47.     Artsana, however, made no such warning to American consumers.   Instead Defendant actively marketed its Booster Seats to the parents of "Big Kids" weighing 30-110 pounds.

48.     Artsana was also fully aware that various safety organizations with expertise in child transportation safety had consistently recommended against using booster seats for children who weighed less than forty (40) pounds and, further, had identified the dangers and risks of using these products, especially for side-impact collisions.

49.     In 2010, NHTSA issued a report reiterating that "[f]orward-facing (convertible or combination) child seats are recommended for children . . . ***until they reach 40 lbs***" and finding

---

[22] American Academy of Pediatrics, Policy Statement: Child Passenger Safety (Nov. 2018), available at https://pediatrics.aappublications.org/content/pediatrics/142/5/e20182460.full.pdf

[23] *See*, *e.g.*, American Academy of Pediatrics, *Selecting and Using the Most Appropriate Car Safety Seats for Growing Children: Guidelines for Counseling Parents* (Mar. 2002), available at https://pediatrics.aappublications.org/content/pediatrics/109/3/550.full.pdf; National Highway Traffic Safety Administration, Premature Graduation of Children to Seat Belts (Aug. 2001), available at https://one.nhtsa.gov/people/outreach/traftech/TT253.htm

that "[e]arly graduation from child restraint seats (CRS) to booster seats may also present safety risks."[24]

50.     Moreover in 2011, the AAP issued a Policy Statement and "best practice recommendation" that children 2 to 8 years of age should remain in "convertible" or "combination" child safety seats (using integrated harnesses) so long as their weight was less than the limit for the seats.[25]   The AAP reiterated that children should remain in harnessed seats "for as long as possible before transitioning to booster seats."[26]

51.     In 2013, Consumer Reports highlighted a "disconnect between the minimum weight limits allowed by manufacturers" on booster seats, many of which gave an allowable weight as low as 30 pounds, and what the organization considered "best practice for booster use."[27] In accord with the AAP, Consumer Reports' safety experts recommended that children "remain harnessed as long as possible" and advised that, by that time, most five-point harnessed seats could accommodate children as heavy as 65 pounds, and some could even accommodate a child up to 90 pounds. Those harnessed seats were "far more secure" than a booster utilizing an adult seat belt.[28]

52.     The scientific consensus is that booster seats do not adequately protect toddlers.  CDC growth charts show that the average 30-pound child is only approximately two-and-a-half years old,

---

[24] National Highway Traffic Safety Administration, Booster Seat Effectiveness Estimates Based on CDS and State Data (July 2010), available at
https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811338

[25] American Academy of Pediatrics, Policy Statement: Child Passenger Safety, (April 2011), available at
https://pediatrics.aappublications.org/content/127/4/788?utm_source=TrendMD&utm_medium=TrendMD&utm_campaign=Pediatrics_TrendMD_0

[26] Id.

[27] Consumer Reports News, Minimum weight limits on some booster seats may put a child at risk (April 10, 2013), available at https://www.consumerreports.org/cro/news/2013/04/minimum-weight-limits-on-some-booster-seats-may-put-a-child-at-risk/index.htm

[28] Id.

far from an appropriate age to move out of a harnessed seat.[29]  To get the full safety benefit in crashes, the adult seat belt has to remain on the strong parts of a child's body: across the middle of the shoulder and across the upper thighs.  Even if toddlers are tall enough for the belt to reach the shoulders, children that young rarely sit upright for long and often wriggle out of position.

53.     Since the early 2000's, experts have recommended that children should not move to a booster seat until they reach the maximum weight or height of their harnessed seats and that kids who weigh 40 pounds or less are best protected in a seat with its own internal harness.  The Products do not have an internal harness and Defendant's weight recommendations for the Products do not comport with this standard.

54.     Nearly 20 years ago, Congress enacted a law requiring the NHTSA to implement rules to improve the safety of car seats and boosters and to minimize children's head injuries in side-impact collisions.  However, regulators never enacted standards for side-impact tests for boosters in such crashes, and those seats need only pass a crash test that simulates a head-on collision.  Defendant has taken advantage of this lack of regulation to make its own safety standards and pass its Products off as safe for side-impacts with no oversight.

**Artsana's Marketing of Booster Seats for Children as Small as 30 Pounds**

55.     Artsana ignored these nationally recognized safety guidelines and best practices for booster seats to increase its share of the booming booster seat market.

56.     Artsana's website advised parents in choosing a style of car seat for the child, that a belt positioning booster seat was a proper selection for their "Big Kids" from 30 to 100 pounds.  For example:[30]

---

[29] *See* CDC Growth Charts, available at
https://www.cdc.gov/growthcharts/data/set1clinical/cj41c021.pdf

[30] http://web.archive.org/web/20200501025458/https://www.chiccousa.com/choosing-a-car-seat/#



57.    Artsana likewise represented in its marketing literature and website that the KidFit line of Booster Seats were appropriate for children weighing 30-110 pounds:[31]



**KidFit®**

38"-57"    30-110 lbs

---

[31] http://web.archive.org/web/20200501025458/https://www.chiccousa.com/choosing-a-car-seat/#

58.     Artsana has long represented with respect to the KidFit Booster Seats: "Recommended Use High Back Booster: 30 – 100 lbs."[32]

59.     More specifically, Arstana represented the KidFit Booster Seat line was suitable for growing children, as small as 30 pounds, and offered "head and shoulder side-impact protection":[33]

- DuoZone™ 10-position head and shoulder side-impact protection
- SuperCinch® LATCH attachment and tightener
- ErgoBoost™ contoured seat with double foam padding
- 2 removable cup holders fold away when not in use
- Removable, machine-washable seat pad and armrest covers
- 2-position backrest adjusts to mimic vehicle seat position
- Removable backrest for use as backless booster

DuoZone™ Side-Impact Protection puts KidFit™ head and shoulders above the rest with 10 positions of combined head and shoulder protection for growing children. Like other Chicco car seats, KidFit™ also features SuperCinch® LATCH attachment and one-pull tightener, which helps keep the seat in place for easy in/out. Double foam padding and contoured ErgoBoost™ seat provide comfort and support in all the right places. Two soft-sided cup holders easily fold out of the way when not in use and are removable for easy cleaning. For added convenience, seat pad and arm rest covers are removable and machine-washable. Other features include easy-to-use vehicle belt guides, reclining seat, and removable backrest for use as a backless booster. Usage: High Back – 30-100 lbs; Backless – 40-110 lbs

---

[32] http://web.archive.org/web/20161203003414/http://www.chiccoshop.com/gear/new-arrivals/kidfit-2-in-1-belt-positioning-booster-car-seat---wimbledon/00079014540070.html

[33] http://web.archive.org/web/20150214213636/http://www.chiccousa.com/gear/car-seats/kidfit-belt-positioning-booster-coupe.aspx

60.     Artsana further repeated its representations that the KidFit Booster Seats were safe for children weighing as little as 30 pounds in the KidFit Product Manual:[34]



61.     Artsana used the risks associated with side-impact collisions to market its Booster Seats to consumers.  For example, Artsana's promotion of the Products promised "Side-Impact Protection For The Way Kids Grow" and "head and torso protection throughout every stage:" [35]

## Side-Impact Protection For the Way Kids Grow

The KidFit® has 10 height positions and adjusts from the waist—instead of at the neck—
providing head and torso protection throughout every stage.







| **Protection** | **Stability** | **Comfort** |
| 10-position DuoGuard® protection | LATCH attachment and SuperCinch® tightener | ErgoBoost® padded, contoured seat |

---

[34] http://web.archive.org/web/20171221041141/http://demandware.edgesuite.net/aamt_prd/on/de
mandware.static/-/Sites-chicco_catalog/default/dwaff85336/images/products/Manuals/Chicco-
KidFit-Booster-Car-Seat-Manual.pdf

[35] http://web.archive.org/web/20200813114541if_/https://www.chiccousa.com/kidfit/

62.     In particular, Artsana represented KidFit offered unique and proprietary "DuoGuard" or "DuoZone"[36] protection:



## Features



**DuoGuard**

Head and torso protection with a rigid shell and energy-absorbing EPS foam throughout 10 height positions



SIDE-IMPACT PROTECTION

DuoZone head and shoulder protection with 10 positions for the way kids grow

63.     Specifically, Artsana represented the KidFit Booster Seats were recommended for children who weighed as little as 30 pounds, and offered DuoGuard or DuoZone side-impact protection to "surround two zones: the head and torso":[37]

---

[36] http://web.archive.org/web/20200921112847/https://www.chiccousa.com/shop-our-products/car-seats/booster/kidfit-2-in-1-belt-positioning-booster-car-seat---celeste/06079014250070.html

[37] http://web.archive.org/web/20200921112847/https://www.chiccousa.com/shop-our-products/car-seats/booster/kidfit-2-in-1-belt-positioning-booster-car-seat---celeste/06079014250070.html



### Head and Shoulders Above the Rest!

The IIHS Best Bet KidFit® Booster is designed with 10 positions of DuoGuard® protection for the way kids grow. With height adjustment from the waist—instead of at the neck—KidFit® offers both head and torso protection throughout every stage.

### Built for Protection, Stability, and Comfort

KidFit® is equipped with premium LATCH connectors and a SuperCinch® one-pull tightener to stabilize the seat for easy in/out and keep it secured when unoccupied. Belt guides make it easy to position the vehicle seat belt and integrated side wings are lined with EPS energy-absorbing foam for improved impact protection.

A contoured ErgoBoost® seat with double foam padding provides comfort and support in all the right places, and a 2-position backrest adjusts to mimic the vehicle seat position. The backrest is also removable to create a backless booster for older children.

### Convenient and Roadtrip-Ready

Two dishwasher-safe CupFolders™ fold out of the way when empty and are easy to remove for cleaning. All fabrics, including armrest covers, are removable and machine-washable.

- DuoGuard® head and torso protection with 10 positions
- Premium LATCH connectors with SuperCinch® one-pull tightener
- ErgoBoost® contoured seat with double foam padding
- Removable, machine-washable seat pad, cushions, and armrest covers
- 2 dishwasher-safe CupFolders™ are easy to remove and fold away to save space
- Integrated side wings lined with EPS energy-absorbing foam for improved impact protection
- 2-position backrest adjusts to mimic vehicle seat position
- Easy-to-use vehicle belt guides
- Backrest is removable to create a backless booster for older children

### Usage

The KidFit® is designed for children who are at least 4 years of age, between 38-57 inches tall, between 30-100 pounds in high-back mode and 40-110 pounds in backless mode, and can sit relatively still in the same seated position throughout the car ride..

### Care and Maintenance

Hand wash fabrics using mild soap and water, or machine wash in cold water on delicate cycle using mild detergent; hang to dry. The foam insert may be hand rinsed; hang to dry. For plastic parts, sponge clean using warm water and mild soap; towel dry. Do not use bleach on fabric, foam or plastic parts.

✕

Because automobile seat belts are designed for adults, the Insurance Institute for Highway Safety (IIHS) evaluates belt positioning boosters on their ability to provide good lap and shoulder belt fit. "Best Bets" are the highest rating and according to IIHS, they provide good belt fit for typical 4 to 8-year-old children in almost any car, minivan or SUV.

✕

Side impact protection for convertible and booster car seats. Includes two layers of protection, a rigid shell and EPS energy-absorbing foam, that surround two zones: the head and torso.

64.     These representations appeared prominently on Product packaging:





65.    The representations also appeared as top product features on retailers' websites:

**Usage:**

High Back – 30-100 lbs
Backless – 40-110 lbs

**Features:**

DuoZone™ 10-position head and shoulder side-impact protection
SuperCinch® LATCH attachment and tightener
ErgoBoost™ contoured seat with double foam padding
2 removable cup holders fold away when not in use
Removable, machine-washable seat pad and armrest covers
2-position backrest adjusts to mimic vehicle seat position
Removable backrest for use as backless booster

66.    Indeed, they continue to appear on some major retailers' websites, such as Kohls, to this day:

Product Details      Shipping & Returns

The IIHS Best Bet Chicco KidFit Belt-Positioning Booster is designed with 10 positions of DuoZone side-impact protection for the way kids grow.

PRODUCT FEATURES
- DuoZone head and shoulder side-impact protection with 10 positions
- Premium LATCH connectors with SuperCinch one-pull tightener
- Easy-to-use vehicle belt guides
- High-back mode: 30-100 pounds
- Backless mode: 40-110 pounds
- Height range: 38-57 inches tall

67.    The thirty (30)-pound minimum weight was specifically intended by Artsana to convince parents to move their small children out of full, safety harness-restrained child car seats and into the Booster Seats, generating profits for Artsana, but endangering children.

68.     Consumers trust and rely on Artsana's representations regarding safety and dangerously place children in the Booster Seats who are much too young to ride in them safely.

**<u>Congressional Investigation</u>**

69.     In February 2020, Subcommittee Chair Raja Krishnamoorthi and Subcommittee Member Katie Porter launched an investigation into booster seat safety following reports that Evenflo's "Big Kid" seats are not safe, particularly for children under 40 pounds.  Throughout the investigation, Krishnamoorthi and Porter requested documents and information from seven of the nation's largest booster seat manufacturers: Artsana (seller of Chicco brand), Baby Trend, Britax, Artsana, Evenflo, Graco, and KidsEmbrace.

70.     This investigation ultimately resulted in the Congressional Report.  The Report was "based on a review of thousands of pages of previously non-public documents from those seven companies, including internal records detailing side-impact testing protocols; written results of side-impact tests; video tapes of side-impact tests; and internal communications regarding marketing, instructions, and safety labeling."[38]  Those internal non-public documents were not available to Plaintiff and members of the Class.

71.     Based upon this investigation, the Congressional Report found:

> *that manufacturers of booster seats have endangered the lives of millions of American children and misled consumers about the safety of booster seats by failing to conduct appropriate side-impact testing, deceiving consumers with false and misleading statements and material omissions about their side-impact testing protocols, and unsafely recommending that children under 40 pounds and as light as 30 pounds can use booster seats.[39]*

72.     The Congressional Report went on to find that in flagrant disregard for the safety of children:

---

[38] Congressional Report at 1.

[39] *Id.*

Artsana . . . also made the unsafe recommendation of a 30-pound minimum weight for their booster seats at the time the Subcommittee launched this inquiry. Since then, Graco has corrected that practice and adopted a 40-pound recommendation. Baby Trend, *Artsana*, and KidsEmbrace *continue to market their booster seats for children between 30 and 40 pounds.*[40]

73.     The Congressional Report also found, to gain further trust of consumers, Artsana markets its proprietary "DuoGuard" protection, which it claims "offers two layers of side-impact protection for the head and torso." The Report found the company advertises this feature on its website and on booster seat labels and indeed noted Artsana tells parents that with DuoGuard they should "Rest Assured":[41]

 

74.     However, the Congressional Report found Artsana omitted material information with regards to its claims of the safety offered by its proprietary "DuoGuard" protection. First, the Report found "no evidence that the DuoGuard feature provides any protection."[42] In fact, Artsana's own side-impact tests showed that its Booster Seats fail to offer such protection. Below is an image from the Congressional Report taken from a previously non-public Artsana booster seat side-impact test,

---

[40]Congressional Report at 8; *see also Artsana*, USAKidFit 2-in-1 Belt Positioning Booster Car Seat—Horizon (available at https://web.archive.org/web/20200925062340/https://www.chiccousa.com/shop-our-products/car-seats/booster/kidfit-2-in-1-belt-positioning-booster-car-seat---celeste/06079014250070.html) (citing a capture dated Sept. 25, 2020).

[41] Congressional Report at 24.

[42] *Id.* at 25.

in which the dummy's head moved beyond the booster seat's headrest and is not protected from a side-impact intrusion.  If that were to happen during an actual crash, a child would likely suffer severe bodily harm or death.[43]



75.     Additional screen captures from the Arstana side-impact collision testing – which were not previously available to the public, likewise show Artsana's Booster Seats fail in their own testing:[44]

---

[43] *Id.*

[44] Artsana, KidFit Side Impact Test (Sept. 4, 2014) (available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/28%20-%20Artsana%20Test%20Image.pdf).







76.     As a result, the Congressional Report concluded Artsana made "unsubstantiated claims about proprietary safety features in side-impact crashes.  Such features are untested, and their advertisements provide consumers with a false sense of security. It is unfair and deceptive to advertise a safety feature without evidence that it improves safety."[45]

77.     These findings are reinforced by a review of booster seats conducted by Wirecutter, which commissioned independent lab testing of various booster seat models in 2018. Wirecutter reported that the KidFit model "did not prevent head contact in our side-impact testing."[46]

78.     A disturbing video from the KidFit crash test included in Wirecutter's review shows that "the dummy made head contact with the door in crash testing."

---

[45] Congressional Report at 22.

[46] https://www.nytimes.com/wirecutter/reviews/best-booster-car-seats/.



The dummy in the Chicco KidFit did make head impact with the door during our crash testing, though overall the seat scored well. Video: Calspan

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

79.     Artsana had actual knowledge for several years that the packaging, marketing, and labeling of its Booster Seats was deceptive and misleading because its Booster Seats have never been safe for children weighing 30 to 39 pounds and Artsana had no basis or substantiation for its claims that its Booster Seats' "DuoGuard" technology would protect children, let alone children weighing less than 40 pounds, in side-impact collisions.

80.     Artsana had a duty to disclose to Plaintiff and the Class members the true quality and nature of its Booster Seats, including that the Booster Seats did not have any special features that actually provided side-impact protection and that they are in fact dangerous for children weighing less than 40 pounds or in a side-impact collision.

81.     This duty to disclose arose, among other things, from Artsana's representations to

consumers that the Booster Seats were safe for children weighing as little as 30 pounds and that its "DuoGuard" technology provided children with protection in side-impact collisions.

82.     Prior to selling the Booster Seats, Artsana knew or – but for its extreme recklessness—should have known that the Booster Seats posed a risk to children weighing less than 40 pounds and were not safe in a side-impact collision and that Artsana's DuoGuard safety representations were false and made without any evidence or substantiation supporting them.

83.     Despite its knowledge of the falsity of its representations, Artsana actively concealed this material information from Plaintiff and other Class members.  Artsana continued to market the Booster Seats as safe for children weighing as little as 30 pounds and in side-impact collisions and as offering special protection in a side-impact collision.

84.     In order to maintain and to grow its market share while maximizing the price that it could charge and in order to prevent Plaintiff and other Class members from seeking remedies for the misrepresentations, Artsana actively concealed the actual quality, nature and testing of its Booster Seats.

85.     Plaintiff and the other Class members justifiably relied on Artsana to disclose the true quality and nature of the Booster Seats they purchased, because the truth was not discoverable by Plaintiff and the other Class members through reasonable efforts.  Any applicable statute of limitations has been tolled by Artsana's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

86.     Moreover, Plaintiff and other Class members, through the exercise of reasonable diligence, could not have discovered Artsana's wrongdoing and illegal conduct.  Nor could Plaintiff and other Class members have known of facts that would have caused a reasonable person to suspect that Artsana knowingly failed to disclose material information to U.S. consumers about the quality, nature or testing of the Booster Seats or the inadequacy of its touted safety features.

87.     As such, no potentially relevant statute of limitations should be applied.

## COUNT I
### Deceptive Acts Or Practices, New York Gen. Bus. Law § 349

89.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

90.     Plaintiff brings this claim individually and on behalf of members of the New York Subclass against Defendant.

91.     By the acts and conduct alleged herein, Defendant has committed unfair or deceptive acts and practices by making false representations and omissions on the label and in the advertising of the Products.

92.     The foregoing deceptive acts and practices were directed at consumers.

93.     The foregoing deceptive acts and practices are misleading in a material way because the Booster Seats are not in fact safe for children as small as 30 pounds, nor do they offer side-impact protection.

94.     Plaintiff and members of the New York Subclass were injured as a result because (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the misrepresentations and omissions that the Products are not safe for children as small as 30 pounds, nor do they offer side-impact protection.

95.     On behalf of herself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

<u>**COUNT II**</u>
**False Advertising, New York Gen. Bus. Law § 350**

96.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

97.     Plaintiff brings this claim individually and on behalf of members of the New York Subclass against Defendant.

98.     Based on the foregoing, Defendant has engaged in consumer-oriented conduct that is deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law because the Products are not safe for children as small as 30 pounds, nor do they offer side-impact protection.  The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

99.     This misrepresentation has resulted in consumer injury or harm to the public interest.

100.     As a result of this misrepresentation, Plaintiff and members of the New York Subclass have suffered economic injury because (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the misrepresentations and omissions that the Products are not safe for children as small as 30 pounds, nor do they offer side-impact protection.

101.     On behalf of herself and other members of the New York Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT III
### Fraud

102.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

103.    Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

104.    As discussed above, Defendant represented that the Products were suitable for children as small as 30 pounds and offered side-impact protection.  However, Defendant failed to disclose to Class members that the Products failed Defendant's own testing and use of the Products could cause severe injury or death in the event of a collision.

105.    The false and misleading representations and omissions were made with knowledge of their falsehood.

106.    The false and misleading representations and omissions were made by Defendant, upon which Plaintiff and members of the Class reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and Class members to purchase the Products.

107.    The fraudulent actions of Defendant caused damage to Plaintiff and members of the Class, who are entitled to damages and other legal and equitable relief as a result.

## COUNT IV
### Unjust Enrichment

108.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

109.    Plaintiff brings this claim individually and on behalf of members of the Class against Defendant.

110.    Plaintiff and Class members conferred benefits on Defendant by purchasing the Products.

111.     Defendant has knowledge of such benefits.

112.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and Class members' purchases of the Products.  Retention of those monies under these circumstances is unjust and inequitable because Defendant represented that the Products were safe, suitable for children as small as 30 pounds, and offered side-impact protection, when in fact they were not and did not.

113.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class members for its unjust enrichment, as ordered by the Court.

<u>**COUNT V**</u>
**Breach of the Implied Warranty of Merchantability**

114.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

115.     Plaintiff brings this claim individually and on behalf of members of the Class against Defendant.

116.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that that the Products are merchantable as a booster seat, suitable for children as small as 30 pounds, and offered side-impact protection.

117.     Defendant breached the warranty implied in the contract for the sale of the Products because the Products were not merchantable or fit for their intended and ordinary purpose, they could not "pass without objection in the trade under the contract description," the goods were not "of fair average quality within the description," the goods were not "adequately contained, packaged, and labeled as the agreement may require," and the goods did not "conform to the promise or affirmations of fact made on the container or label."  *See* U.C.C. § 2-314(2) (listing

requirements for merchantability).  As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

118.   Plaintiff and Class members purchased the Products relying on Defendant's skill and judgment in properly packaging and labeling the Products.

119.   Plaintiff and Class members were the intended consumers of the Booster Seats. That is, the retailers through which Defendant sold its product were not intended to be the ultimate consumers of the Products and have no rights under the warranties provided with the Booster Seats. The warranties are designed for and intended to benefit the ultimate consumers only.  Plaintiff is an ultimate consumer.  Accordingly, Plaintiff and Class members are third-party beneficiaries consistent with New York law.

120.   The Products were not altered by Plaintiff or Class members.

121.   The Products were defective when they left the exclusive control of Defendant.

122.   Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and Class members.

123.   The Products were defectively designed and unfit for their intended purpose and Plaintiff and Class members did not receive the goods as warranted.

124.   As a direct and proximate result of Defendant's breach of the implied warranty, Plaintiff and Class members have been injured and harmed because they would not have purchased the Products if they knew the truth about the product and that the product they received was worth substantially less than the product they were promised and expected.

## <u>COUNT VI</u>
### Breach of Express Warranty

64.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

65. Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

66. Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted on its packaging and other marketing materials that the Products were suitable for children as small as 30 pounds and that the Products offered side-impact protection.

67. This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain between Plaintiff and the members of the Class and New York Subclass and Defendant.

68. Defendant breached its express warranties because Defendant's statements about the Products were false and the Products do not conform to Defendant's affirmations and promises described above.  In fact, the Products are not safe for use or suitable for children as small as 30 pounds, and do not pass any side-impact testing or offer side-impact protection.

69. Plaintiff and the Class members were injured as a direct and proximate result of Defendant's breach because:  (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Products had been known; (b) they paid a price premium due to Defendant's misrepresentations about the Products; and (c) the Products did not perform as promised.

70. On February 19, 2021, prior to filing this action, Defendant was served with a presuit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607.  Plaintiff's counsel sent Defendant a letter advising it that it had breached its warranties to purchasers of the Products and demanded that it cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of herself and members of the Class and New York Subclass as follows:

a.      For an order certifying the Class and the New York Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and New York Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and New York Subclass members;

b.      For an order declaring that Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiff, the Class, and the New York Subclass on all counts asserted herein;

d.      For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e.      For injunctive relief enjoining the illegal acts detailed herein;

f.      For prejudgment interest on all amounts awarded;

g.      For an order of restitution and all other forms of equitable monetary relief;

h.      For an order awarding Plaintiff and the Class and New York Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  September 23, 2021                   Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:_____*/s/ Alec M. Leslie*_____
        Alec M. Leslie

Alec M. Leslie
888 Seventh Avenue
New York, NY  10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email:  aleslie@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (*Pro Hac Vice* Forthcoming)
Sean L. Litteral  (*Pro Hac Vice* Forthcoming)

1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:   (925) 407-2700
Email:  ltfisher@bursor.com
　　　　slitteral@bursor.com

**VOZZOLO LLC**
Antonio Vozzolo
Andrea Clisura
345 Route 17 South
Upper Saddle River, NJ 07458
Telephone: (201) 630-8820
Facsimile:  (201) 604-8400
Email:  avozzolo@vozzolo.com
　　　　aclisura@vozzolo.com

*Attorneys for Plaintiff*