## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MASHAYILA SAYERS, BRITTNEY TINKER, JENNIFER MONACHINO, KIMBERLY MULLINS, HILDA MICHELLE MURPHREE, and AMANDA JIMENEZ,** *on behalf of themselves and all others similarly situated*, <br><br> Plaintiffs, <br> v. <br><br> **ARTSANA USA, INC.,** <br><br> Defendant. | Civil Action No.: 2021-cv-7933 <br><br> **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Mashayila Sayers, Brittney Tinker, Jennifer Monachino, Kimberly Mullins, Hilda Michelle Murphree, and Amanda Jimenez (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action lawsuit against Artsana USA, Inc. ("Defendant" or "Artsana") based upon personal knowledge as to themselves and their own actions, due investigation of undersigned counsel, and upon information and belief as to all other matters.

## INTRODUCTION

1.      Motor vehicle accidents are a leading cause of death among children.[1]

---

[1] https://www.cdc.gov/transportationsafety/child_passenger_safety/cps-factsheet.html (last visited January 17, 2023).

Consequently, the child car seat and booster seat industry is big business. Indeed, by one estimate, the market size was valued for 2020 at $7.93 billion worldwide and forecast to grow to $10.87 billion in 2025.[2]

2.      Perhaps not surprisingly, the industry is highly competitive with brands like Chicco (manufactured by defendant Artsana), Evenflo, and Graco (among others) jockeying for competitive advantage and a larger piece of this tremendously lucrative market.

3.      Booster seats, which use a car's own seat belt system to restrain a child, provide less protection in a motor vehicle collision than car seats with harnesses. Nonetheless, manufacturers, eager to increase their sales, have engaged in marketing designed to encourage parents to move their children from car seats to booster seats as early as possible notwithstanding unanimous safety recommendations.

4.      Since the average parent is not in a position to conduct his or her own safety testing, in order to make informed purchasing decisions, they must rely on the marketing, labeling, and representations of booster seat manufacturers regarding the safety of a given booster seat and its appropriateness for children of a specific age and/or size.

5.      Until the end of 2020, Artsana, in order to increase its booster seat sales,

---

[2]      https://www.grandviewresearch.com/industry-analysis/baby-car-seat-market (last visited October 27, 2022).

consistently assured parents that its booster seats were safe for children weighing as little as 30 pounds.  However, the National Highway Traffic Safety Administration ("NHTSA") and the American Academy of Pediatrics ("AAP") have agreed for decades that children under 40 pounds should remain in harnessed car seats and, in the last decade, along with the Center for Disease Control ("CDC"), have agreed that children should remain in harnessed car seats until they reach the maximum weight for that car seat, usually 65 to 90 pounds.

6.     Further, booster seat manufacturers, including Artsana, have for years exploited legitimate fears of side-impact collisions.  In 2018, for example, side-impact collisions accounted for approximately 25% of the fatalities for children under the age of 15.  Children who survive side-impact collisions often sustain serious injuries such as traumatic brain injuries, concussions, neck injuries, whiplash, broken bones, spinal cord injuries, or paralysis.[3]  The manufacturers have sought to increase their booster seat sales by proclaiming to consumers that their booster seats have special side-impact protection and that the booster seats have been side-impact tested.

---

[3] Subcommittee on Economic and Consumer Policy, Staff Report, "Booster Seat Manufacturers Give Parents Dangerous Advice: Misleading Claims, Meaningless Safety Testing, and Unsafe Recommendations to Parents About When They Can Transition Their Children from Car Seats to Booster Seats at 1 (Dec. 10, 2020),

7.       To encourage parents not only to purchase its booster seats but also to pay a higher price for its models, Defendant Artsana markets its booster seats as having its proprietary "DuoGuard" side-impact protection, claiming that DuoGuard "offers two layers of side-impact protection for the head and torso."  The company advertises this feature on its boxes, on its website, and on booster seat labels":

 

8.       Simply put, Artsana's booster seats do *not* appreciably reduce the risk of serious injury or death from side-impact collisions, its testing does *not* show that the booster seats are safe in a side-impact collision, and the booster seats are *not* safe for children under 40 pounds.

9.       On December 10, 2020 – after a 10-month investigation of the seven leading booster seat manufacturers, including Defendant Artsana – the U.S. House of Representatives Subcommittee on Economic and Consumer Policy published a report of the results of that investigation: *Booster Seat Manufacturers Give Parents Dangerous Advice: Misleading Claims, Meaningless Safety Testing, and Unsafe Recommendations to Parents About When They Can Transition Their Children from*

*Car Seats to Booster Seats*.[4]

10.     Based on a review of thousands of previously non-public documents produced by the seven manufacturers, the House Subcommittee Report concluded that booster seat manufacturers, including Defendant Artsana, "have endangered the lives of millions of American children and misled consumers about the safety of booster seats by failing to conduct appropriate side-impact testing [and] deceiving consumers with false and misleading statements and material omissions about their side-impact testing protocols . . . and unsafely recommending that children under 40 pounds and as light as 30 pounds can use booster seats."[5]

11.     With respect to Artsana, the House Subcommittee Report specifically found that "[d]espite a decades-old expert consensus that booster seats are not safe for children under 40 pounds," Artsana "marketed booster seats for children as light as 30 pounds" and even though other manufacturers had "switched to a 40-pound standard as a result of the Subcommittee's investigation, . . . Artsana . . . continue[s] to make the unsafe recommendation for 30-pound children to use their booster seats."[6]

12.     The House Subcommittee Report further found that Artsana

---

[4] *Id.*

[5] *Id.* at 1.

[6] *Id.* at 2.

"deceptively market[s] their booster seats with unsubstantiated claims about 'safety features,' while failing to disclose that those features have not been objectively shown to increase child safety."[7]  Specifically, "Artsana omits material information. There is no evidence that the DuoGuard feature provides any protection."[8]  The Report also included a picture of an Artsana booster seat side-impact test that showed the child-sized dummy's head moving beyond the booster seat's headrest, demonstrating that Artsana's purported DuoGuard feature left a child's head and neck vulnerable to serious injury in a side-impact collision. The Report concluded: "It is unfair and deceptive to advertise a safety feature without evidence that it improves safety."[9]

13.     In short, in an effort to achieve maximum profits in a fiercely competitive market, Defendant Artsana has deceived parents with its false and misleading marketing into believing (1) that they can safely move their children from car seats with harnesses to a booster seat when their child weighed as little as 30 pounds, (2) that they could move their children to a booster seat without fear of motor vehicle collisions, and (3) that Artsana has superior safety technology giving their seats a higher market value.

---

[7] *Id.* at 3.
[8] *Id.* at 25.
[9] *Id.* at 22.

14.     Plaintiffs bring this action individually and on behalf of all other similarly situated consumers to halt the dissemination of Defendant's fraudulent and misleading representations, to correct the false and misleading perceptions that Defendant has created in the minds of consumers, and to obtain redress for those who have actually purchased Artsana booster seats.

15.     Consumers, including Plaintiffs, who purchased Artsana's booster seats did not receive the benefit of their bargain in that they paid for but did not receive (1) a booster seat with special protection for side-impact collisions, and (2) a booster seat safe for children weighing 30 to 39 pounds.  Had Plaintiffs known the truth, they would not have purchased Artsana's booster seats, or they would not have paid as much for the booster seats.

## PARTIES

16.     Plaintiff Mashayila Sayers is a citizen and resident of Denver, Colorado.

17.     Plaintiff Brittney Tinker is a citizen and resident of Miami, Florida.

18.     Plaintiff Jennifer Monachino is a citizen and resident of Yorkville, Illinois.

19.     Plaintiff Kimberly Mullins is a citizen and resident of Baltimore, Maryland.

20.     Plaintiff Hilda Michelle Murphree is a citizen and resident of

Bridgeport, Texas.

21.     Plaintiff Amanda Jimenez is a citizen and resident of Newburgh, New York.

22.     Defendant Artsana USA, Inc. is a New Jersey corporation with its principal place of business located at 1826 William Penn Way, Lancaster, Pennsylvania.  Artsana USA, Inc. is part of the Artsana Group of companies and Artsana S.p.A, which is an Italian company that makes and sells children's products globally.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, as this class action lawsuit alleges a claim under the Magnuson-Moss Warranty Act, the amount in controversy is equal to or exceeds $50,000 (exclusive of interest and costs), there are more than 100 Class Members, and the amount-in-controversy of any individual claim exceeds $25.  *See* 15 U.S.C. § 2310(d)(3)(B).

24.     This Court also has original jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 Class Members, and at least one Class Member is a citizen of a state different from Artsana.

25.     The Court has supplemental jurisdiction over the state law claims

pursuant to 28 U.S.C. § 1367.

26.     This Court has personal jurisdiction over Artsana because it purposefully avails itself of the New York consumer market and distributes the Products to at least hundreds of locations within this County and thousands of retail locations throughout New York, where the Products are purchased by thousands of consumers every week.

27.     Venue is proper in this District under 28 U.S.C. § 1391(a).  Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information and omissions regarding the Products, occurred within this District.

## GENERAL FACTUAL ALLEGATIONS

### A.     The Development of the Car Seat Market

28.     The first child restraint systems were introduced in 1968, and the first child passenger safety law was passed in Tennessee 10 years later.

29.     In the late 1970s, the U.S. public's increasing awareness of the high rates of morbidity and mortality for child passengers resulted in a rapid proliferation of numerous state laws on the issue.  Between 1977 and 1985, all 50 states adopted laws aimed at reducing harm to infants and child passengers traveling in vehicles by requiring the use of child restraint devices.

30.     In the early 1980s, states started requiring crash testing for car seats.

9

31.     There is and has been a wealth of industry data, recommendations, and "best practice" guidelines not readily available to consumers about the appropriate weight range for children to use booster seats.

32.     For example, the "1989 AAP Car Safety Guidelines" adopted by the American Academy of Pediatrics ("AAP") recommended keeping a child in a convertible seat "for as long as possible" and using booster seats only for children 40 pounds and over.

33.     Upon information and belief, Artsana knew about a NHTSA flier pending approval in 1992 that stated: "A toddler over one year of age, weighing 20 to 40 pounds, is not big enough for a booster seat in a car.  He needs the extra protection for his upper body and head that a harness with hip and shoulder straps can give."

34.     This flier was included in a 1996 safety study issued by the National Transportation Safety Board.[10]

---

[10]     National Transportation Safety Board, Safety Study, *The Performance And Use Of Child Restraint Systems, Seat Belts And Airbags For Children In Passenger Vehicles, Volume 1: Analysis*. NTSB/SS – 96/01. (1996), *available at* https://books.google.com/books?id=Ufw5AQAAMAAJ&pg=PA125&lpg=PA125 &dq=%22A+toddler+over+one+year+of+age,+weighing+20+to+40+pounds,+is+n ot+big+enough+for+a+booster+seat%22&source=bl&ots=_CgFFf67VI&sig=ACf U3U0sxpAZJs_K01GyMYG_- ivhhjuFA&hl=en&sa=X&ved=2ahUKEwiRicD4moXtAhXBGs0KHfxGDccQ6AE wAHoECAIQAg#v=onepage&q&f=false (last visited January 17, 2023).

35.     Beginning in the 1990s, NHTSA, as well as professional associations like the AAP, developed child passenger safety standards and guidelines that cover a wider range of child passenger safety issues and better protect children from injuries.  Among other things, they emphasized the importance of designing and using child safety restraints tailored to the age and size of individual child passengers.

36.     Though models vary, the market for children's car safety seats is generally grouped around the three basic designs that track, sequentially, with children's growing weights and heights: rear-facing seats, forward-facing seats with harnesses, and belt-positioning booster seats.

37.     Booster seats use the car's own seat belt system to restrain the child. The booster seats "boost" the child's height so that the car's seat belt is positioned to fit properly over the stronger parts of the child's body.[11]

38.     In 2000, Massachusetts and California implemented laws requiring booster seats for children over 40 pounds.

39.     In the early 2000s, the CDC Task Force strongly recommended that states adopt laws mandating the use of age and size appropriate child restraints. Subsequently, the NHTSA and AAP guidelines were updated with similar emphasis.

---

[11] https://www.nhtsa.gov/equipment/car-seats-and-booster-seats#car-seat-types (last visited January 17, 2023).

The CDC has since established the following guidelines for transitioning children from one type of child restraint system to another:[12]

**Know the stages**

Make sure children are properly buckled in a car seat, booster seat, or seat belt— whichever is appropriate for their weight, height, and age.

- **Rear-facing car seat:** Birth until age 2-4.
  For the best possible protection, infants and toddlers should be buckled in a rear-facing car seat in the back seat until they reach the upper weight or height limits of their seat. Check the seat owner's manual and labels on the seat for weight and height limits.

- **Forward-facing car seat:** After outgrowing rear-facing seat and until at least age 5.
  When children outgrow their rear-facing seats, they should be buckled in a forward-facing car seat in the back seat until they reach the upper weight or height limit of their seat. Check the seat owner's manual and labels on the seat for weight and height limits.

- **Booster seat:** After outgrowing forward-facing seat and until seat belts fit properly.
  Once children outgrow their forward-facing seat, they should be buckled in a belt-positioning booster seat until seat belts fit properly. Seat belts fit properly when the lap belt lays across the upper thighs (not the stomach) and the shoulder belt lays across the chest (not the neck). Proper seat belt fit usually occurs when children are about 4 feet 9 inches tall and 9-12 years old.

40.    In 2010, NHTSA issued a report reiterating that "[f]orward-facing (convertible or combination) child seats are recommended for children age 1 to 4, or until they reach 40 lbs" and finding that "[e]arly graduation from child restraint seats

_____

[12] *See* https://www.cdc.gov/transportationsafety/child_passenger_safety/cps-factsheet.html (last visited January 17, 2023).

(CRS) to booster seats may also present safety risks."[13]   These recommended convertible or combination safety seats use integrated harnesses, rather than seatbelts, to keep children in place.

41.    And, in 2011, the AAP revised its 1989 Policy Statement, issuing a best practice recommendation that children from 2 to 8 years of age should remain in convertible or combination child safety seats, so long as their weight was less than the limit for the seats.  NHTSA updated its guidelines shortly thereafter to reflect the AAP's recommendations:[14]

---

[13]    *See* NHTSA, "Booster Seat Effectiveness Estimates Based on CDS and State Data,"   https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811338   (last visited January 17, 2023).

[14]    *See* NHTSA, "NHTSA Releases New Child Seat Guidelines" (March 21, 2011), *available at* https://www.autoblog.com/2011/03/21/nhtsa-issues-new-child-seat-guidelines/#:~:text=NHTSA%20issues%20new%20child%20seat%20guidelines%201%20,in%20front%20of%20an%20active%20passenger%20air%20bag   (last visited January 17, 2023).



42.     According to the AAP, the most recent evidence-based, best practices

for optimizing child passenger safety include:

a.      All infants and toddlers should ride in a rear-facing car safety seat as long as possible, until they reach the highest weight or height allowed by their car seat manufacturer. Most convertible seats have limits that will permit children to ride rear-facing for 2 years or more.

b.      All children who have outgrown the rear-facing weight or height limit for their seat should use a forward-facing seat with a

harness for as long as possible, up to the highest weight or height allowed by the manufacturer.

c.      All children whose weight or height exceed the forward-facing limit for their car seat should use a belt-positioning booster seat until the vehicle lap and shoulder seat belt fits properly, typically when they have reached 4 feet, 9 inches in height and are between 8 and 12 years of age.[15]

43.      While car seat recommendations have changed, the AAP has long embraced one central principle: parents should not move children from a harnessed seat to a booster seat until they reach the maximum weight or height of their harnessed seat.

44.      Specifically, since the early 2000s, the AAP has advised that children who weigh 40 pounds or less—at the time, the weight limit of most harnessed seats—are best protected in a seat with its own internal harness.  Today, almost all harnessed seats can accommodate children up to 65 pounds and as tall as 4 feet, 1 inch, and some fit children up to 90 pounds.

45.      And even the original 40-pound threshold is no longer considered ideal.  Since 2011, the AAP has recommended (consistent with the above) that children stay in harnessed seats "as long as possible"—that is, in many cases, until they are 65 pounds (and in some cases up to 90 pounds).

---

[15]      *See* Dennis R. Durbin, *et al*., *Child Passenger Safety*, 142(5) PEDIATRICS (2018), *available at* https://pediatrics.aappublications.org/content/142/5/e20182460 (last visited January 17, 2023).

46.     These thresholds are crucial because, according to scientific consensus, booster seats *do not adequately protect toddlers weighing under 40 pounds*.  To deliver its full safety benefit in a crash, an adult seat belt must remain on the strong parts of a child's body—*i.e.*, across the middle of the shoulder and the upper thighs.  Even if young children are tall enough for a belt to reach their shoulders, they rarely sit upright for long and often wriggle out of position.

47.     By contrast, a tightly adjusted five-point harness secures a child's shoulders and hips, and goes between the legs.  Harnesses secure children's bodies so that they are less likely to be ejected in a collision, and they disperse crash forces over a wider area.

48.     Even for children weighing 40 pounds or more, booster seats are not as safe as fully-harnessed seats and, as the House Subcommittee Report found, placing a child in a booster seat too early greatly increases risk of serious injury or death in a crash.[16]

49.     Studies have compared the safety results of children in harness seats and booster seats versus children of the same age who are only wearing a seatbelt and are not in any child safety seat.  *Child safety seats*, including car seats with harnesses, reduce the risk of injury to a child in a motor vehicle accident by 71% to

---

[16] House Subcommittee Report at 4.

as much as 82% over a child of the same age using only a seat belt.  In comparison, *booster seats* only reduce the risk of injury to a child by 45% as compared to a child of the same age just wearing a seat belt.[17]

50.   A 2009 NHTSA study recognized that "[t]he primary reasons for injuries to children restrained at the time of motor vehicle crashes" include "premature graduation from harnessed safety seats to booster seats."[18]  In 2010, NHTSA issued a report, finding that "[e]arly graduation from child restraint seats (CRS) to booster seats may also present safety risks."[19]

### B.   Efforts to Improve Safety of Car Seats and Booster Seats

51.   In an effort to ensure that child restraint systems were protecting children from injury, states started requiring crash testing for car seats in the early 1980s.

52.   NHTSA adopted a rule setting forth certain safety standards relating

---

[17] https://pediatrics.aappublications.org/content/142/5/e20182460 (last visited January 17, 2023).

[18] *See* K.E. Will, et al., "Effectiveness of Child Passenger Safety Information For the Safe Transportation of Children," (NHTSA 2015) at 1, *available at* https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/812121-safe_transportation_of_children.pdf  (citing Arbogast et al., "Effectiveness of belt positioning booster seats: An updated assessment" (2009) (last visited January 17, 2023).

[19]*See* NHTSA, "Booster Seat Effectiveness Estimates Based on CDS and State Data," https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/811338 (July 2010) (last visited January 17, 2023).

to car seats and booster seats, including testing of car seats and booster seats, in its Federal Motor Vehicle Safety Standard ("FMVSS") No. 213, 49 C.F.R. § 471.213. Car seats and booster seats not meeting the requirements of FMVSS No. 213 may not be sold. Therefore, all car seats and booster seats on the market must meet the standards of FMVSS No. 213.

53.     FMVSS No. 213 does not, however, include any requirements regarding side-impact protection or side-impact testing for booster seats.

54.     In 2000, Congress directed NHTSA to "initiate a rulemaking for the purpose of improving the safety of child restraints, including minimizing head injuries from side impact collisions."[20]   NHTSA did not, however, initiate any rulemaking.

55.     By 2012, NHTSA still had not issued a rule relating to side-impact collisions and child restraint systems. Congress then passed the Moving Ahead for Progress in the 21st Century Act, requiring that NHTSA amend FMVSS No. 213 within two years with a final rule "to improve the protection of children seated in child restraint systems during side impact crashes."[21]  More than eight years later, when this action was filed, NHTSA still had not issued a final rule relating to side-impact collisions and side-impact testing.

---

[20] Pub. L. No. 106-414 (2000), 114 Stat. 1800.
[21] Pub. L. No. 112-141 (2012), 126 Stat. 774.

56.     While NHTSA purportedly was working on amending FMVSS 213 to address side-impact tests, the proposed rule from 2014 only addressed side-impact testing of car seats and not of booster seats.[22]  As the House Subcommittee Report found, "[d]espite Congress urging side-impact testing standards for more than 20 years, NHTSA has failed to promulgate any such standards."[23]  And it concluded: "[I]n the absence of authoritative rulemaking by NHTSA, manufacturers market their car seats in ways that put children at risk of serious injury."[24]

57.     The House Subcommittee reviewed thousands of pages of previously non-public documents from the seven booster seat companies it was investigating, including Defendant Artsana.    Review of the documents led the House Subcommittee Report to conclude that "[l]ax federal regulation enables these booster seat companies to mislead consumers about side-impact safety testing and get away with making unfair and deceptive size and weight recommndations that are not reasonably safe."[25]  Further, "[d]espite having regulatory authority over booster seats, the National Highway Traffic Safety Administration (NHTSA) has failed to regulate them in any meaningful way. It has not set a 40-pound minimum for booster

---

[22] *See* FMVSS, *Child Restraint Systems – Side Impact Protection*, 79 Fed. Reg. 32211 (2014).
[23] House Subcommittee Report at 27.
[24] *Id.*
[25] *Id.* at 3.

seats and despite being directed by Congress 20 years ago, [NHTSA] has not created a side-impact testing standard.  The Subcommittee recommends that NHTSA fulfill its duty to regulate booster seat safety to ensure that manufacturers do not mislead parents or put children at risk in how they design and market their booster seats."[26]

58.     The    House    Subcommittee    Report    further    concluded    that "[m]anufacturers' misleading and dangerous practices occurred in NHTSA's willful absence of adequate federal regulation.  Though it has made mildly encouraging progress in this area, NHTSA's failure to regulate the car seat industry is all too representative of an agency that has failed time and time again to keep motorists and their families safe through regulatory delay and deregulation.  Reform is needed at all levels of NHTSA to speed up the rulemaking process and crack down on companies flouting the rules."[27]

### C.     Artsana's Misleading and Deceptive Marketing of Booster Seats

59.     Artsana manufactures and markets infant and juvenile products, including booster seats.  Artsana is one of the top-selling manufacturers of car seats, including booster seats, both in the United States and, through its parent corporation, globally.

60.     Artsana's line of booster seats is sold under the "Chicco" brand name,

---

[26] *Id.*
[27] *Id.* at 32.

and the seats, associated advertising, and the product packaging all bear the "Chicco" badge.

61.    Artsana's booster seats are mass-marketed products that are easy to find at countless retailers online and in retail stores.  Artsana sells its products throughout the country, including, but not limited to, through retail giants Walmart and Target, online via Amazon.com, direct-to-consumer through its website Chiccousa.com, and many third-party retail websites.

62.    The relevant products at issue in this case include any belt-positioning booster seat with a back advertised as being suitable for children weighing as little as 30 pounds and/or touting the safety of the booster seats in a side-impact collision (collectively the "Booster Seats").  Artsana has marketed its Booster Seats under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus. For example, the Taurus model of the KidFit Zip Plus 2-in-1 Belt-Positioning Booster, pictured below:



63.     Throughout the relevant time, Artsana marketed and sold at least nine different models of the KidFit belt-positioning Booster Seats.  Artsana currently prices its Booster Seats for sale at various prices from $99.99 to $149.99,[28] prices significantly higher than some of its leading competitors.

64.     Artsana's Booster Seats are supposed to be designed to elevate children riding in a vehicle so that the vehicle's seat belt system is positioned correctly on the children's bodies.  While the Booster Seats have cosmetic differences across various models, they are identical in size and design and in every respect relevant to this lawsuit.

65.     Although Artsana labeled and marketed the Booster Seats in the United States (i) as providing "side impact protection," (ii) as safe for children

---

[28]     https://www.chiccousa.com/kidfit/ (last visited Apr. 20, 2021).

weighing as little as 30 pounds, and (iii) as otherwise providing special safety protection, Artsana has known throughout the relevant time period that these statements are false and misleading.

66.    Artsana knows that safety is a primary factor in a parent's decision to move their child from a harnessed car seat to a booster seat and in their choice regarding which booster seat to buy.  For this reason. Artsana's packaging and advertising uniformly highlights the supposed additional safety protections of its Booster Seats.

67.    Artsana has advertised on its packaging as well as on its website that its proprietary "DuoGuard" offers protection in the event of a side-impact collision, including "2 Layers" and "2 Zones" of protection and "Adjustable Side-Impact Protection":



68.     Other Artsana KidFit packaging emphasizes "DuoZone Head and Shoulder Side-Impact Protection":



69.     Artsana's online advertisement also promises "two layers of side impact protection" and tells parents they can "Rest Assured."   Artsana then even repeats these promises on the Booster Seats themselves, with a label that says "DuoGuard Side-Impact Protection."[29]

---

[29]     House Subcommittee Report at 24.

 

70.    In addition, Artsana, on its website, encourages parents to move their children to their Booster Seats because of the convenience "for busy families" and reassures parents that KidFit 2-in-1 Booster Seats also provide "extended side impact rotection":[30]

As your child becomes older and rushing from activity to activity is the norm, on-the-go convenience is more important than ever. That's why the built-in carry handle on our GoFit® Backless Boosters is the perfect solution for busy families. Or, maybe you'd prefer the extended side impact protection of a KidFit® 2-in-1 Booster. Ten height positions provide head and shoulder protection for every stage, but you still have the option to go backless, giving you the best of both worlds.

71.    Artsana's claims regarding its DuoGuard and DuoZone purported technology are uniform and widely advertised not only on the Booster Seats'

---

[30]    https://www.chiccousa.com/car-seat-roadmap/baby-talk-car-seat-roadmap.html (last visited Mar. 23, 2021)

packaging and Artsana's website, but also on third-party websites such as Amazon,

Walmart, and Kohls, with Artsana encouraging consumers to move their children to

Artsana's Booster Seats with the affirmative representation that they are "designed

with 10 positions of DuoZone side-impact protection for the way kids grow":[31]



72.     In truth, Artsana's DuoGuard and DuoZone provide little to no

protection from a side-impact collision.    As the House Subcommittee Report

concluded, "[t]here is *no evidence that the DuoGuard feature provides any*

---

[31]     https://www.kohls.com/product/prd-3449907/chicco-kidfit-2-in-1-belt-positioning-booster-seat.jsp (last visited Apr. 20, 2021).

*protection.*"[32] (Emphasis added.)

73.    Indeed, as shown in the Report, side-impact testing shows that in the event of a side impact, the crash-test dummy's head moves beyond any purported protection of the Booster Seat's headrest:[33]



74.    In addition, the *New York Times* "conducted independent side-impact testing" of various boosters seats, including Artsana's Chicco KidFit.[34]  The *New York Times*' side-impact testing of the KidFit booster seat showed even more disturbingly that in a side-impact collision, its "dummy made head contact with the

---

[32]  House Subcommittee Report at 25 (emphasis added).
[33]  *Id.*
[34]    https://www.nytimes.com/wirecutter/reviews/best-booster-car-seats/#how-we-tested.

door in crash testing":[35]



The dummy in the Chicco KidFit did make head impact with the door

75.    Artsana makes additional representations about the safety of its Booster Seats that are likewise false and misleading.  Artsana represents that its DuoGuard DuoZone, in addition to providing "head and torso protection," also contains EPS energy-absorbing foam:[36]

---

[35]    https://www.nytimes.com/wirecutter/reviews/best-booster-car-seats/#runner-up-chicco-kidfit.

[36]    https://www.target.com/p/chicco-174-kidfit-2-in-1-booster-car-seat/-/A-17093370 (last visited Apr. 20, 2021).

- Safety Features: DuoGuard DuoZone head and torso protection, EPS energy-absorbing foam, SuperCinch LATCH attachment, IIHS Best Bet Booster.

76. But Artsana's representations regarding its "safety features" are false and misleading.  For instance, the supposed EPS energy-absorbing foam is nothing more than Styrofoam that provides little to no protection, as evidenced by the photos accompanying the review below:[37]

---

[37]  https://www.target.com/p/chicco-174-kidfit-2-in-1-booster-car-seat/-/A-17093370 (last visited Apr. 20, 2021).






77.    The advertisements touting DuoGuard and DuoZone are materially false and misleading because they fail to disclose that there is no evidence that DuoGuard and DuoZone offer any actual protection in crashes and certainly does

31

not provide the safety features or side-impact protection that it advertised to Plaintiffs and consumers.

78.     Artsana also has falsely advertised that its Booster Seats are safe for children weighing as little as 30 pounds, even though it knows they are unsafe for children weighing less than 40 pounds:[38]

**CHILD GUIDELINES**

This Booster Seat is designed for children who demonstrate an ability to sit in a seat belt and meet the following requirements. **ONLY** use this Booster Seat if the child meets the following requirements:

- **Child is at least 4 years old.**
- **Child can sit relatively still, in the same seated position throughout the car ride.**
- **Child can leave the shoulder and lap belt properly positioned on their body, and can do this every time in the car.**
- **Weight is between 30 and 110 pounds** (13.6 and 50 kg).
- **Height is between 38-57 inches (97-145 cm).**

⚠ **YOUR CHILD'S SAFETY DEPENDS ON YOU!** You MUST follow the detailed instructions in this User Guide to ensure the steps in this User Guide are performed correctly!

---

[38]     https://www.amazon.com/Chicco-KidFit-Belt-Positioning-Booster-Celeste/dp/B076QM8SYJ/ref=psdc_166837011_t5_B01DYJF5NU (last visited Feb. 26, 2020).

79.     The specifications Artsana advertised and distributed with its Booster

Seats made the same representations:[39]



| Harness Mode – Rear-Facing | - |
| Harness Mode – Forward-Facing | - |
| Booster Mode – High Back | 30-100 lbs |
| Booster Mode – Backless | 40-110 lbs |
| LATCH | SuperCinch® |
| Seat Belt Installation | - |
| Recline Positions | 2 |
| Product Weight | 10 lbs |
| Product Total Width | 17" |
| Total Harness Slot Height | - |
| Total Belt-Positioning Clip Height | High Back: 19" / Backless: 27" |

---

80.     As the House Subcommittee Report pointed out, Artsana was, as of September 2020, still advertising on its website that its Booster Seats were safe for children weighing as little as 30 pounds.[40]

81.     Although Artsana has since changed its packaging and advertising on its website to state that its Booster Seats are safe for children weighing a minimum of 40 pounds weight minimum, it allowed the false and dangerous 30 pound minimum to remain active on third-party websites.

82.     For example, Artsana's "Chicco KidFit 2-in-1 Belt Positioning Booster Car Seat – Taurus" model continued to be advertised on Target's website as having been designed for children "between 30-100 lbs.":[41]



---

[40] House Subcommittee Report at 11.
[41]     https://www.target.com/p/chicco-kidfit-zip-2-in-1-belt-positioning-booster-car-seat-taurus/-/A-79178915 (last visited Mar. 15, 2021).

83.     Similarly, Artsana's advertisement on department store Kohl's website continues to represent that its Booster Seats are safe for a child weighing 30 pounds, even after Artsana removed that representation from its own website:[42]

PRODUCT DETAILS

- 32.75"H x 18.75"W x 16.5"D
- Product weight: 32.75 lbs.
- Maximum weight capacity: 30-110 lbs.
- Maximum height capacity: 57"
- Polyester fill, metal, plastic
- Spot clean
- Manufacturer's 1-year limited warranty
- For warranty information please click here
- Imported

84.     Upon information and belief, Artsana continues to advertise that its Booster Seats are safe for children weighing as little as 30 pounds in numerous mass-market retail outlets, both online and at brick-and-mortar stores.

85.     Artsana's representation that children weighing 30 pounds minimum could safely use its Booster Seats was also included in the User Guides that accompanied the Booster Seats and were also available on Artsana's website.

86.     Artsana's representations that its Booster Seats are safe for children who weigh less than 40 pounds and as little as 30 pounds are false. Although Artsana

---

[42]     https://www.kohls.com/product/prd-4259311/chicco-kidfit-2-in-1-belt-positioning-booster-car-seat.jsp (last visited Mar. 15, 2021).

has long known that children under 40 pounds are at risk of serious injury or death if they are riding in a Booster Seat during a car crash, it still marketed its Booster Seats as safe for children weighing as little as 30 pounds.

87.     During the same period that Artsana was assuring consumers in the United States that children as light as 30 pounds could safely use their Booster Seats, it was instructing consumers in Canada to "Make Sure Child Fits This Booster Seat" and "[u]se [it] ONLY with children who weigh between 18-50 kg (40-110 lbs) . . . ."   And Artsana warned consumers in bold print: "**Failure to Follow these instructions can result in serious injury or death to your children.**"[43]

88.     By advertising the unsafe 30-pound minimum weight, Artsana deliberately intended to convince parents to move their small children out of child harness restraint systems and into the Booster Seats, generating enormous profits for Artsana while endangering children.

89.     Artsana's misrepresentations were effective.  Not only did Plaintiffs purchase their Booster Seats for children who weighed less than 40 pounds based on Artsana's representations, but, as shown in the review below from Amazon.com,

---

[43] https://www.chicco.ca/common/sitemedia/KidFit%20S0163EF_03%20(LRes)-19346686-1.pdf at p. 6 (last visited Apr. 14, 2021).

other parents did as well:[44]



### D.   The House Subcommittee Report's Conclusion That Artsana's Claims Were False and Misleading.

90.     The House Subcommittee Report noted that "[f]or more than 20 years, federal authorities and medical groups specializing in child safety have advised that a child should remain in a harnessed car seat until the child has outgrown that seat, and in any case until the child reaches 40 pounds."  However, "[d]espite a decades-old expert consensus that booster seats are not safe for children under 40 pounds, five of the top manufacturers – Evenflo, Graco, Baby Trend, *Artsana (Chicco)*, and KidsEmbrace – marketed booster seats for children as light as 30 pounds.  Though Evenflo and Graco have switched to a 40-pound standard as a result of the Subcommittee's investigation, . . . Artsana . . . continue[s] to make the unsafe

---

[44]     https://www.amazon.com/Chicco-KidFit-Belt-Positioning-Booster/dp/B01DYJF5NU?th=1 (last visited Mar. 15, 2021).

recommendation for 30-pound children to use their booster seats."[45] (Emphasis added.)  The Report further found that "[d]espite this decades-long consensus—and in the absence of adequate federal regulation—leading booster seat manufacturers have ignored the prevailing safety knowledge and have deceptively and unfairly made recommendations that mislead consumers into thinking their booster seats are safe for children as light as 30 pounds."[46]

91.    The House Subcommittee Report, after reviewing non-public documents, including internal records, further concluded that Artsana "deceptively market[s] their booster seats with unsubstantiated claims about 'safety features,' while failing to disclose that those features have not been objectively shown to increase child safety."[47]  The Report repeated that Artsana makes "unsubstantiated claims about proprietary safety features in side-impact crashes.  Such features are untested and their advertisements provide consumers with a false sense of security. It is unfair and deceptive to advertise a safety feature without evidence that it improves safety."[48]

92.    After noting that "Artsana markets its proprietary 'DuoGuard' protection, which it claims 'offers two layers of side-impact protection for the head

---

[45]  House Subcommittee Report at 2.
[46]  *Id.* at 4.
[47]  *Id.* at 3.
[48]  *Id.* at 22.

and torso,' and the company advertises this feature on its website and booster seat labels," the House Subcommittee Report concluded that "Artsana omits material information. There is no evidence that the DuoGuard feature provides any protection."[49]

93. The House Subcommittee Report then concluded that "manufacturers have endangered children by recommending that booster seats may be used by children that weigh only 30 pounds. The expert consensus, confirmed by guidance from the federal regulator, NHTSA, is that children should remain in a fully harnessed seat until they can no longer fit in it, and in no case before the child is at least 40 pounds and 4 years old. The manufacturers' failure to label and market booster seats according to those [sic] guidance renders the seats not reasonably safe and appears to constitute an unfair and deceptive practice."[50]

94. With respect to the manufacturers' claims of proprietary safety features, the Report concluded that manufacturers, including Artsana, "appear to have engaged in unfair and deceptive practices by making claims that children's car seats and booster seats are 'side-impact tested' and *have 'side-impact protection' features*. Safety is indisputably material, if not the most important factor, in a parent's purchase of a child's car seat. *A parent would read those claims to mean*

---

[49] *Id.* at 24-25.
[50] *Id.* at 31.

*that the product increased safety by reducing the risk of injury during side-impact collisions.  These claims are false and misleading, as the manufacturers did not conduct testing under reasonably rigorous simulated crash conditions and did not assess for risk of injury or death.*"[51] (Emphasis added.)

95.     The Report further concluded: "Parents who want to keep their children safe by choosing the appropriate car seat or booster seat encounter false claims and misleading advertising in the market place.  This results in premature transitions from car seats to booster seats.  In some cases, that tragically results in serious injury or death."[52]

## PLAINTIFFS' FACTS

### *Plaintiff Sayers*

96.     On March 24, 2021, Plaintiff Sayers purchased a KidFit booster seat at Target for her son who weighed less than 40 pounds.

97.     Plaintiff Sayers purchased the Artsana booster seat because Defendant had said it was safe for children weighing less than 40 pounds and because of Defendant's safety claims.

98.     Plaintiff Sayers' decision to buy this booster seat was directly impacted by Defendant's representations that its booster seat was safe for children

---

[51] *Id.* at 31-32.
[52] *Id.* at 32.

weighing less than 40 pounds and Defendant's representations about the booster seat providing safety.

99.    Plaintiff Sayers would not have purchased the booster seat if she had known that the booster seat was not safe for children weighing less than 40 pounds and that it did not provide side-impact protection.

100.    Plaintiff Sayers would like to purchase Defendant Artsana's Booster Seats in the future if they truly did provide side-impact protection and were safe for children weighing less than 40 pounds.  Plaintiff Sayers is, however, unable to rely on Defendant Artsana's representations regarding the safety of its Booster Seats in deciding whether to purchase Defendant Artsana's Booster Seats in the future.

***Plaintiff Tinker***

101.    In November or December of 2020, Plaintiff Tinker bought a KidFit booster seat from Target for her son who weighed less than 40 pounds.

102.    Plaintiff Tinker purchased the booster seat because Defendant represented that it was safe for children weighing less than 40 pounds and that the booster seat provided side-impact protection.

103.    Plaintiff Tinker's decision to buy this booster seat was directly impacted by Defendant's representations that its booster seat was safe for children weighing less than 40 pounds and that the booster seat had side-impact protection.

104.    Plaintiff Tinker would not have purchased the booster seat or would

not have paid as much for it if she had known that it was not safe for children weighing less than 40 pounds and that it had no actual side-impact protection.

105.   Plaintiff Tinker would like to purchase Defendant Artsana's Booster Seats in the future if they truly did provide side-impact protection and were safe for children weighing less than 40 pounds. Plaintiff Tinker is, however, unable to rely on Defendant Artsana's representations regarding the safety of its Booster Seats in deciding whether to purchase Defendant Artsana's Booster Seats in the future.

### *Plaintiff Monachino*

106.   In August 2020, Plaintiff Monachino bought a KidFit 2-in-1 booster seat on Amazon for her daughter who weighed less than 40 pounds.

107.   Plaintiff Monachino purchased the Artsana booster seat because Defendant represented it was safe for children weighing less than 40 pounds and that the booster seat provided side-impact protection.

108.   Plaintiff Monachino's decision to buy this booster seat was directly impacted by Defendant's representations that its booster seat was safe for children weighing less than 40 pounds and that the booster seat had side-impact protection.

109.   Plaintiff Monachino would not have purchased the booster seat or would not have paid as much for the booster seat if she had known that the booster seat was not safe for children weighing less than 40 pounds and that it did not provide side-impact protection.

110.    Plaintiff Monachino would like to purchase Defendant Artsana's Booster Seats in the future if they truly did provide side-impact protection and were safe for children weighing less than 40 pounds. Plaintiff Monachino is, however, unable to rely on Defendant Artsana's representations regarding the safety of its Booster Seats in deciding whether to purchase Defendant Artsana's Booster Seats in the future.

### *Plaintiff Mullins*

111.    About four years ago, Plaintiff Mullins bought eight KidFit booster seats at Target in Middle River, Maryland for her granddaughter and grandson who each weighed less than 40 pounds.

112.    Plaintiff Mullins purchased the Artsana booster seat because Defendant had said it was safe for children weighing less than 40 pounds and that the booster seat provided side-impact protection.

113.    Plaintiff Mullins' decision to buy this booster seat was directly impacted by Defendant's representations that its booster seat was safe for children weighing less than 40 pounds and that the booster seat had side-impact protection.

114.    Plaintiff Mullins would not have purchased the booster seat or would not have paid as much for the booster seat if she had known that the booster seat was not safe for children weighing less than 40 pounds and that it did not provide side-impact protection.

115.     Plaintiff Mullins would like to purchase Defendant Artsana's Booster Seats in the future if they truly did provide side-impact protection and were safe for children weighing less than 40 pounds. Plaintiff Mullins is, however, unable to rely on Defendant Artsana's representations regarding the safety of its Booster Seats in deciding whether to purchase Defendant Artsana's Booster Seats in the future.

### Plaintiff Murphree

116.     Plaintiff Murphree purchased a KidFit booster seat on Amazon in November 2020 for her daughter who weighed less than 40 pounds.

117.     Plaintiff Murphree purchased the Artsana booster seat because Defendant represented it was safe for children weighing less than 40 pounds and that the booster seat provided side-impact protection.

118.     Plaintiff Murphree's decision to buy this booster seat was directly impacted by Defendant's representations that its booster seat was safe for children weighing less than 40 pounds and that the booster seat had side-impact protection.

119.     Plaintiff Murphree would not have purchased the booster seat or would not have paid as much for the booster seat if she had known that the booster seat was not safe for children weighing less than 40 pounds and that it did not provide side-impact protection.

120.     Plaintiff Murphree would like to purchase Defendant Artsana's Booster Seats in the future if they truly did provide side-impact protection and were

safe for children weighing less than 40 pounds. Plaintiff Murphree is, however, unable to rely on Defendant Artsana's representations regarding the safety of its Booster Seats in deciding whether to purchase Defendant Artsana's Booster Seats in the future.

### Plaintiff Jimenez

121.   In or around February 2017, Plaintiff Jimenez purchased Chicco's KidFit 2-in-1 booster seat.

122.   In purchasing the booster seat, Plaintiff Jimenez relied on Defendant's false, misleading, and deceptive marketing of the booster seats as a safe booster seat suitable for children as small as 30 pounds and providing side-impact protection. Had Defendant disclosed that the booster seats are not safe, fit to be used as a booster seat, do not pass side-impact testing, and do not offer side-impact protection, Plaintiff Jimenez would not have purchased the booster seat or would have paid less for it.

123.   Plaintiff Jimenez read and followed the booster seat's instructions when using it.

124.   Defendant's misrepresentations that the booster seats offer side-impact protection and are safe for children as small as 30 pounds in the event of a collision were immediate causes of Plaintiff Jimenez's decision to purchase one of Defendant's booster seats.  Plaintiff Jimenez would not have purchased one of the

booster seats, or would have sought materially different terms, had she known the truth. Defendant's misrepresentations were substantial factors in Plaintiff Jimenez's decision to purchase the booster seat.

125. Each of the Plaintiffs believed they were purchasing a Booster Seat that was safe for children weighing as little as 30 pounds and that had special safety features that would provide added protection in a side-impact collision. They did not receive the benefit of their bargain and in fact received a product worth far less than what they paid. Purchasers of the Booster Seats overpaid for them because they are worth materially less than what they paid and for which they bargained.

## TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS

126. Artsana has had actual knowledge for several years that the packaging, marketing, and labeling of its Booster Seats was deceptive and misleading because its Booster Seats have never been safe for children weighing 30 to 39 pounds and Artsana had no basis for its claims that its Booster Seats had special features that would protect children in side-impact collisions.

### A.     Fraudulent Concealment Tolling

127. Artsana had a duty to disclose to Plaintiffs and Class Members the true quality and nature of its Booster Seats, including that the Booster Seats did not have any special features providing side-impact protection and that they are in fact dangerous for children weighing less than 40 pounds or in a side-impact collision.

128.     This duty to disclose arose, among other things, from Artsana's representations to consumers that the Booster Seats were safe for children weighing as little as 30 pounds and had special features to provide children with protection in side-impact collisions.

129.     Artsana knew about its Booster Seats' safety risks at all relevant times. Prior to selling the Booster Seats, Artsana knew or—but for its extreme recklessness—should have known that the Booster Seats posed a risk to children weighing less than 40 pounds and were not safe in a side-impact collision and that Artsana's DuoGuard and DuoZone safety representations were made without any evidence supporting them.

130.     Despite its knowledge of the falsity of its representations, Artsana actively concealed this material information from Plaintiffs and other Class Members.   Artsana continued to market the Booster Seats as safe for children weighing as little as 30 pounds and in side-impact collisions and as offering special protection in a side-impact collision, going so far as to tell parents to "rest assured."

131.     In order to maintain and to grow its market share while maximizing the price that it could charge and in order to prevent Plaintiffs and other Class Members from seeking remedies for the misrepresentations, Artsana actively concealed the actual quality and nature of its Booster Seats.

Plaintiffs and the other Class Members justifiably relied on Artsana to disclose

the true quality and nature of the Booster Seats they purchased, because the truth was not discoverable by Plaintiffs and the other Class Members through reasonable efforts. Any applicable statute of limitations has been tolled by Artsana's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### B.   Discovery Rule Tolling

132.   Plaintiffs and other Class Members, through the exercise of reasonable diligence, could not have discovered Artsana's wrongdoing.  Artsana concealed and misrepresented the true quality and nature of the Booster Seats and the safety risks in their use.

133.   Plaintiffs and Class Members could not have reasonably discovered the true extent of Artsana's illegal conduct.  Nor could Plaintiffs and other Class Members have known of facts that would have caused a reasonable person to suspect that Artsana knowingly failed to disclose material information to U.S. consumers about the quality and nature of the Booster Seats or the inadequacy of its touted safety features.

134.   As such, no potentially relevant statute of limitations should be applied.

### C.   Estoppel

135.   Artsana was under a continuous duty to disclose to Plaintiffs and other

Class Members that the Booster Seats were not safe for children weighing less than 40 pounds, that its Booster Seats were not safe in the event of a side-impact collision, and that it had no evidence that its purported proprietary safety features provided any protection in a side-impact collision.

136.    Artsana knowingly, affirmatively, and actively concealed the true nature, quality, and character of its Booster Seats from Plaintiffs and other Class Members.

137.    Thus, Artsana is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

138.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (the "Nationwide Class") and subclasses (the "State Subclasses"):

**Nationwide Class:** All persons and entities in the United States, its territories, and/or its possessions who purchased one or more Artsana Booster Seats marketed under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus, from April 22, 2015 to December 13, 2021.

**Colorado Subclass:** All persons and entities in the state of Colorado, its territories, and/or its possessions who purchased one or more Artsana Booster Seats marketed under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus, from April 22, 2015 to December 13, 2021.

**Florida Subclass:** All persons in the state of Florida, its territories, and/or its possessions who purchased one or more Artsana Booster Seats marketed under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus, from April 22, 2015 to December 13, 2021.

**Illinois Subclass**: All persons in the state of Illinois, its territories, and/or its possessions who purchased one or more Artsana Booster Seats marketed under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus, from April 22, 2015 to December 13, 2021.

**Maryland Subclass**: All persons in the state of Maryland, its territories, and/or its possessions who purchased one or more Artsana Booster Seats marketed under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus, from April 22, 2015 to December 13, 2021.

**New York Subclass**: All persons in the state of New York, its territories, and/or its possessions who purchased one or more Artsana Booster Seats marketed under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus, from April 22, 2015 to December 13, 2021.

**Texas Subclass**: All persons in the state of Texas, its territories, and/or its possessions who purchased one or more Artsana Booster Seats marketed under the "KidFit" branding, which includes the KidFit, KidFit Zip, KidFit Zip Air, KidFit Luxe, KidFit Plus, and KidFit Air Plus, from April 22, 2015 to December 13, 2021.

139.    Excluded from the Classes are Defendant and any entities in which Defendant or its parents, subsidiaries or affiliates have a controlling interest, and Defendant's officers, agents, and employees.  Also excluded from the Classes are the judge assigned to this action, members of the judge's staff, and any member of the judge's immediate family.

140.    Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be narrowed, expanded, or otherwise modified.

141.    **Numerosity**. Class Members are so numerous and geographically dispersed that joinder of all Members is impracticable.  During the Class Period,

hundreds of thousands of Artsana Booster Seats were sold to hundreds of thousands of individual customers.  Class Members are readily identifiable from information and records in the possession of Artsana and third-party merchants such as, for example, Amazon, Target, Walmart, Costco, Kohls, and Babies R Us.

142.    **Commonality and Predominance.** Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Artsana acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate.  Such generally applicable conduct is inherent in Artsana's wrongful actions.  Questions of law and fact common to the Class include, but are not limited to:

a.      Whether Artsana represented through advertising, marketing, and labeling that the Booster Seats were safe for child occupants weighing as little as 30 pounds and/or had special safety features that would keep a child safe in a side-impact crash;

b.      Whether Artsana acted to conceal that the Booster Seats are unsafe for children under 40 pounds;

c.      Whether Artsana acted to conceal that the Booster Seats are unsafe in side-impact crashes and that it had no basis for claiming that its DuoGuard and DuoZone features actually provided any protection

in side-impact collisions;

d.     Whether Artsana's failure to disclose the safety risks posed by use of the Booster Seats and the lack of any evidence that its Booster Seats were safe in a side-impact collision was unfair, deceptive, fraudulent, or unconscionable;

e.     Whether Artsana's representations and/or omissions in advertising, marketing, and labeling are likely to mislead a reasonable consumer;

f.     Whether Artsana knew that its representations and/or omissions in advertising, marketing, and labeling were false, deceptive, or misleading;

g.     Whether Artsana engaged in unlawful, fraudulent, or unfair business practices;

h.     Whether Artsana was unjustly enriched at the expense of Plaintiffs and Class Members;

i.     Whether Artsana should be ordered to disgorge all or part of the ill-gotten profits it received from the sales of the Booster Seats;

j.     Whether Artsana breached express and implied warranties to Plaintiffs and Class Members;

k.     Whether Plaintiffs and the other Class Members are entitled to

damages, and in what amount; and

l.      Whether Plaintiffs and the other Class Members are entitled to declaratory or injunctive relief.

143.   **Typicality**. Plaintiffs' claims are typical of the claims of the other Class Members because, among other things, Plaintiffs and the other Class Members were injured through the substantially uniform misconduct by Artsana.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all other Class Members, and there are no defenses that are unique to Plaintiffs.  The claims of Plaintiffs and of other Class Members arise from the same operative facts and are based on the same legal theories.

144.   **Adequacy of Representation.** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seeks to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The Class Members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

145.   **Declaratory and Injunctive Relief**. Artsana will continue to commit the unlawful practices alleged herein, and Class Members will remain at an unreasonable and serious safety risk as a result of the Booster Seats. Artsana has acted or refused to act on grounds generally applicable to Plaintiffs and the other

members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as requested in the Prayer for Relief below, with respect to the members of the Classes as a whole.

146. **Superiority.** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Artsana, making it impracticable for Class Members to individually seek redress for Artsana's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

147. Further, Artsana has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

148.     Likewise, particular issues under Rule 23(c)(4) of the Federal Rules of Civil Procedure are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.  Such particular issues include, but are not limited to, those set forth above.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**15 U.S.C. § 2301, *et seq.***
**(on behalf of the Nationwide Class)**

149.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

150.     Plaintiffs bring this count on behalf of themselves and Nationwide Class Members.

151.     The sale of the Booster Seats was subject to the provisions and regulations of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*

152.     The Booster Seats are "consumer products" as defined in the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

153.     Plaintiffs and the other Nationwide Class Members are "consumers" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

154.     Artsana is a "supplier" and "warrantor" as defined by the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301(4)-(5).

155.    The Booster Seats' implied warranties are covered by the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

156.    Artsana breached these warranties, as further described above, by not disclosing the true nature of the Booster Seats, and by providing the Booster Seats not in merchantable condition and not fit for the ordinary purpose for which they are used.  They are also not fit for the specific purposes for which Artsana sold them and for which Class Members purchased and/or owned them.

157.    Privity is not required in this case because Plaintiffs and the other Class Members are intended third-party beneficiaries of contracts between Defendant and those who sell its products; specifically, they are the intended beneficiaries of Artsana's express and implied warranties.

158.    The vendors were not intended to be the ultimate consumers of the Booster Seats and have no rights under the warranty agreements provided with the Booster Seats; the warranty agreements were designed for and intended to benefit the ultimate consumers only.

159.    Finally, privity is also not required because the Booster Seats are dangerous instrumentalities due to the unsafe nature for children weighing under 40 pounds and in side-impact crashes.

160.    Requiring an informal dispute settlement procedure, or affording Artsana a reasonable opportunity to cure its breach of written warranties, is

unnecessary and futile. Artsana knew, should have known, or was reckless in not knowing, of its misrepresentations concerning the Booster Seats, but nonetheless failed to rectify the situation and/or disclose the truth. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement – whether under the Magnuson-Moss Warranty Act or otherwise – that Plaintiffs resort to an informal dispute resolution procedure and/or afford Artsana a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

161.    Plaintiffs and the other Class Members have been damaged as a result of the wrongful conduct complained of herein. Said conduct continues, and the harm or risk of harm is ongoing.

162.    There are more than 100 Class Members. The amount in controversy also exceeds the statutory minimums set forth at 15 U.S.C. § 2310(d)(3). Each Class Member's individual claim is equal to or larger than $25 and the cumulative amount in controversy (excluding interest and costs) exceeds $50,000.

163.    As a result of Artsana's violations of the Magnuson-Moss Warranty Act and warranties with consumers, Plaintiffs and the other Class Members have been damaged in an amount to be determined at trial.

## COUNT II
## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### (on behalf of the Nationwide Class)

164.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

165.    Plaintiffs assert this claim for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law on behalf of themselves and the Nationwide Class.

166.    Artsana, Plaintiffs, and the Nationwide Class Members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

167.    Plaintiffs and the Nationwide Class members purchased the Booster Seats primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2(a).

168.    Artsana was and is engaged in "trade" or "commerce" within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

169.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" 73 Pa. Cons. Stat. § 201-3.

170.    In the course of its business, Artsana, through its agents, employees, and/or subsidiaries, violated the Pennsylvania CPL by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts

regarding the reliability, safety, and performance of the Booster Seats, as detailed above.

171.    Specifically, by misrepresenting the Booster Seats as safe for children weighing as little as 30 pounds, as being safe in a side-impact collision, and as having special features to provide side-impact protection and by failing to disclose and actively concealing the dangers and risks posed by the Booster Seats, Artsana engaged in one or more of the following unfair or deceptive business practices prohibited by 73 Pa. Cons. Stat. § 201-2(3):

> a.    Representing that the Booster Seats have characteristics, uses, benefits, and qualities that they do not have;
>
> b.    Representing that the Booster Seats are of a particular standard, quality, and grade when they are not;
>
> c.    Advertising the Booster Seats with the intent not to sell them as advertised; and
>
> d.    Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

73 Pa. Cons. Stat. § 201-2(4)(v), (vii), (ix) and (xxi).

172.    Artsana's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers

and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Nationwide Class members, about the true safety and reliability of the Booster Seats, the quality of the Booster Seats, and the true value of the Booster Seats.

173.   Artsana's scheme and concealment of the true characteristics of the Booster Seats were material to Plaintiffs and the Nationwide Class members, as Artsana intended.  Had they known the truth, Plaintiffs and the Nationwide Class members would not have purchased the Booster Seats or would not have paid as much for them.

174.   Plaintiffs and the Nationwide Class members had no way of discerning that Artsana's representations were false and misleading, or otherwise learning the facts that Artsana had concealed or failed to disclose.  Plaintiffs and the Nationwide Class members did not, and could not, unravel Artsana's deception on their own.

175.   Artsana had an ongoing duty to Plaintiffs and the Nationwide Class members to refrain from unfair and deceptive practices under the Pennsylvania CPL in the course of its business.   Specifically, Artsana owed Plaintiffs and the Nationwide Class members a duty to disclose all the material facts concerning the Booster Seats because Artsana possessed exclusive knowledge, intentionally concealed the true characteristics of the Booster Seats from Plaintiffs and the Nationwide Class members, and/or made misrepresentations that were rendered

misleading because they were contradicted by withheld facts.

176.     Plaintiffs and the Nationwide Class members suffered ascertainable

loss and actual damages as a direct and proximate result of Artsana's concealment,

misrepresentations, and/or failure to disclose material information.

177.     Artsana's violations present a continuing risk to the Plaintiffs and the

Nationwide Class members, as well as to the general public.  Artsana's unlawful acts

and practices complained of above affect the public interest.

178.     Pursuant to 73 Pa. Cons. Stat. § 201-9.2(a), Plaintiffs and the

Nationwide Class members seek an order enjoining Artsana's unfair or deceptive

acts or practices and awarding damages and any other just and proper relief available

under the Pennsylvania CPL.

**COUNT III**
**UNJUST ENRICHMENT**
**(on behalf of the Nationwide Class)**

179.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 148 as if fully set forth herein.

180.     Plaintiffs bring this count on behalf of themselves and Nationwide

Class Members and, in the alternative, on behalf of the State Subclasses.

181.     Artsana knowingly accepted and enjoyed the benefits of Plaintiffs and

Class Members purchasing or causing the purchase of Booster Seats.

182.     Artsana should not be able to retain the benefit of the funds paid

because Plaintiffs and Class Members rendered payment with the expectation that the Booster Seats would be as represented and warranted – a well-designed and constructed product that was safe for children weighing as little as 30 pounds and that provided safety in a side-impact car crash.

183. Artsana misrepresented and omitted material facts regarding the actual dangers posed by the Booster Seats for children weighing 30 to 39 pounds and the illusory protection provided by the Booster Seats in a side-impact car crash. Based on those misrepresentations and omissions, Plaintiffs and Class Members purchased the Booster Seats through which Artsana profited.

184. Equity dictates that Artsana's ill-gotten gains be disgorged and that Plaintiffs and Class Members are entitled to restitution.

**COUNT IV**
**BREACH OF EXPRESS WARRANTIES**
**Colo. Rev. Stat. § 4-2-313**
**(on behalf of the Colorado Subclass)**

185. Plaintiff Sayers repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

186. Plaintiff Sayers brings this claim on behalf of herself and the Colorado Subclass.

187. Artsana is and was at all relevant times a "seller" of Booster Seats under Colo. Rev. Stat. § 4-2-313(1).

188. Plaintiff Sayers and all Colorado Subclass Members who purchased

the Booster Seats in Colorado are "buyers" within the meaning of Colo. Rev. Stat. § 4-2-313(1)(a).

189.    The Booster Seats are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. § 4-2-105(1).

190.    In connection with the purchase of the Booster Seats, Artsana provided the Plaintiff Sayers and Colorado Subclass Members with written express warranties that the Booster Seats were free of defects.

191.    Further, Artsana expressly warranted and represented that its Booster Seats:

    a.    Are safe for children who weigh as little as 30 pounds;

    b.    Are safe for children who weigh less than 40 pounds;

    c.    Provide head and torso protection;

    d.    Provide side-impact protection to keep children safe in side-impact collisions; and

    e.    Included DuoGuard and DuoZone technology to provide protection in a side-impact collision.

192.    Artsana's express warranties formed the basis of the bargain that was reached when Plaintiff Sayers and Colorado Subclass Members purchased the Booster Seats.  Artsana breached its express warranties because the Booster Seats are not safe for children weighing between 30 and 40 pounds and do not protect child

occupants during a side-impact crash.

193.    As a direct and proximate result of Artsana's breach of its express warranties, Plaintiff Sayers and Colorado Subclass Members have been damaged in an amount to be proven at trial.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Colo. Rev. Stat. § 4-2-314
### (on behalf of the Colorado Subclass)

194.    Plaintiff Sayers repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

195.    Plaintiff Sayers brings this claim on behalf of herself and the Colorado Subclass.

196.    A warranty that the Booster Seats were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to Colo. Rev. Stat. § 4-2-314.

197.    The Booster Seats did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which the Booster Seats were used.  Specifically, the Booster Seats are not safe for use by children weighing between 30 and 40 pounds and do not provide safety and protection for children in the event of a side-impact collision.  Thus, the Booster Seats are inherently defective

and dangerous and pose a high risk of serious bodily injury or death if the child weighs under 40 pounds or is involved in a side-impact collision.

198.   Artsana is and was at all relevant times a "merchant" with respect to Booster Seats and a "seller" of Booster Seats under Colo. Rev. Stat. § 4-2-314(1).

199.   The Booster Seats are and were at all relevant times "goods" within the meaning of Colo. Rev. Stat. § 4-2-314(1)(a)-(f).

200.   As a direct and proximate result of Artsana's breach of the implied warranty of merchantability, Plaintiff Sayers and Colorado Subclass Members have been damaged in an amount to be proven at trial.

## COUNT VI
## VIOLATION OF COLORADO CONSUMER PROTECTION LAW
### Colo. Rev. Stat. § 6-1-101, *et seq*.
### (on behalf of the Colorado Subclass)

201.   Plaintiff Sayers repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

202.   Plaintiff Sayers brings this Count on behalf of herself and the Colorado Subclass.

203.   Defendant is a "person" under § 6-1-102(6) of the Colorado Consumer Protection, Colo. Rev. Stat. § 6-1-101, *et seq*. Act (the "Colorado CPA").

204.   Plaintiff Sayers and Colorado Subclass Members are "consumers" for the purpose of Colo. Rev. Stat. § 6-1-113(1)(a) and each purchased one or more Booster Seats.

205.    In the course of its business, Artsana, through its agents, employees, and/or subsidiaries, violated the Colorado CPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding the reliability, safety, and performance of the Booster Seats, as detailed above.

206.    Specifically, by misrepresenting the Booster Seats as safe for children weighing 30 to 39 pounds, as safe in a side-impact collision, and as having special features that provide children with protection in a side-impact collision, Artsana engaged in one or more of the following unfair or deceptive business practices prohibited by Colo. Rev. Stat. § 6-1-105:

    a.    Representing that the Booster Seats have characteristics, uses, or benefits that they do not have;

    b.    Representing that the Booster Seats are of a particular standard, quality, and grade when they are not;

    c.    Advertising the Booster Seats with an intent not to sell them as advertised;

    d.    Failing to disclose material information concerning the Booster Seats which information was known at the time of the Booster Seats' advertisement or sale with the intent to induce consumers to purchase the Booster Seats; and

e. Knowingly or recklessly engaging in other unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent acts or practices.

Colo. Rev. Stat. § 6-1-105(e), (g), (i), (u), (kkk).

207. Artsana's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff Sayers and Colorado Subclass Members, about the true safety and reliability of Booster Seats, the quality of the Booster Seats, and the true value of the Booster Seats.

208. In purchasing the Booster Seats, Plaintiff Sayers and Colorado Subclass Members were deceived by Artsana's failure to disclose that the Booster Seats were unsafe for children under 40 pounds and by Artsana's deceptive marketing and labeling of its Booster Seats as providing side-impact protection when it knew that its Booster Seats would not be safe in the event of a side-impact collision and its Booster Seats' features had not been shown to keep a child safe in a side-impact collision.

209. Plaintiff Sayers and Colorado Subclass Members reasonably relied upon Artsana's false misrepresentations. They had no way of knowing that

Artsana's representations were false and gravely misleading.  As alleged herein, Artsana engaged in extremely sophisticated methods of deception.  Plaintiff Sayers and Colorado Subclass Members did not, and could not, unravel Artsana's deception on their own, as Artsana kept secret any test results and corporate information indicating that the Booster Seats were not safe as advertised for children under 40 pounds or in the event of side-impact collisions, and Plaintiff Sayers and other Colorado Subclass Members were not aware of the unsafe nature of the Booster Seats prior to purchase.

210.    Artsana had a duty to disclose the true safety characteristics of the Booster Seats as described above because it knew Plaintiff Sayers and the other Colorado Subclass Members were relying on Artsana's material misrepresentations and omissions regarding the features of the Booster Seats, specifically, their safe weight range and the ability of features of the Booster Seats to ensure safety in a side-impact collision.

211.    The facts misrepresented, concealed, and omitted by Artsana are material in that a reasonable consumer, including Plaintiff Sayers and the Colorado Subclass Members, would have considered them to be important in deciding whether to purchase a Booster Seat and at what price.  Had Plaintiff Sayers and Colorado Subclass Members known about the true nature of the Booster Seats, they would not have purchased them or would not have paid the prices they paid.

212.   Plaintiff Sayers and Colorado Subclass Members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Artsana's conduct in that Plaintiff Sayers and Colorado Subclass Members incurred costs, including overpaying for their Booster Seats.

213.   Artsana acted in bad faith in making its misrepresentations and concealing material information about the safety of its Booster Seats from Plaintiff Sayers and Colorado Subclass Members.

214.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff Sayers and Colorado Subclass Members seek monetary relief against Artsana measured as the greater of (a) actual damages in an amount to be determined at trial and the discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for Plaintiff Sayers and each Colorado Subclass Member.

215.   Artsana's widespread false and deceptive advertisement directed to the market generally implicates a significant public interest under Colorado law.

216.   Plaintiff Sayers and Colorado Subclass Members also seek attorneys' fees and any other just and proper relief available under the Colorado CPA.

## COUNT VII
## BREACH OF EXPRESS WARRANTY
### Fla. Stat. § 672.313
### (on behalf of the Florida Subclass)

217.   Plaintiff Tinker repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

218.    Plaintiff Tinker brings this claim on behalf of herself and the Florida Subclass.

219.    Artsana is and was at all relevant times a "merchant" with respect to Booster Seats under Fla. Stat. § 672.104(1).

220.    Plaintiff Tinker and all Florida Subclass Members who purchased the Booster Seats in Florida are "buyers" within the meaning of Fla. Stat. § 672.103(1)(a).

221.    The Booster Seats are and were at all relevant times "goods" within the meaning of Fla. Stat. § 672.105(1).

222.    In connection with the purchase of all Booster Seats, Artsana provided the Plaintiff Tinker and Florida Subclass Members with written express warranties that the Booster Seats were free of defects.

223.    Further, Artsana expressly warranted and represented that its Booster Seats:

          a.    Were safe for children who weigh as little as 30 pounds;

          b.    Were safe for children who weigh less than 40 pounds;

          c.    Provided head and torso protection;

          d.    Provided side-impact protection; and

          e.    Included DuoGuard and DuoZone technology to provide protection in a side-impact collision.

224.     Artsana's express warranties formed the basis of the bargain that was reached when Plaintiff Tinker and Florida Subclass Members purchased the Booster Seats.

225.     Artsana breached its express warranties because the Booster Seats are not safe for children weighing between 30 and 40 pounds and do not provide protection for child occupants during a side-impact crash.

226.     As a direct and proximate result of Artsana's breach of its express warranties, Plaintiff Tinker and Florida Subclass Members have been damaged in an amount to be proven at trial.

**COUNT VIII**
**BREACH OF IMPLIED WARRANTY**
**Fla. Stat. § 672.314**
**(on behalf of the Florida Subclass)**

227.     Plaintiff Tinker repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

228.     Plaintiff Tinker brings this claim on behalf of herself and the Florida Subclass.

229.     Florida law states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Fla. Stat. § 672.314(1).

230.     Artsana is and was at all relevant times a "merchant" as defined by Fla. Stat. § 672.104(1).

231. Plaintiff Tinker and Florida Subclass Members purchased Booster Seats manufactured and marketed by Artsana by and through its authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Artsana's contracts with authorized sellers, or eventual purchasers when bought from a third party.  At all relevant times, Artsana was a merchant, manufacturer, marketer, warrantor, and/or seller of the Booster Seats.  Artsana knew or had reason to know of the specific use for which the Booster Seats were purchased.

232. The Booster Seats are and were at all relevant times goods within the meaning of Fla. Stat. § 672.105(1).

233. Artsana impliedly warranted that the Booster Seats were in merchantable condition and fit for their ordinary purpose.  However, when sold, and at all times thereafter, the Booster Seats were not in merchantable condition, were not fit for the ordinary purpose of providing safety and protection for children in the event of a side-impact crash, and were not fit for the ordinary purpose of providing safety and protection for children who weighed between 30 and 40 pounds, thus presenting undisclosed safety risks to children.  Consequently, Artsana breached its implied warranty of merchantability for the ordinary purpose for which the Booster Seats are purchased and used.

234. Artsana cannot disclaim its implied warranty as it knowingly sold

unsafe and hazardous booster seats.

235.    As a direct and proximate result of Artsana's breach of the implied warranty of merchantability, Plaintiff Tinker and Florida Subclass Members have been damaged in an amount to be proven at trial.

236.    Plaintiff Tinker and Florida Subclass Members have been excused from performance of any warranty obligations as a result of Artsana's conduct described herein.

**COUNT IX**
**VIOLATION OF FLORIDA DECEPTIVE AND**
**UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. §§ 501.201, *et seq.***
**(on behalf of the Florida Subclass)**

237.    Plaintiff Tinker repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

238.    Plaintiff Tinker brings this claim on behalf of herself and the Florida Subclass.

239.    Plaintiff Tinker and Florida Subclass Members are "consumers" as defined by Fla. Stat. § 501.203.

240.    Artsana advertised, offered, or sold goods or services in Florida and engaged in trade or commerce directly affecting the people of Florida.

241.    Artsana engaged in unconscionable, unfair, and deceptive acts and practices in the conduct of trade and commerce, in violation of Fla. Stat. §

501.204(1).

242.    Artsana's false representations and omissions as alleged above were material because they were likely to deceive reasonable consumers.

243.    For example, Artsana falsely and misleadingly represented that the Booster Seats provided side-impact protection and were safe for children weighing as little as 30 pounds.  Artsana also failed to disclose material facts, including but not limited to the following: (a) that Artsana's Booster Seats would not provide any appreciable protection to its child occupants in the event of a side-impact crash; (b) that the Booster Seats were not safe for children weighing between 30 and 40 pounds; (c) that children should not be moved from a harnessed seat to a booster seat until they reach the maximum weight or height of their harnessed seat; and (d) that no child should use a booster seat until he or she weighs at least 40 pounds.

244.    Had Plaintiff Tinker and Florida Subclass Members known the truth, they would not have purchased the Booster Seats or would not have paid as much for them.  Plaintiff Tinker and Florida Subclass Members acted reasonably in relying on Artsana's misrepresentations and omissions, the truth of which they could not have discovered.

245.    As a direct and proximate result of Artsana's deceptive acts and practices, Plaintiff Tinker and Florida Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary

and non-monetary damages, including by not receiving the benefit of their bargain in purchasing the Booster Seats.

246.    Plaintiff Tinker and Florida Subclass Members seek all monetary and nonmonetary relief allowed by law, including actual or nominal damages under Fla. Stat. § 501.21; declaratory and injunctive relief; reasonable attorneys' fees and costs, under Fla. Stat. § 501.2105(1); and any other relief that is just and proper.

**COUNT X**
**BREACH OF EXPRESS WARRANTIES**
**810 Ill. Comp. Stat. 5/2-313**
**(on behalf of the Illinois Subclass)**

247.    Plaintiff Monachino repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

248.    Plaintiff Monachino brings this claim on behalf of herself and the Illinois Subclass.

249.    Artsana is and was at all relevant times a "merchant" with respect to Booster Seats under 810 ILCS 5/2-104(1), and a "seller" of Booster Seats under 5/2-103(1)(d).

250.    Plaintiff Monachino and all Illinois Subclass Members who purchased the Booster Seats in Illinois are "buyers" within the meaning of 810 ILCS 5/2-103(1)(a).

251.    The Booster Seats are and were at all relevant times "goods" within the meaning of 810 ILCS 5/2-105(1).

252.     In connection with the purchase of the Booster Seats, Artsana provided Plaintiff Monachino and Illinois Subclass Members with written express warranties that the Booster Seats were free of defects.

253.     Further, Artsana expressly warranted and represented that its Booster Seats:

f.     Are safe for children who weigh as little as 30 pounds;

g.     Are safe for children who weigh less than 40 pounds;

h.     Provide head and torso protection;

i.     Provide side-impact protection to keep children safe in side-impact collisions; and

j.     Included DuoGuard and DuoZone technology to provide protection in a side-impact collision.

254.     Artsana's express warranties formed the basis of the bargain that was reached when Plaintiff Monachino and Illinois Subclass Members purchased the Booster Seats.  Artsana breached its express warranties because the Booster Seats are not safe for children weighing between 30 and 40 pounds and do not protect child occupants during a side-impact crash.

255.     As a direct and proximate result of Artsana's breach of its express warranties, Plaintiff Monachino and Illinois Subclass Members have been damaged in an amount to be proven at trial.

## COUNT XI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### 810 Ill. Comp. Stat. 5/2-314
### (on behalf of the Illinois Subclass)

256.    Plaintiff Monachino repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

257.    Plaintiff Monachino brings this claim on behalf of herself and the Illinois Subclass.

258.    A warranty that the Booster Seats were in merchantable condition and fit for the ordinary purpose for which such goods are used is implied by law pursuant to 810 ILCS 5/2-314.

259.    The Booster Seats did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which the Booster Seats were used.  Specifically, the Booster Seats are not safe for use by children weighing between 30 and 40 pounds and do not provide safety and protection for children in the event of a side-impact collision.  Thus, the Booster Seats are inherently defective and dangerous and pose a high risk of serious bodily injury or death if the child weighs under 40 pounds or is involved in a side-impact collision.

260.    Artsana is and was at all relevant times a "merchant" with respect to Booster Seats under 810 ILCS 5/2-104(1), and a "seller" of Booster Seats under 5/2-

103(1)(d).

261.    Plaintiff Monachno and all Illinois Subclass Members who purchased the Booster Seats in Illinois are "buyers" within the meaning of 810 ILCS 5/2-103(1)(a).

262.    The Booster Seats are and were at all relevant times "goods" within the meaning of 810 ILCS 5/2-105(1).

263.    As a direct and proximate result of Artsana's breach of the implied warranty of merchantability, Plaintiff Monachino and Illinois Subclass Members have been damaged in an amount to be proven at trial.

**COUNT XII**
**VIOLATION OF ILLINOIS CONSUMER FRAUD AND**
**DECEPTIVE BUSINESS PRACTICES ACT**
**815 Ill. Comp. Stat. 505/1,** *et seq.*
**(on behalf of the Illinois Subclass)**

264.    Plaintiff Monachino repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

265.    Plaintiff Monachino brings this claim on behalf of herself and the Illinois Subclass.

266.    Artsana, Plaintiff Monachino, and Illinois Subclass Members are "persons" within the meaning of 815 ILCS 505/1(c).

267.    Plaintiff Monachino and Illinois Subclass Members are "consumers" within the meaning of 815 ILCS 505/1(e).

268.     The Booster Seats are "merchandise" within the meaning of 815 ILCS 505/1(b).

269.     Artsana was and is engaged in "trade" and "commerce" within the meaning of 815 ILCS 505/1(f).

270.     The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFDBPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices[.]"  815 ILCS 505/2.

271.     In the course of its business, Artsana, through its agents, employees, and/or subsidiaries, violated the Illinois CFDBPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts regarding the reliability, safety, and performance of the Booster Seats, as detailed above.

272.     Specifically, Artsana made the following misrepresentations and omissions:

       a.     Misrepresenting that the Booster Seats are safe for children who weigh between 30 and 40 pounds;

       b.     Misrepresenting that the Booster Seats provide head and torso protection; and

       c.     Misrepresenting that the Booster Seats provide side-impact protection to keep children safe in side-impact collisions.

273.    Artsana's representations were false and misleading because Artsana omitted to disclose that: (a) Artsana knew that the Booster Seats are not safe for use by children weighing between 30 and 40 pounds; (b) Artsana knew that use of its Booster Seats by children weighing between 30 and 40 pounds makes them susceptible to serious bodily injury or death in the event of a car crash; (c) Artsana had no basis for its claim that features of the Booster Seats would in fact protect children in the event of a side-impact collision; and (d) Artsana knew that its Booster Seats do not keep child occupants safe in a side-impact collision.

274.    Specifically, by misrepresenting the Booster Seats' safety and by failing to disclose and actively concealing the dangers and risk posed by the Booster Seats, Artsana engaged in one or more of the following unfair or deceptive business practices prohibited by 815 ILCS 505/2 and 510/2:

a.    Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Booster Seats;

b.    Representing that the Booster Seats have approval, characteristics, uses, or benefits that they do not have;

c.    Representing that the Booster Seats are of a particular standard, quality, and grade when they are not;

d.    Advertising the Booster Seats with the intent not to sell them as advertised;

e.      Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

f.      Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the Booster Seats, whether or not any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2 and 815 ILCS 510/2.

275.    Artsana's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff Monachino and Illinois Subclass Members, about the true safety and reliability of the Booster Seats, the quality of the Booster Seats, and the true value of the Booster Seats.

276.    Artsana's scheme and concealment of the true characteristics of the Booster Seats were material to Plaintiff Monachino and Illinois Subclass Members, as Artsana intended.  Had they known the truth, Plaintiff Monachino and Illinois Subclass Members would not have purchased Booster Seats or would not have paid

as much for them.

277.    Plaintiff Monachino and Illinois Subclass Members had no way of discerning that Artsana's representations were false and misleading or of otherwise learning the facts that Artsana had concealed or failed to disclose.   Plaintiff Monachino and Illinois Subclass Members did not, and could not, unravel Artsana's deception on their own.

278.    Artsana had an ongoing duty to Plaintiff Monachino and Illinois Subclass Members to refrain from unfair or deceptive practices under the Illinois CFDBPA in the course of its business.   Specifically, Artsana owed Plaintiff Monachino and Illinois Subclass Members a duty to disclose all the material facts concerning the true characteristics of the Booster Seats because Artsana possessed exclusive knowledge, intentionally concealed true characteristics of the Booster Seats from Plaintiff Monachino and Illinois Subclass Members, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

279.    Plaintiff Monachino and Illinois Subclass Members suffered ascertainable loss and actual damages as a direct and proximate result of Artsana's concealment, misrepresentations, and/or failure to disclose material information.

280.    Artsana's violations present a continuing risk to Plaintiff Monachino and Illinois Subclass Members, as well as to the general public.  Artsana's unlawful

acts and practices complained of herein affect the public interest.

281.     Pursuant to  815 ILCS 505/10a, Plaintiff Monachino and Illinois Subclass Members seek an order enjoining Artsana's unfair or deceptive acts or practices and awarding damages and any other just and proper relief available under the Illinois CFDBPA.

## ILLINOIS COUNT XIII
## VIOLATION OF ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT
### 815 Ill. Comp. Stat. 510/1, *et seq*.
### (on behalf of the Illinois Subclass)

282.     Plaintiff Monachino repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

283.     Plaintiff Monachino brings this claim on behalf of herself and the Illinois Subclass.

284.     Artsana, Plaintiff Monachino, and Illinois Subclass Members are "persons" within the meaning of 815 ILCS 510/1(5).

285.     The Illinois Uniform Deceptive Trade Practices Act ("Illinois UDTPA") prohibits deceptive trade practices in the course of a business, vocation, or occupation.  815 ILCS 510/2(a).

286.     In the course of its business, Artsana, through its agents, employees, and/or subsidiaries, violated the Illinois UDTPA by knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose material facts

regarding the reliability, safety, and performance of the Booster Seats, as detailed above.

287.    Specifically, by misrepresenting the Booster Seats as safe, and by failing to disclose and actively concealing the dangers and risks posed by the Booster Seats, Artsana engaged in one or more of the following unfair or deceptive business practices prohibited by 815 ILCS 510/2(a):

> a.    Representing that the Booster Seats have characteristics, uses, benefits, and qualities which they do not have;
>
> b.    Representing that the Booster Seats are of a particular standard, quality, and grade when they are not;
>
> c.    Advertising the Booster Seats with the intent not to sell them as advertised; and
>
> d.    Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding.

815 ILCS 510/2(a)(5), (7), (9), and (12).

288.    Artsana's unfair or deceptive acts or practices, including misrepresentations, concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiff Monachino and Illinois Subclass Members, about the true safety and reliability of

Booster Seats, the quality of the Booster Seats, and the true value of the Booster Seats.

289.    Artsana's scheme and concealment of the true characteristics of the Booster Seats were material to Plaintiff Monachino and Illinois Subclass Members, as Artsana intended.  Had they known the truth, Plaintiff Monachino and Illinois Subclass Members would not have purchased the Booster Seats or would not have paid as much for them.

290.    Plaintiff Monachino and Illinois Subclass Members had no way of discerning that Artsana's representations were false and misleading, or otherwise learning the facts that Artsana had concealed or failed to disclose.   Plaintiff Monachino and Illinois Subclass Members did not, and could not, unravel Artsana's deception on their own.

291.    Artsana had an ongoing duty to Plaintiff Monachino and Illinois Subclass Members to refrain from unfair or deceptive practices under the Illinois UDTPA in the course of its business.   Specifically, Artsana owed Plaintiff Monachino and Illinois Subclass Members a duty to disclose all the material facts concerning the Booster Seats because Artsana possessed exclusive knowledge, intentionally concealed the true characteristics of the Booster Seats from Plaintiff Monachino and Illinois Subclass Members, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

292.    Plaintiff Monachino and Illinois Subclass Members suffered ascertainable loss and actual damages as a direct and proximate result of Artsana's concealment, misrepresentations, and/or failure to disclose material information.

293.    Artsana's violations present a continuing risk to Plaintiff Monachino and Illinois Subclass Members, as well as to the general public.  Artsana's unlawful acts and practices complained of herein affect the public interest.

294.    Pursuant to 815 ILCS 510/3, Plaintiff Monachino and Illinois Subclass Members seek an order enjoining Artsana's unfair or deceptive acts or practices and any other just and proper relief available under the Illinois UDTPA.

**COUNT XIV**
**BREACH OF EXPRESS WARRANTIES**
**Md. Comm. Law §§ 2-313, *et seq.***
**(on behalf of the Maryland Subclass)**

295.    Plaintiff Mullins repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

296.    Plaintiff Mullins brings this claim on behalf of herself and the Maryland Subclass.

297.    Plaintiff Mullins and Maryland Subclass Members were at all relevant times "consumers" under §§ 2-313, *et seq*.

298.    Plaintiff Mullins and Maryland Subclass Members bought Artsana's Booster Seats either directly from Artsana or through retailers, such as Target, Walmart, Kohl's, Buy Buy Baby, and Amazon, among others.

299.    The Booster Seats at issue constitute a "good" under §§ 2-313, *et seq*.

300.    Artsana is and was at all relevant times a merchant and/or seller under §§ 2-313, *et seq*.

301.    Artsana, as the designer, manufacturer, marketer, distributor, and/or seller of the Booster Seats, expressly warranted through the terms of its express limited warranty that its Booster Seats were free of defects in material or workmanship.

302.    Artsana, as the designer, manufacturer, marketer, distributor, and/or seller of the Booster Seats, expressly warranted through the marketing, packaging, and labeling of the Booster Seats that the Booster Seats:

        a.    Were safe for children who weigh as little as 30 pounds;

        b.    Were safe for children who weigh less than 40 pounds;

        c.    Provided head and torso protection;

        d.    Provided side-impact protection; and

        e.    Included DuoGuard and DuoZone technology to provide protection in a side-impact collision.

303.    Each model of the Booster Seat has an identical or substantially identical warranty.

304.    Plaintiff Mullins and Maryland Subclass Members have privity of contract with Artsana through their purchase of the Booster Seat, and through the

express warranties that Artsana issued to its customers. Artsana's warranties accompanied the Booster Seats and were intended to benefit end-users of the Booster Seat. To the extent that Plaintiff Mullins and/or Maryland Subclass Members purchased the Booster Seats from third-party retailers, privity is not required because Plaintiff Mullins and Maryland Subclass Members are intended third-party beneficiaries of the contracts between Defendant and third-party retailers, and because the express warranty is intended to benefit purchasers or owners subsequent to the third-party retailers. In other words, the contracts are intended to benefit the ultimate consumer or user of the Booster Seat.

305.    Artsana made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiff Mullins, Maryland Subclass Members, and Artsana.

306.    In fact, Artsana's Booster Seat is not safe in the event of a side-impact collision and is not safe for children weighing between 30 and 40 pounds because each of the express warranties is a false and misleading misrepresentation.

307.    Artsana breached these warranties and/or contractual obligations by placing the Booster Seats into the stream of commerce and selling them to consumers, when the Seats are unsafe and pose a significant safety risk to children. The lack of safety inherent in the Booster Seats renders it unfit for its intended use and purpose and substantially and/or completely impairs the use and value of the

Booster Seat.

308.    Artsana breached its express warranties by selling the Booster Seats, which are in actuality not free of defects, are unsafe for use as represented, and cannot be used for their ordinary purpose of protecting children (1) in the event of a side-impact collision and/or (2) weighing between 30 and 40 pounds.  Artsana breached its express written warranties to Plaintiff Mullins and Maryland Subclass Members in that the Booster Seats are not safe for their intended purpose at the time that they left Artsana's possession or control and were sold to Plaintiff Mullins and Maryland Subclass Members, creating a serious safety risk to the children of Plaintiff Mullins and Maryland Subclass Members.

309.    The Booster Seats that Plaintiff Mullins and Maryland Subclass Members purchased were uniformly deficient with respect to their ability to protect children in the event of a side-impact collision and to protect children weighing between 30 and 40 pounds, which caused each of them damages including loss of the benefit of their bargain.

310.    Plaintiff Mullins and Maryland Subclass Members were injured as a direct and proximate result of Artsana's breach of its express warranties because they did not receive the benefit of their bargain, lost the product's intended benefits, and suffered damages at the point-of-sale, as they would not have purchased the Booster Seats or would not have paid as much if they had known the truth about the

unreasonable safety risks to children posed by the Booster Seats.

**COUNT XV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**Md. Comm. Law §§ 2-314 and 2-315**
**(on behalf of the Maryland Subclass)**

311.   Plaintiff Mullins repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

312.   Plaintiff Mullins brings this claim on behalf of herself and the Maryland Subclass.

313.   Maryland law states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."  Md. Comm. Law § 2-314(1).

314.   Artsana is and was at all relevant times a "merchant" as defined by Md. Comm. Law § 2-104(1).

315.   Plaintiff Mullins and Maryland Subclass Members purchased Booster Seats manufactured and marketed by Artsana by and through its authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Artsana's contracts with authorized sellers, or eventual purchasers when bought from a third party.  At all relevant times, Artsana was a merchant, manufacturer, marketer, warrantor, and/or seller of the Booster Seats.  Artsana knew or had reason to know of the specific use for which the Booster Seats were purchased.

316. The Booster Seats are and were at all relevant times "goods" within the meaning of Md. Comm. Law § 2-105(1).

317. Artsana impliedly warranted that the Booster Seats were in merchantable condition, were fit for the ordinary purpose for which Booster Seats are used, and conformed to the promises and affirmations of fact made on the Booster Seats' packaging. However, when sold, and at all times thereafter, the Booster Seats were not in merchantable condition, were not fit for the ordinary purpose of providing safety and protection for children in the event of a side-impact crash, were not fit for the ordinary purpose of providing safety and protection for children who weighed between 30 and 40 pounds, and did not conform to the promises on the Booster Seats' packaging that the Booster Seats provided side-impact protection and were safe for children weighing between 30 and 40 pounds. Thus, Artsana breached its implied warranty of merchantability.

318. As a direct and proximate result of Artsana's breach of the implied warranty of merchantability, Plaintiff Mullins and Maryland Subclass Members have been damaged in an amount to be proven at trial.

319. Plaintiff Mullins and Maryland Subclass Members have been excused from performance of any warranty obligations as a result of Artsana's conduct described above.

## COUNT XVI
## VIOLATION OF MARYLAND CONSUMER PROTECTION ACT

## Md. Code, Commercial Law, §§ 13-101, *et seq.*
### (on behalf of the Maryland Subclass)

320. Plaintiff Mullins repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

321. Plaintiff Mullins brings this claim on behalf of herself and the Maryland Subclass.

322. Plaintiff Mullins and Maryland Subclass Members were at all relevant times "consumers" as defined in Md. Code, Commercial Law, § 13-101(c).

323. Defendant Artsana was at all relevant times a "person" and a "merchant" as defined in Md. Code, Commercial Law, § 13-101.

324. Defendant Artsana advertises, offers, or sells "consumer goods" or "consumer services" as defined by Md. Comm. Code § 13-101.

325. Defendant Artsana was at all relevant times engaged in trade or commerce through its "advertising" and "sale" of the Booster Seats at issue, as defined in as defined in Md. Comm. Code § 13-101.

326. The Booster Seats at issue constitute "merchandise" as defined in as defined in Md. Comm. Code § 13-101.

327. Defendant's foregoing unfair and deceptive acts and trade practices, including its omissions, were and are committed in its course of trade or commerce, directed at consumers, affect the public interest, and injured Plaintiff Mullins and Maryland Subclass Members.

328.    Defendant's foregoing unfair and deceptive acts and trade practices, including its omissions, were material, in part, because they concerned an essential part of the Booster Seats' intended use and provision of safety to children. Defendant omitted material facts regarding the safety (or lack thereof) of the Booster Seats by failing to disclose that the Seats were unsafe for children weighing between 30 and 40 pounds, that Defendant had no basis for its claims that special features of the Booster Seats would keep a child safe during a side-impact collision, and that, in fact, the Booster Seats will not adequately protect children in the event of a side-impact collision.  Rather than disclose this information, Defendant marketed and labeled the Booster Seats as providing "side impact" protection and misrepresented that the Seats were safe for children weighing as little as 30 pounds.

329.    Defendant intended Plaintiff Mullins and Maryland Subclass Members to rely upon its misrepresentations regarding the safety of its Booster Seats, including that the Seats provide side-impact collision protection and are safe for children weighing as little as 30 pounds.

330.    The Booster Seats pose an unreasonable risk to the safety of children in the event of a side-impact collision, despite Defendant's representation that the Seats provide side-impact protection, and, contrary to Defendant's claim, are not safe for children weighing between 30 and 40 pounds.

331.    Defendant did not disclose this information to consumers.

94

332.    Artsana's foregoing unfair and deceptive acts and trade practices, including its omissions, were and are fraudulent and deceptive acts or practices in violation of the Maryland Consumer Protection Act, as defined in Md. Comm. Code § 13-101, *et seq.*, in that:

a.    Defendant manufactured, labeled, packaged, marketed, advertised, distributed, and/or sold the Booster Seats as having safety features that protected children in the event of a side-impact collision and as being safe for children weighing as little as 30 pounds when it knew, or should have known, that the Booster Seats did not possess the character, benefit, and/or use that Defendant misrepresented them as having.  Rather, the Booster Seats posed an unreasonable risk to the safety of children in the event of a side-impact collision and when children weigh between 30 and 40 pounds;

b.    Defendant manufactured, labeled, packaged, marketed, advertised, distributed, and/or sold the Booster Seats as having safety features that protected children in the event of a side-impact collision and as being safe for children weighing as little as 30 pounds when it knew, or should have known, that the Booster Seats were not of the standard and quality that Defendant misrepresented them to be. Rather, the Booster Seats posed an unreasonable risk to the safety of children

in the event of a side-impact collision and when children weigh between 30 and 40 pounds;

c.      Defendant knew that the fact that its Booster Seats did not actually have safety features protecting children in the event of a side-impact collision, that they were not safe for childen weighing between 30 and 40 pounds, and that they presented  an unreasonable risk to the safety of children was unknown to and would not be easily discovered by Plaintiff Mullins and Maryland Subclass Members, and would defeat their ordinary, foreseeable and reasonable expectations concerning the performance of the Booster Seats;

d.      Defendant advertised its Booster Seats or offered its Booster Seats for sale as having safety features protecting children in the event of a side-impact collision and were safe for children weighing between 30 and 40 pounds when it had no intent to sell the Booster Seats as advertised or offered;

e.      Defendant misrepresented the safety of its Booster Seats and knowingly concealed and omitted the fact that its Booster Seats did not actually have safety features protecting children in the event of a side impact collision and were not safe for childen weighing between 30 and 40 pounds with the intent that Plaintiff Mullins and Maryland Subclass

Members rely on the same in connection with the purchase of the Booster Seats;

f.      Plaintiff Mullins and Maryland Subclass Members were deceived by Defendant's failure to disclose and could not discover the fact that Defendant's Booster Seats did not actually have safety features protecting children in the event of a side impact collision, that they were not safe for childen weighing between 30 and 40 pounds, and that they presented an unreasonable risk to the safety of children; and

g.      Defendant's deceptive acts and practices, including its omissions, injured Plaintiff Mullins and Maryland Subclass Members, and had – and still have – the potential to injure members of the public at-large.

333.    Plaintiff Mullins and Maryland Subclass Members suffered damages when they purchased the Booster Seats.   Defendant's fraudulent and deceptive practices caused actual damages to Plaintiff Mullins and Maryland Subclass Members who were unaware that Defendant's Booster Seats did not actually have safety features protecting children in the event of a side impact collision, that they were not safe for childen weighing between 30 and 40 pounds, and that they presented an unreasonable risk to the safety of children, notwithstanding Defendant's representations at the time of purchase.

334.   Defendant's foregoing deceptive acts and practices, including its omissions, were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

335.   Consumers, including Plaintiff Mullins and Maryland Subclass Members, would not have purchased the Booster Seats or would not have paid as much for the Booster Seats had they known that Defendant's Booster Seats did not actually have safety features protecting children in the event of a side impact collision, that they were not safe for childen weighing between 30 and 40 pounds, and that they presented an unreasonable risk to the safety of children.

336.   As a direct and proximate result of Defendant's deceptive acts and practices, including its omissions, Plaintiff Mullins and Maryland Subclass Members have been damaged as alleged herein, and are entitled to recover actual damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

337.   In addition, Plaintiff Mullins and Maryland Subclass Members seek equitable relief against Defendant on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

**COUNT XVII**
**BREACH OF EXPRESS WARRANTY**
**Tex. Bus. & Com. Code § 2.313**
**(on behalf of the Texas Subclass)**

338.   Plaintiff Murphree repeats and realleges the allegations contained in

paragraphs 1 through 148 as if fully set forth herein.

339.    Plaintiff Murphree brings this claim on behalf of herself and the Texas

Subclass.

340.    Artsana is and was at all relevant times a "merchant" with respect to

the Booster Seats under Tex. Bus. & Com. Code § 2.104(a) and a "seller" of Booster

Seats under Tex. Bus. & Com. Code § 2.103(a)(4).

341.    Plaintiff Murphree and all Texas Subclass Members who purchased

Booster Seats in Texas are "buyers" within the meaning of Tex. Bus. & Com. Code

§ 2.103(a)(1).

342.    The Booster Seats are and were at all relevant times "goods" within

the meaning of Tex. Bus. & Com. Code § 2.105(a).

343.    In connection with the purchase of all Booster Seats, Artsana provided

Plaintiff Murphree and Texas Subclass Members with written express warranties

that the Booster Seats were free of defects.

344.    Further, Artsana expressly warranted and represented that its Booster

Seats:

  a. Were safe for children who weigh as little as 30

  pounds;

  b. Were safe for children who weigh less than 40

  pounds;

c.     Provided head and torso protection;

d.     Provided side-impact protection; and

e.     Included DuoGuard and DuoZone technology to

provide protection in a side-impact collision.

345.   Artsana's express warranties formed the basis of the bargain that was reached when Plaintiff Murphree and Texas Subclass Members purchased the Booster Seats.

346.   Artsana breached its express warranties because the Booster Seats are not safe for children weighing less than 40 pounds and do not protect child occupants during a side-impact crash and DuoGuard and DuoZone do not actually provide protection in a side-impact collision.

347.   As a direct and proximate result of Artsana's breach of its express warranties, Plaintiff Murphree and Texas Subclass Members have been damaged in an amount to be proven at trial.

**COUNT XVIII**
**BREACH OF IMPLIED WARRANTY**
**Tex. Bus. & Com. Code Ann. § 2.314**
**(on behalf of the Texas Subclass)**

348.   Plaintiff Murphree repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

349.   Plaintiff Murphree brings this claim on behalf of herself and the Texas Subclass.

350.    Texas law states that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Tex. Bus. & Com. Code § 2.314(a).

351.    Artsana is and was at all relevant times a "merchant" as defined by Tex. Bus. & Com. Code § 2.104(a).

352.    Plaintiff Murphree and Texas Subclass Members purchased Booster Seats manufactured and marketed by Artsana by and through its authorized sellers for retail sale to consumers, or were otherwise expected to be the third-party beneficiaries of Artsana's contracts with authorized sellers, or eventual purchasers when bought from a third party.  At all relevant times, Artsana was a merchant, manufacturer, marketer, warrantor, and/or seller of the Booster Seats.  Artsana knew or had reason to know of the specific use for which the Booster Seats were purchased.

353.    The Booster Seats are and were at all relevant times goods within the meaning of Tex. Bus. & Com. Code § 2.105(a).

354.    Artsana impliedly warranted that the Booster Seats were in merchantable condition and fit.  However, when sold, and at all times thereafter, the Booster Seats were not in merchantable condition, were not fit for the ordinary purpose of providing safety and protection for children in the event of a side-impact crash, and were not fit for the ordinary purpose of providing safety and protection

for children who weighed less than 40 pounds, thus presenting undisclosed safety risks to children.   Consequently, Artsana breached its implied warranty of merchantability for the ordinary purpose for which the Booster Seats are purchased and used.

355.    Artsana cannot disclaim its implied warranty as it knowingly sold unsafe and hazardous booster seats.

356.    As a direct and proximate result of Artsana's breach of the implied warranty of merchantability, Plaintiff Murphree and Texas Subclass Members have been damaged in an amount to be proven at trial.

357.    Plaintiff Murphree and Texas Subclass Members have been excused from performance of any warranty obligations as a result of Artsana's conduct described herein.

## COUNT XIX
### VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT
### Tex. Bus. & Com. Code §§ 17.41, *et seq.*
### (on behalf of the Texas Subclass)

358.    Plaintiff Murphree repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

359.    Plaintiff Murphree brings this claim on behalf of herself and the Texas Subclass.

360.    Plaintiff Murphree and Texas Subclass Members are individuals with

assets of less than $25 million. *See* Tex. Bus. & Com. Code § 17.41.

361.    The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides a private right of action to a consumer where the consumer suffers economic damage as the result of either (i) the use of false, misleading, or deceptive acts or practices specifically enumerated in Tex. Bus. & Com. Code § 17.46(b); or (ii) "an unconscionable action or course of action by any person." Tex. Bus. & Com. Code § 17.50(a)(2) & (3).

362.    The Texas DTPA declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have"; "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; and "(9) advertising goods or services with intent not to sell them as advertised."   An "unconscionable action or course of action" means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  Tex. Bus. & Com. Code § 17.45(5).  As detailed above, Artsana has engaged in each of these actions declared unlawful under the Texas DTPA and thereby caused economic damages to Plaintiff Murphree and the Texas Subclass.

363.    In the course of its business, Artsana willfully failed to disclose the

safety risks posed by its Booster Seats, which put children's health and wellbeing at serious risk in side-impact car crashes and when those children weighed between 30 and 40 pounds.

364.    Artsana also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of its Booster Seats.

365.    Artsana's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Murphree and Texas Subclass Members, about the true safety risks posed by its Booster Seats.

366.    Artsana intentionally and knowingly misrepresented material facts regarding its Booster Seats with intent to mislead Plaintiff Murphree and Texas Subclass Members.

367.    Artsana knew or should have known that its conduct violated the Texas DTPA.

368.    Artsana owed Plaintiff Murphree and Texas Subclass Members a duty to disclose the truth about the safety risks posed by its Booster Seats, because Artsana:

a.    Possessed exclusive knowledge about the actual safety of its

Booster Seats in side-impact collisions;

b.      Possessed exclusive knowledge that its proprietary technology identified as DuoGuard and DuoZone did not actually provide side-impact protection;

b.      Knew Plaintiff Murphree and Texas Subclass Members would not reasonably know that its Booster Seats were not safe for children weighing between 30 and 40 pounds;

c.      Intentionally concealed the foregoing from Plaintiff Murphree and Texas Subclass Members; and/or

d.      Made incomplete and misleading representations that the Booster Seats provided side-impact protection and were safe for children weighing between 30 and 40 pounds while purposefully withholding material facts from Plaintiff Murphree and Texas Subclass Members that contradicted these representations.

369.    Artsana's omissions and/or misrepresentations about the safety of its Booster Seats were material to Plaintiff Murphree and Texas Subclass Members.

370.    Plaintiff Murphree and Texas Subclass Members suffered ascertainable loss caused by Artsana's misrepresentations and its concealment of and failure to disclose material information.  Plaintiff Murphree and Texas Subclass Members would not have purchased the Booster Seats or would not have paid as

much for the Booster Seats but for Artsana's violations of the Texas DTPA.

371.   Artsana had an ongoing duty to its customers to refrain from unfair and deceptive practices under the Texas DTPA.  As a direct and proximate result of Artsana's violations of the Texas DTPA, Plaintiff Murphree and Texas Subclass Members have suffered injury-in-fact and actual damages.

372.   Artsana's violations present a continuing risk to Plaintiff Murphree as well as to the general public.  Artsana's unlawful acts and practices complained of above affect the public interest.

373.   Plaintiff Murphree sent Artsana pre-suit notice of her claims under the Texas Deceptive Trade Practices and Consumer Protection Act,  Tex. Bus. & Com. Code § 17.41, *et seq*.  A  copy of the original version of this complaint was also mailed to the Attorney General of the State of Texas in accordance with Tex. Bus. & Com. Code § 17.501.

374.   Pursuant to Tex. Bus. & Com. Code § 17.505(a), since Artsana did not rectify its conduct within 60 days of the pre-suit notice, Plaintiff Murphree is entitled under the DTPA to obtain monetary relief against Artsana, measured as actual damages in an amount to be determined at trial, treble damages for Artsana's knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

## COUNT XX
## BREACH OF EXPRESS WARRANTY
### (on behalf of the New York Subclass)

375.    Plaintiff Jimenez repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

376.    Plaintiff Jimenez incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

377.    Plaintiff Jimenez brings this claim individually and on behalf of the members of the New York Subclass against Defendant.

378.    Defendant, as the designer, manufacturer, marketer, distributor, or seller expressly warranted on its packaging and other marketing materials that the Products were suitable for children as small as 30 pounds and that the Products offered side-impact protection.

379.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain between Plaintiff Jimenez and the members of the New York Subclass and Defendant.

380.    Defendant breached its express warranties because Defendant's statements about the Products were false and the Products do not conform to Defendant's affirmations and promises described above.  In fact, the Products are not safe for use or suitable for children as small as 30 pounds, and do not pass any side-impact testing or offer side-impact protection.

381.    Plaintiff Jimenez and the New York Subclass members were injured as a direct and proximate result of Defendant's breach because:  (a) they would not have purchased the Products on the same terms if the truth concerning Defendant's Products had been known; (b) they paid a price premium due to Defendant's misrepresentations about the Products; and (c) the Products did not perform as promised.

382.    On February 19, 2021, prior to filing this action, Defendant was served with a presuit notice letter that complied in all respects with U.C.C. §§ 2-313, 2-607. Plaintiff's counsel sent Defendant a letter advising it that it had breached its warranties to purchasers of the Products and demanded that it cease and desist from such breaches and make full restitution by refunding the monies received therefrom.

## COUNT XXI
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (on behalf of the New York Subclass)

383.    Plaintiff Jimenez repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

384.    Plaintiff Jimenez brings this claim individually and on behalf of members of the New York Subclass against Defendant.

385.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that that the Products are merchantable as a booster seat, suitable for children as small as 30 pounds, and offered side-impact protection.

386. Defendant breached the warranty implied in the contract for the sale of the Products because the Products were not merchantable or fit for their intended and ordinary purpose, they could not "pass without objection in the trade under the contract description," the goods were not "of fair average quality within the description," the goods were not "adequately contained, packaged, and labeled as the agreement may require," and the goods did not "conform to the promise or affirmations of fact made on the container or label." *See* U.C.C. § 2-314(2) (listing requirements for merchantability). As a result, Plaintiff and Class members did not receive the goods as impliedly warranted by Defendant to be merchantable.

387. Plaintiff Jimenez and New York Subclass Members purchased the Products relying on Defendant's skill and judgment in properly packaging and labeling the Products.

388. Plaintiff Jimenez and New York Subclass members were the intended consumers of the Booster Seats. That is, the retailers through which Defendant sold its product were not intended to be the ultimate consumers of the Products and have no rights under the warranties provided with the Booster Seats. The warranties are designed for and intended to benefit the ultimate consumers only. Plaintiff is an ultimate consumer. Accordingly, Plaintiff Jimenez and New York Subclass Members are third-party beneficiaries consistent with New York law.

389. The Products were not altered by Plaintiff Jimenez or New York

Subclass Members.

390.    The Products were defective when they left the exclusive control of Defendant.

391.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff Jimenez and New York Subclass Members.

392.    The Products were defectively designed and unfit for their intended purpose and Plaintiff Jimenez and New York Subclass Members did not receive the goods as warranted.

393.    As a direct and proximate result of Defendant's breach of the implied warranty, Plaintiff Jimenez and New York Subclass Members have been injured and harmed because they would not have purchased the Products if they knew the truth about the product and that the product they received was worth substantially less than the product they were promised and expected.

**COUNT XXII**
**VIOLATION OF THE NEW YORK DECEPTIVE ACTS**
**OR PRACTICES LAW**
**New York Gen. Bus. Law § 349**
**(on behalf of the New York Subclass)**

394.    Plaintiff Jimenez repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

395.    Plaintiff Jimenez brings this claim on behalf of herself and the New York Subclass against Defendant.

396.    By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by making false representations and omissions on the label and in the advertising of the Products.

397.    The foregoing deceptive acts and practices were directed at consumers.

398.    The foregoing deceptive acts and practices were misleading in a material way because the Booster Seats are not in fact safe for children as small as 30 pounds, nor do they offer side-impact protection.

399.    Plaintiff Jimenez and New York Subclass Members were injured as a result because (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the misrepresentations and omissions that the Products are not safe for children as small as 30 pounds, nor do they offer side-impact protection.

400.    On behalf of herself and other New York Subclass Members, Plaintiff Jimenez seeks to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT XXIII
### VIOLATION OF NEW YORK FALSE ADVERTISING LAW
### New York Gen. Bus. Law § 350
### (on behalf of the New York Subclass)

401.    Plaintiff Jimenez repeats and realleges the allegations contained in paragraphs 1 through 148 as if fully set forth herein.

402.    Plaintiff Jimenez brings this claim on behalf of herself and the New York Subclass against Defendant.

403.    Based on the foregoing, Defendant engaged in consumer-oriented conduct that was deceptive or misleading in a material way which constitutes false advertising in violation of Section 350 of the New York General Business Law because the Products are not safe for children as small as 30 pounds, nor do they offer side-impact protection.  The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

404.    This misrepresentation resulted in consumer injury or harm to the public interest.

405.    As a result of this misrepresentation, Plaintiff Jimenez and New York Subclass Members have suffered economic injury because (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the misrepresentations and omissions that the Products are not safe for children as small as 30 pounds, nor do they offer side-impact protection.

406.    On behalf of herself and other New York Subclass Members, Plaintiff Jimenez seeks to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members, respectfully request that this Court enter an Order:

a. Certifying the Nationwide Class and/or the State Subclasses and appointing Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

b. Declaring that Artsana's failure to disclose the dangers of its Booster Seats was deceptive, unfair and unlawful;

c. Enjoining Artsana's deceptive, unfair, and unlawful conduct;

d. Finding that Artsana's conduct was deceptive, unfair, and unlawful as alleged herein;

e. Finding that Artsana's conduct was in violation of the statutes and common law referenced herein;

f. Awarding Plaintiffs and the other Class Members actual, compensatory, and consequential damages;

g. Awarding Plaintiffs and the other Class Members punitive

damages, statutory damages, and penalties, as allowed by law;

h.   Awarding Plaintiffs and the other Class Members restitution and disgorgement;

i.   Awarding Plaintiffs and the other Class Members pre-judgment and post-judgment interest;

j.   Awarding Plaintiffs and the other Class Members reasonable attorneys' fees costs and expenses and

k.   Granting such other relief as the Court deems just and proper.

Dated: January 17, 2023.             Respectfully submitted,

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

*/s/ Martha A. Geer*
Martha A. Geer
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
mgeer@milberg.com

**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
Gregory F. Coleman (admitted *pro hac vice*)
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
Facsimile: (865) 522-0080
Email: gcoleman@milberg.com

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
Jonathan B. Cohen*
3833 Central Ave.
St. Petersburg, FL 33713
Telephone: (865) 247-0080
Facsimile: (865) 522-0049
Email:  jcohen@milberg.com

**BURSOR & FISHER, P.A.**

*/s/ Alec M. Leslie*
Alec M. Leslie
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: aleslie@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher*
Sean L. Litteral*
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  ltfisher@bursor.com
Email:  slitteral@bursor.com

**VOZZOLO LLC**
Antonio Vozzolo
Andrea Clisura
345 Route 17 South
Upper Saddle River, NJ 07458
Telephone: (201) 630-8820
Facsimile: (201) 604-8400
Email:  avozzolo@vozzolo.com
Email:  aclisura@vozzolo.com

* *Pro hac vice* forthcoming

*Attorneys for Plaintiffs and Class Members*

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2023, the foregoing document was electronically filed with the Clerk of the United States District Court for the Southern District of New York, using the Court's CM/ECF system, and is available for viewing and downloading from the Court's CM/ECF system.  All counsel of record will be served via the CM/ECF system.

*/s/ Martha A. Geer*
Martha A. Geer