## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MASHAYILA SAYERS, BRITTNEY TINKER, JENNIFER MONACHINO, KIMBERLY MULLINS, HILDA MICHELLE MURPHREE, and AMANDA JIMENEZ, on behalf of themselves and all others similarly situated,

                  Plaintiffs,

    v.

ARTSANA USA, INC.,

                  Defendant.

Case No. 7:21-cv-07933-VB

Hon. Vincent L. Briccetti

## ARTSANA USA, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, EXPENSES, AND INCENTIVE AWARDS

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 2

    A.    Congress Publishes a Report on Booster Seats, and Plaintiffs File Class-Action Lawsuits ......................................................................................... 2

    B.    The Parties Reached a Settlement Five Months into the *Sayers* Action and One Week After the Filing of the *Jimenez* Complaint............................. 4

    C.    Fraud Plagues the Settlement Claims Process ........................................ 5

    D.    Plaintiffs' Counsel Claim an "Excellent" Result and Seek $2.25 Million in Fees ....................................................................................................... 6

III.  LEGAL STANDARDS ..................................................................................... 10

IV.   ARGUMENT ..................................................................................................... 10

    A.    The Court Should Defer Ruling on Any Fees Request Until the Close of the Claims Period .................................................................................. 11

    B.    There Is No Basis in Law or Equity for Any Fee Award in This Case ................ 11

        1.    *The "Common Fund Doctrine" Does Not Support Any Fee Award.* ........ 11

        2.    *Plaintiffs' Counsel's Actions Foreclose Any Fee Award*......................... 14

    C.    At a Minimum, the Court Should Substantially Reduce Any Fee Award ........... 15

        1.    *The Court Should Not Endorse the Fiction that Assumes 100% of Class Members Will Participate.* ............................................................ 15

        2.    *Proper Methodologies Result in a Substantial Reduction in Fees.* .......... 18

V.    CONCLUSION................................................................................................... 25

**PAGE(S)**

**Cases**

*Alleyne v. Time Moving & Storage Inc.*,
    264 F.R.D. 41 (E.D.N.Y. 2010) ........................................................................17

*Alyeska Pipeline Service Co. v. Wilderness Society*,
    421 U.S. 240 (1975) ........................................................................................12

*Ambac Assurance Corp. v. Adelanto Public Utility Authority*,
    No. 09-cv-5087-JFK, 2013 WL 4615404 (S.D.N.Y. Aug. 29, 2013).............23

*Behzadi v. International Creative Management Partners, LLC*,
    No. 14-cv-4382-LGS, 2015 U.S. Dist. LEXIS 90117 (S.D.N.Y. July 9, 2015) ....................17

*Bodon v. Domino's Pizza, LLC*,
    No. 09-cv-2941, 2015 WL 3889577 (E.D.N.Y. June 4, 2015)..............................16

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ...............................................................................11, 12

*Central Railroad & Banking Co. v. Pettus*,
    113 U.S. 116 (1885) ........................................................................................13

*In re Citigroup Inc. Securities Litigation*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013)...........................................................20, 24

*Cunningham v. Suds Pizza, Inc.*,
    290 F. Supp. 3d 214 (W.D.N.Y. 2017) ................................................10, 16, 17, 18

*Darby v. Sterling Home Care, Inc.*,
    No. 17-cv-5370-RMB, 2020 WL 29932 (S.D.N.Y. Jan. 2, 2020).........................25

*Diaz v. Eastern Locating Service, Inc.*,
    No. 10-cv-04082-JCF, 2010 U.S. Dist. LEXIS 139136 (S.D.N.Y Nov. 29, 2010) ......................................................................................17

*Dubin v. E.F. Hutton Group Inc.*,
    878 F. Supp. 616 (S.D.N.Y. 1995) ...............................................................14

*In re Excess Value Insurance Coverage Litigation*,
    598 F. Supp. 2d 380 (S.D.N.Y. 2005)...........................................................19

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517 (1994)........................................................................................14

*Fox v. Vice*,
    563 U.S. 826 (2011) ........................................................................................10

*Goldberger v. Integrated Resources, Inc.*,
    209 F.3d 43 (2d Cir. 2000)............................................................................10, 18, 21

*Gordon v. Vanda Pharmaceuticals Inc.*,
    No. 19-cv-1108, 2022 WL 4296092 (E.D.N.Y. Sept. 15, 2022) ...........................11

*Grice v. Pepsi Beverages Co.*,
    363 F. Supp. 3d 401 (S.D.N.Y. 2019) ..................................................................19

*Hart v. BHH, LLC*,
    No. 15-cv-4804-WHP, 2020 WL 5645984 (S.D.N.Y. Sept. 22, 2020) ............16, 17

*Hart v. RCI Hospitality Holdings*,
    No. 09-cv-3043-PAE, 2015 U.S. Dist. LEXIS 126934 (S.D.N.Y. Sept. 22,
    2015) .....................................................................................................................17

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..........................................................................10, 11, 22

*Internal Improvement Fund Trustees v. Greenough*,
    105 U.S. 527 (1881)..............................................................................................11

*Johnson v. NPAS Solutions, LLC*,
    975 F.3d 1244 (11th Cir. 2020) ...........................................................................13

*Kapoor v. Rosenthal*,
    269 F. Supp. 2d 408 (S.D.N.Y. 2003)..................................................................22

*Kirsch v. Fleet Street, Ltd.*,
    148 F.3d 149 (2d Cir. 1998).............................................................................20, 25

*In re Longwei Petroleum Investment Holding Ltd. Securities Litigation*,
    No. 13-cv-214-RMB-RLE, 2017 WL 2559230 (S.D.N.Y. May 22, 2017) ...........19, 20, 21

*Masters v. Wilhelmina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007).................................................................................17

*McDaniel v. County of Schenectady*,
    595 F.3d 411 (2d Cir. 2010).................................................................................18

*McGreevy v. Life Alert Emergency Response, Inc.*,
    258 F. Supp. 3d 380 (S.D.N.Y. 2017)..............................................................15, 18

*McLaughlin v. IDT Energy*,
    No. 14-cv-4107, 2018 WL 3642627 (E.D.N.Y. July 30, 2018)...................16, 17, 18

*Moses v. New York Times Co.*,
    79 F.4th 235 (2d Cir. 2023) .................................................................................13

*Motorola Credit Corp. v. Uzan*,
  561 F.3d 123 (2d Cir. 2009).................................................................................14

*N.Y. State Association for Retarded Children, Inc. v. Carey*,
  711 F.2d 1136 (2d Cir. 1983)............................................................................23

*Oladapo v. Smart One Energy, LLC*,
  No. 14-cv-7117, 2017 WL 5956907-LTS-BCM (S.D.N.Y. Nov. 9, 2017)......................16, 19

*Parker v. Time Warner Entertainment Co.*,
  631 F. Supp. 2d 242 (E.D.N.Y. 2009), *aff'd*, 378 F. App'x 63 (2d Cir. 2010)..................15, 16

*In re Penthouse Executive Club Compensation Litigation*,
  No. 10-cv-1145-KMWV, 2014 U.S. Dist. LEXIS 5864 (S.D.N.Y. Jan. 14,
  2014) ....................................................................................................17

*Ramirez v. Marriott International*,
  No. 20-cv-02397-PMH, 2023 WL 2447398 (S.D.N.Y. Mar. 10, 2023).................................22

*Sands v. CBS Interactive Inc.*,
  No. 18-cv-7345-JSR, 2019 WL 1447014 (S.D.N.Y. Mar. 13, 2019) ...................................14

*Seigal v. Merrick*,
  619 F.2d 160 (2d Cir. 1980)...............................................................................22

*Torres v. Gristede's Operating Corp.*,
  519 F. App'x 1 (2d Cir. 2013) .....................................................................17, 20

*U.S. Airways, Inc. v. McCutchen*,
  569 U.S. 88 (2013)........................................................................................11

*United States v. East River Housing Corp.*,
  90 F. Supp. 3d 118 (S.D.N.Y. 2015)......................................................................13

*Varljen v. H.J. Meyers & Co.*,
  No. 97-cv-6742-DLC, 2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ..................................21

*Velez v. Novartis Pharmaceuticals Corp.*,
  No. 04-cv-09194-CM, 2010 U.S. Dist. LEXIS 125945 (S.D.N.Y. Nov. 30,
  2010) ....................................................................................................17

*Zink v. First Niagara Bank, N.A.*,
  No. 13-cv-01076, 2016 WL 7473278 (W.D.N.Y. Dec. 29, 2016) .........................................17

**Rules**

Federal Rules of Civil Procedure 23(h) ............................................................11, 12

**Other Authorities**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studs. 811 (2010) ............................................19

Staff of H. Subcommitee on Economix & Consumer Policy, 116th Congress, Booster Seat Manufacturers Give Parents Dangerous Advice (Dec. 10, 2020), https://tinyurl.com/yk9daamv ...............................................................................2, 3

Staff Report*, Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns*, FTC (Sept. 2019), https://www.ftc.gov/system/files/ documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf ....................................................16

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Studs. 248 (2010)...............................19

# I.    INTRODUCTION

Plaintiffs' counsel's request for $2.25 million in attorneys' fees and costs is built on a house of cards. It assumes the class's reaction to the settlement has been "overwhelmingly positive," when in fact the enthusiasm has come from fraudsters. It also assumes that Plaintiffs' counsel did significant work, when in fact their main contribution in this case amounted to copying and pasting from a congressional report into three successive complaints—there was no discovery in this matter and the bulk of the work related to negotiating and then policing the settlement. And most dubiously, Plaintiffs' counsel's fee request assumes that this Court will award fees on a hypothetical that every single class member will submit a claim, when in fact that could never come to fruition. The Court should either deny counsel's fee request or at least substantially reduce it.

As a threshold matter, the Court should defer ruling on fees until after the close of the claims period. As Artsana explains in its response to the Motion for Final Approval, there have been more than twice as many claims as products sold during the class period, and, if this claims rate continues, the total claims would be more than *triple* the total number of products actually sold. Both the Court-approved settlement administrator and the separate company that Artsana retained have confirmed that the overwhelming majority (95%+) of claims have been fraudulent. Because of this overwhelming fraud, Artsana has requested that the Court immediately close the claims period and defer final approval of this settlement until after the claims period closes, to allow all claims to be properly evaluated for fraud. The Court also should delay consideration of fees until final approval.

But whenever the Court reaches the merits of Plaintiffs' counsel's request, it should reject it. Fee-shifting is not appropriate in this case because the common-fund doctrine—which is the exclusive basis for counsel's request—allows class-action counsel to collect from *the class*. But

this is a claims-made settlement with no common fund—and counsel seeks to collect from *Artsana*, not the class. There is therefore no legal basis for their fee request. And even if fees were available as a matter of law, they are not as a matter of equity: The doctrine of unclean hands bars counsel from sitting idle as fraud crippled the settlement process and then seeking to financially benefit from the fraud by using it to justify their fee award when they did nothing to prevent it.

At a minimum, the Court should award a small fraction of the requested $2.25 million. The process counsel uses to reach this number is fundamentally flawed because it assumes that 100% of all class members will participate in the claims process. A more realistic, yet generous estimate of a 10% claims rate yields a much more modest sum, on the order of $331,234. Similarly, a proper application of the lodestar method leads to a similar number after the Court accounts for the fact that counsel's billing records are riddled with inconsistency, inefficiency, and error. For example:

- Counsel employed *30* timekeepers across *three* firms, when only two attorneys were primarily responsible for negotiating and supervising the settlement.

- Two name partners at their respective firms spent *more than 55 hours* talking *only to each other*, to say nothing of the endless conferences with other attorneys.

- Counsel's entries are vague and unreliable, including entries such as "Call w/ Anthony," "case organization," and simply "Emails."

- The two firms billed $232,602 *before ever filing a complaint*.

In short, *no* fees are merited in this case, and certainly not at this juncture. But in any event, a substantial reduction is necessary here, if any award is ever granted.

## II. FACTUAL BACKGROUND

### A. Congress Publishes a Report on Booster Seats, and Plaintiffs File Class-Action Lawsuits

In December 2020, the majority staff of a House Committee on Oversight and Reform subcommittee published a report regarding the marketing of booster seats for children smaller than 40 pounds. *See* Staff of H. Subcomm. on Econ. & Consumer Pol'y, 116th Cong., Booster Seat

Manufacturers Give Parents Dangerous Advice (Dec. 10, 2020), https://tinyurl.com/yk9daamv.
The report claimed that this marketing was in tension with federal guidelines, which sometimes recommend a minimum weight of 40 pounds. *E.g.*, *id.* at 27–28.

A group of plaintiffs represented by Milberg Coleman Bryson Phillips Grossman, PLLC filed suit against Artsana in the Eastern District of Pennsylvania in April 2022. Complaint, *Sayers v. Artsana USA, Inc.*, No. 5:21-cv-01876-JMG, ECF No. 1 (E.D. Pa.). The complaint makes the same basic allegation as the House Report—that Artsana misrepresented that its booster seats were safe and provided side-impact protection for children weighing 30 pounds or more—and includes much of the same Artsana promotional material as the report does. *See id.* ¶¶ 6, 9–12, 47, 55–57, 68, 71–72, 79, 89–94. It adds little fact investigation beyond what the House Report already provided, essentially retelling the history of car-seat regulation based on publicly available documents and quoting a smattering of Artsana promotional materials. *Id.* ¶¶ 27–54, 58–88. There is also little in the way of individualized facts about class members: Each plaintiff allegedly bought a booster seat for their child who weighed less than 40 pounds. *Id.* ¶¶ 95–120.

Artsana moved to dismiss a number of the claims in July 2021. Defendant's Brief in Support of Mot. to Dismiss, *Sayers*, No. 5:21-cv-01876-JMG, ECF No. 20. The motion argued that the complaint revealed that the central proposition of their lawsuit was false: Plaintiffs alleged Artsana markets its booster seats "are safe for children weighing as little as 30 pounds," but Artsana actually said that children should "ONLY use this Booster Seat if" they met a number of *additional* age, height, and development requirements. *Id.* at 3. The complaint also conceded that all Artsana said about side-impact protection was that the booster seat came with "Duoguard Side-Impact Protection" and "two layers of side-impact protection," which Plaintiffs have never alleged was false. *Id.* at 2.

Plaintiffs filed an opposition of just over 17 pages on September 3, 2021. Plaintiffs' Opp.

to Mot. to Dismiss, *Sayers*, No. 5:21-cv-01876-JMG, ECF No. 27.  The opposition made many of the same legal arguments as the 50-page motion-to-dismiss opposition in *Carder v. Graco Children's Products, Inc.*, No. 2:20-cv-00137, ECF No. 70 (N.D. Ga. Aug. 31, 2021), which the same lawyers prepared, *id.* at 51–53, and which counsel admitted involved "virtually identical claims against another booster seat manufacturer," *id*. at 9.

Shortly before Artsana filed its motion to dismiss, the parties agreed to mediate before the Honorable Diane M. Welsh (Ret.).  On the same day each side's mediation brief was due, Bursor & Fisher, P.A. and Vozzolo LLC filed another class-action complaint in the Southern District of New York on September 23, 2021.  Complaint, ECF No. 1.  These attorneys, who had previously sent Artsana demand letters on behalf of other putative plaintiffs, had been coordinating with Milberg (the original counsel in *Sayers*) since at least April 2021.  ECF No. 63-3 at 13–15; ECF No. 64-1 at 5–7.  Their complaint thus not only drew on the House Report, *Jimenez* Complaint ¶¶ 6–8, 11–16, 69–76, but also copied and pasted from the *Sayers* Complaint, *e.g.*, *id*. ¶¶ 80–87 (paragraphs copied essentially verbatim).

## B.  The Parties Reached a Settlement Five Months into the *Sayers* Action and One Week After the Filing of the *Jimenez* Complaint

At the September 30 mediation before Judge Welsh, seven attorneys for Plaintiffs appeared—including five partners.  Smith Decl. in Support of Opp. to Mot. for Fees ¶ 7.  Artsana, by contrast, had one partner and one associate in attendance.  *Id.*  The parties reached a tentative settlement at the mediation and requested that the Court stay the action.  Letter, ECF No. 6.  No discovery had occurred before the settlement was reached; nor had there been any court hearings.

The basic terms of the settlement provided that class members with proof of purchase (such as a receipt or a registration with Artsana) would be eligible to receive $50.  ECF No. 42-1 ¶ 46.  For claimants who may have lost their proof of purchase or failed to register, class members could receive $25 if they could provide specific information about their booster seat to verify their

purchase. *Id.* ¶ 47. Specifically, class members would need to corroborate their purchase of a KidFit booster seat by satisfying at least two of four requirements: (1) identifying the serial number, (2) identifying the model of the Eligible Product they purchased and either the primary and/or secondary colors of the seat, (3) identifying the retailer from which they purchased, as well as the approximate month (or season) and year of purchase, or (4) if the Eligible Product was not purchased online, identifying the municipality and state in which the Eligible Product was purchased and attaching a picture of the Eligible Product. *Id.*

The parties participated in a second mediation on November 8, 2021, to discuss the specifics of the non-monetary relief. For this one, Plaintiffs again had five partners and two associates present. Smith Decl. ¶ 7. The same two lawyers participated on Artsana's behalf. *Id.*

Following the successful mediation, Artsana drafted the vast bulk of the settlement papers. Artsana—not Plaintiffs' counsel—wrote the initial draft of the settlement agreement. Smith Decl. ¶ 16. Artsana, together with the settlement administrator, Angeion, also drafted most of the exhibits, while Plaintiffs' counsel drafted only two exhibits. *Id.*

In accord with the settlement, the *Sayers* and *Jimenez* plaintiffs filed a consolidated complaint in this Court. ECF No. 39. As the concurrently filed redline demonstrates, this complaint was largely identical to the previous *Sayers* Complaint, adding only the plaintiffs and causes of action from the *Jimenez* action. Smith Decl. Ex. D. Plaintiffs filed for preliminary approval of the settlement in January 2023. ECF No. 40. The Court granted preliminary approval six days later. ECF Nos. 45, 52.

## C.   Fraud Plagues the Settlement Claims Process

Unfortunately, fraud has overwhelmed the settlement claims in this case, as explained in Artsana's Opposition to Plaintiffs' Motion for Final Approval, filed concurrently with this brief. From the outset, Artsana raised concerns about fraud to Plaintiffs' counsel. However, counsel were initial hopeful because the early period of claims that followed direct notice appeared reasonable: Claims

averaged approximately 12,350 claims per week, or about 1,765 claims per day. Heller Decl. ¶ 21. But after Angeion instigated the media notice, the claims exploded. In a three-day period from March 29 through March 31, 55,028 claims were submitted. *Id.* ¶ 22. Even more troubling, Angeion reported to the parties that as of May 15, an overwhelming *99%* of claimants were picking the model-year-color-retailer option and over *71%* were getting the answers wrong. Smith Decl. in Support of Response to Mot. for Final Approval ¶ 8, Ex. B. And claims continued to accumulate at an unbelievable pace even *after* the media notice ended that Spring, peaking at roughly 47,270 per day, or 330,920 per week, in late August. Heller Decl. ¶ 28.

In light of these figures, Artsana repeatedly told Plaintiffs' counsel that the evident fraud could derail the settlement and pressed counsel for meaningful changes to the claims process. Smith Decl. ¶ 15. Artsana convened no fewer than four conferences with Plaintiffs' counsel, including one attended by the CEO of Angeion. *Id.* The parties also attempted to mediate their dispute, to no avail. *Id.* ¶¶ 7, 14. Earlier in the process, Plaintiffs' counsel would only agree to reshuffle the order of the claims matrix, on the condition that a valid serial number would automatically qualify a claimant for $25. *Id.*

## D. Plaintiffs' Counsel Claim an "Excellent" Result and Seek $2.25 Million in Fees

Notwithstanding the fraud problems, Plaintiffs' counsel pressed ahead with their motion for final approval and request for $2.25 million in fees and costs. Those motions do not discuss the massive fraud. ECF Nos. 56, 61. Rather, counsel argues that the class's reaction to the settlement has been "overwhelmingly positive," ECF No. 57 at 21, and that the settlement was "outstanding" and achieves an "excellent result" for the class, ECF No. 62 at 1, 14.

Counsel attempts to justify a $2.25 million award in a number of ways. First, they suggest that the settlement is worth $24,735,203.20—a total they calculate by multiplying $25 (the claim amount for no-proof claimants) by 874,538, an estimate of the total products sold, and adding

costs. ECF No. 62 at 9. In other words, counsel urges the Court to assume that *every single class member will submit a claim* for $25. Using this unrealistic denominator, counsel calculates its fee request as "only 9.1% of the total estimated value of the Settlement." *Id.* Second, Plaintiffs' counsel cite the 153,244 products that Angeion, the settlement administrator, determined to be "preliminarily eligible" as a basis for calculating a settlement value. Using this number, Plaintiffs' counsel claim their $2.25 million fee request is only 33.5% of the settlement's value. *Id.* at 16. This statement ignores Angeion's caveat that 153,244 figure was "preliminary" and "will be subjected to final audits," ECF No. 60 ¶ 27 & n.1, and in fact, the actual number of non-fraudulent, preliminarily eligible products is actually only 61,582. Weisbrot Decl. ¶ 4.[1] Third, and only in the alternative, counsel argues their actual hours worked justify the $2.25 million fee award, submitting their billing records as evidence. ECF No. 62 at 17–18.

Those billing records, however, are unreliable. For example, for a mediation on November 8, 2021, one attorney logged 3.3 hours, and four others billed 4.8 hours. ECF No. 64-1 at 10; ECF No. 63-3 at 19. But a sixth attorney, billing $919 per hour, recorded 7 hours for the same mediation—almost 1.5 times the others. ECF No. 65 at 27. A seventh attorney block billed, but at any rate billed only 5.5 hours for *both* "mediation and follow up." *Id.* at 40. Similarly, for the August 18, 2023 follow-up mediation, four class lawyers reported four significantly different amounts of time: 2.7 hours, 3.7 hours, 4.6 hours, and 6.0 hours. ECF No. 63-3 at 34; ECF No. 64-1 at 18; ECF No. 65 at 35, 42. (A fifth lawyer block billed his time. ECF No. 65 at 39.) No client actually paying the fees would ever sanction such inconsistency, and there is no basis to charge it to Artsana.

---

[1] Plaintiffs' counsel acknowledged this reduction on the morning this brief was due. ECF No. 77 at 1.

The records are also vague. One attorney recorded $900 per hour for "Fact research re potential new matter (3.10)," without identifying the research or whether it even was relevant to this litigation. ECF No. 63-3 at 13. The records are rife with this type of entry: No fewer than 133 billing entries refer to discussions of "next steps." Smith Decl. ¶ 8. One Bursor & Fisher partner has two entries on consecutive days for "Research re potential claims and venue" (a total of 10.5 hours and $7,087.50), another for "Research re potential claims" (5.7 hours and $3,847.50), and still another for "Pre-suit investigation" (5.9 hours and $3,982.50). ECF No. 64-1 at 5. Other entries from Bursor & Fisher include "Call w/ Anthony, "Case file organization," "case organization," "Email re next steps w/ team," "contact w/ client," "Email re: next steps," and "Call w/ Tim." *Id.* at 10, 15, 16, 19. The lawyers at the Milberg firm billed for "Emails w/ team re: litigation strategy," "Emails w/ team re: status report," and "call re settlement agreement." ECF No. 65 at 38, 39, 41. One entry, for $299.10, just says, "Emails." *Id.* at 37.

A few things are clear from the billing records, however. One notable feature is the sheer number of people that worked on this case across the three firms—30 timekeepers, including 17 lawyers:

|  | Timekeeper | Role | Time billed | Billed amount |
|---|---|---|---|---|
| 1 | Anthony Vozzolo | Named partner | 295.9 | $ 266,310.00 |
| 2 | L. Timothy Fisher | Named partner | 193.7 | $ 193,700.00 |
| 3 | Martha A. Geer | Partner | 255 | $ 239,234.60 |
| 4 | Alec M. Leslie | Partner | 177.9 | $ 120,082.50 |
| 5 | Gregory F. Coleman | Named partner | 90.2 | $ 83,619.20 |
| 6 | Jonathan B. Cohen | Partner | 77.4 | $ 60,014.00 |
| 7 | Arthur Stock | Partner | 8.5 | $ 7,808.00 |
| 8 | Neal J. Deckant | Partner | 0.4 | $ 320.00 |
| 9 | Jeremy R. Williams | Senior associate | 0.7 | $ 325.00 |
| 10 | Ryan McMillan | Senior counsel | 23.2 | $ 15,600.00 |
| 11 | Andrea Clisura | Associate | 321.7 | $ 209,105.00 |
| 12 | Sarah J. Spangenburg | Associate | 104.9 | $ 39,897.00 |
| 13 | Sean Litteral | Associate | 67.7 | $ 25,387.50 |
| 14 | Blair Reed | Associate | 34.2 | $ 14,535.00 |
| 15 | Katharine Batchelor | Associate | 27.4 | $ 11,293.80 |

| | Timekeeper | Role | Time billed | Billed amount |
|---|---|---|---|---|
| 16 | Amanda Murphy | Associate | 9 | $ 3,429.00 |
| 17 | Erin J. Ruben | Associate | 1 | $ 340.00 |
| 18 | Judy Fontanilla | Support staff | 44.1 | $ 12,127.50 |
| 19 | Sherry Helminiak | Support staff | 41.5 | $ 9,281.40 |
| 20 | Jordon Crowe | Support staff | 11.4 | $ 1,791.20 |
| 21 | Tracy M. Smith | Support staff | 10.5 | $ 1,575.00 |
| 22 | Cathy Bryant | Support staff | 6.9 | $ 1,434.20 |
| 23 | Molly C. Sasseen | Support staff | 4.2 | $ 1,260.00 |
| 24 | Rebecca S. Richter | Support staff | 3.9 | $ 1,170.00 |
| 25 | Jeff S. Steen | Support staff | 1.8 | $ 354.60 |
| 26 | Renee Pothier | Support staff | 0.6 | $ 123.60 |
| 27 | Sarah Davis | Support staff | 0.3 | $ 62.40 |
| 28 | Dawn L. Holt | Support staff | 0.2 | $ 45.00 |
| 29 | Debbie L. Schroeder | Support staff | 0.1 | $ 30.00 |
| 30 | Unidentified B&F support staff | Support staff | 0.2 | $ 55.00 |
| | **Total** | | 1,814.1 | $ 1,320,051.00 |

*Source: ECF 63-2 at 2; ECF No. 64-1 at 2–4; ECF No. 65-2 at 3; Smith Decl. ¶ 4.*

By contrast, Artsana's core defense team has comprised three lawyers: one partner, one senior associate who became a partner, and a mid-level associate. Smith Decl. ¶ 13.

Another fact that emerges from the billing entries is the amount of time that this sprawling enterprise required for lawyers to communicate with one another across firms. One of the named partners, for instance, spent 34 hours over the life of the case exchanging emails and phone calls with *one of his counterparts* at a different firm—billing a total of $31,320 for this time. Smith Decl. ¶ 11. Troublingly, the attorney on the other side of these calls and emails, a named partner at another firm, billed considerably less time for them—21.1 hours, or 12.9 hours less—but nonetheless hopes to earn $21,100 for time speaking to this one counterpart. *Id.* These entries total $52,420—approximately 4% of the entire lodestar amount. *Id.* And these conversations were memorialized with generic entries like "Corresp with T Fisher re plaintiff." ECF No. 63-3 at 14.

The overstaffing problem also meant numerous lawyers duplicating one another's efforts and billing excessively for tasks, despite the relative simplicity of this case and the paper trail that the House subcommittee laid out for them to follow. The sheer number of lawyers who worked

on particular tasks is noteworthy: Seven lawyers worked on the *Jimenez* Complaint, and *nine* worked on the very simple task of preparing the consolidated complaint. Smith Decl. ¶ 12, Ex. C. And it's also reflected in the *amounts* billed—for example, Bursor & Fisher and Vozzolo LLC racked up $232,602 in fees before they ever filed the complaint in this action—despite having the benefit of the *Sayers* Complaint and the House Report that supplied the lion's share of the allegations. *Id.* ¶ 9.

Tallying up their 2017 time entries across all three firms and 30 timekeepers, Plaintiffs' counsel generate a lodestar figure of $1,320,040.50. ECF No. 62 at 18. But according to counsel, that amount should be multiplied by 1.7, because of "the excellent result obtained here" and the "relatively early resolution of this matter." *Id.* at 18–19.

## III.    LEGAL STANDARDS

The Court is "under an obligation to evaluate the reasonableness of the settlement, including attorney fees." *Cunningham v. Suds Pizza, Inc.*, 290 F. Supp. 3d 214, 221 (W.D.N.Y. 2017). Fee awards "should be assessed based on scrutiny of the unique circumstances of each case." *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 53 (2d Cir. 2000). The Court is tasked with assuring that counsel is only compensated for hours that were "reasonably expended" and excluding "hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). Its "essential goal in shifting fees" should be "to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

## IV.    ARGUMENT

Because Artsana has asked the Court to defer final approval until after all claims have been submitted, it should also defer consideration of counsel's fee request. If the Court grants final approval (either now or later), it should deny fees altogether because they are not warranted by law or equity. At a minimum, the Court should substantially reduce the requested award.

**A.    The Court Should Defer Ruling on Any Fees Request Until the Close of the Claims Period**

Because the Court should defer consideration of final approval of the settlement due to the rampant fraud that has infected the claims process, it should also defer deciding Plaintiffs' counsel's fee request.  Final approval is a necessary prerequisite of a fee award because without it, the Court cannot determine (1) how much work counsel has done for the class and (2) the results they have obtained, which are the key metrics in deciding how much to award.  *See Hensley*, 461 U.S. at 434; *Gordon v. Vanda Pharms. Inc.*, No. 19-cv-1108, 2022 WL 4296092, at *5 (E.D.N.Y. Sept. 15, 2022) (noting it was "premature to pass judgment on any anticipated fee application" before final approval).  Additionally, Rule 23(h) allows the court to award attorneys' fees only in "a certified class action," which this case will not be until final approval.  Accordingly, if the Court postpones consideration of the motion for final approval, as Artsana has requested in its concurrently filed Response, it should do the same for the fees motion.

**B.    There Is No Basis in Law or Equity for Any Fee Award in This Case**

When the Court proceeds to the merits of counsel's fee request, it should deny it in full because (1) it has no basis in law and (2) is barred as a matter of equity by Plaintiffs' counsel's conduct.

**1.    *The "Common Fund Doctrine" Does Not Support Any Fee Award.***

The Court may only grant fees "authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Neither supports the request here.

Counsel's request relies *exclusively* on the "common fund" doctrine.  ECF No. 62 at 6.  The Supreme Court has held that a lawyer who creates a "common fund . . . is entitled to a reasonable attorney's fee from the fund"—otherwise, class members would be "unjustly enriched" at the lawyers' expense.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  In other words, this doctrine permits courts to shift fees *from the class members* to class counsel.  Making class

members pay their fair share has always been the rationale behind fee-shifting: Class members "ought to contribute their due portion" of the legal expenses to avoid them receiving an "unfair advantage." *Internal Improvement Fund Trs. v. Greenough*, 105 U.S. 527, 532 (1881); *see U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 104–05 (2013) (explaining that the common-fund doctrine prevents free-riding by third parties who recover from the fund). Requiring absent class members to pay for the legal services they receive "is entirely consistent with the American rule," under which parties pay for their own attorneys' fees. *Boeing*, 444 U.S. at 481.

The common-fund doctrine allows successful class lawyers to collect fees from a particular source—the class members, *not the defendant*. Here, Plaintiffs' counsel admit that "this Settlement does not create a traditional 'common fund.'" ECF No. 62 at 9. They also concede that their fees "will not come out of a common fund," but instead from Artsana. *Id*. at 19. But counsel cannot have it both ways, arguing exclusively that the common-fund doctrine supports their request but also that they do not want to collect fees from the only source made available by that doctrine (the common fund). There simply is no basis in the common-fund doctrine—not in its underlying logic or in any decision applying the doctrine—to recover fees from Artsana, which has not "obtain[ed] the benefit of [this] lawsuit" or been "unjustly enriched" by counsel's efforts. *Boeing*, 444 U.S. at 478. To the contrary, this lawsuit has generated only *costs* (not benefits) for Artsana. Counsel's request to shift these fees from the class to Artsana thus violates the American rule—the backdrop for the common-fund doctrine. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 264 n.39 (1975) (rejecting extension of common-fund doctrine to situation where *defendant* would pay plaintiff's attorneys' fees).

Because the common-fund doctrine does not support counsel's request for attorneys' fees, the only remaining potential basis for fees would be the settlement agreement itself. But the agreement provides only that Artsana has to pay "[a]ny Attorneys' Fees and Expenses awarded by

the Court." Settlement Agreement ¶ 68. This Court, again, can award fees only "authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The parties' agreement does not substitute its own fee-shifting rule and instead takes the law as it finds it. Accordingly, there is no basis to award Plaintiffs' counsel's fees.[2]

Because there's no common fund from which to collect attorneys' fees, there's also no basis to award the requested $1,500 "incentive awards" for each named plaintiff. ECF No. 62 at 21. Like fee-shifting more generally, incentive awards are rooted in the idea that a litigant who creates a common fund should be able to recover from those that benefit from it. *See Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 126–27 (1885). But that does not mean litigants should be able to recover from the *other party* in cases where no common fund is created.

Artsana also preserves for appellate review the question of whether incentive awards are lawful in the first place. While Artsana recognizes that the Second Circuit has held that "fair and appropriate incentive awards" are allowable, *Moses v. New York Times Co.*, 79 F.4th 235, 253 (2d Cir. 2023), that holding conflicts with Supreme Court precedent that draws a distinction between "expenses incurred in carrying on the suit," which are reimbursable, and charges for "personal services and private expenses," which are not. *Pettus*, 113 U.S. at 122; *see also Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244, 1260 (11th Cir. 2020) (reversing decision granting incentive award because "[a]lthough it's true that such awards are commonplace in modern class-action litigation, that doesn't make them lawful, and it doesn't free us to ignore Supreme Court precedent forbidding them"). Here, there can be no question that Plaintiffs are seeking charges for personal services:

---

[2] Counsel cannot assert any new or additional justifications for their fee request on reply, because their motion was based exclusively on the common-fund doctrine. *See, e.g.*, *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 160 (S.D.N.Y. 2015). Artsana repeatedly urged Plaintiffs' counsel to defer the final approval and attorneys' fees motions pending the fraud analysis; having opted to proceed now, Plaintiffs' counsel are foreclosed from offering additional justifications. Artsana reserves the right to move to strike any such new arguments on reply.

*i.e.*, their "time protecting the interests of the class." ECF No. 62 at 21. That request is "foreclosed by Supreme Court precedent." *Johnson*, 975 F.3d at 1260.

### 2.    *Plaintiffs' Counsel's Actions Foreclose Any Fee Award.*

Equity also bars the fee request. The "paramount consideration in awarding attorneys' fees . . . is the protection of the interests of the class members and the achievement of equity." *Dubin v. E.F. Hutton Grp. Inc.*, 878 F. Supp. 616, 619 (S.D.N.Y. 1995). And the Supreme Court has emphasized that courts awarding attorneys' fees should exercise their "equitable discretion" in light of "the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 & n.19 (1994). For example, another court in this District held that fee-shifting was inappropriate in a copyright case in part because the plaintiff's attorney had arguably engaged in the "dubious practice of copyright trolling." *Sands v. CBS Interactive Inc.*, No. 18-cv-7345-JSR, 2019 WL 1447014, at *7 (S.D.N.Y. Mar. 13, 2019).

Here, while Plaintiffs' counsel has not engaged in copyright trolling, their conduct is far from exemplary and certainly not deserving of the type of windfall they request. The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009). Although counsel has not perpetrated fraud, their inaction has allowed the fraud to proliferate. As the number of claims skyrocketed far past any feasible number of bona fide claims, Artsana repeatedly pleaded with Plaintiffs' counsel to agree to reasonable measures to root out fraudulent claims and stem the bleeding. Smith Decl. ¶ 15. Counsel continuously refused. *Id.* Not doing so has only increased Artsana's costs of having Angeion (as well as ClaimScore) to identify hundreds of thousands of illegitimate claims. And then, when Plaintiffs' counsel sought final approval, they not only omitted any mention of the rampant fraud to the Court, they actually argued in a federal court filing that they "should be rewarded" for an "exceptional settlement" and "excellent result." ECF No. 62 at 14, 20.

Counsel also attempted to justify their request by saying there were "153,244 claims awaiting confirmation," *id.* at 16 n.6, even though Angeion said all along those claims were only "preliminarily" "eligible" and would be "subjected to final audits." ECF 60 ¶ 27 & n.1. And now, with only part of the final audit process complete, Angeion has already reported that nearly two-thirds of *those* claims were fraudulent. Weisbrot Decl. ¶ 4; ECF No. 77 (Plaintiffs' counsel acknowledging the same).

Having turned a blind eye to the fraud, which only increased Artsana's costs and harmed legitimate claimants by risking final approval of this settlement, Plaintiffs' counsel should not be awarded any fees. Equitable "considerations of compensation and deterrence" support an outright denial of fees.

## C. At a Minimum, the Court Should Substantially Reduce Any Fee Award

Even if the Court were to determine that a fee award was permissible in this case, there is no possible way that any award could approach the $2.25 million request. The Court should award attorneys' fees based on the actual claims that will be paid, not a fiction that every single class member will submit a claim. And the Court should apply an across-the-board cut to counsel's inflated lodestar.

### 1. *The Court Should Not Endorse the Fiction that Assumes 100% of Class Members Will Participate.*

Plaintiffs' counsel's primary justification for their $2.25 million fee request is based on the impossible assumption that every single class member will participate in the settlement. This settlement would be the first ever to achieve such a 100% participation rate (unfortunately, it is historic for all the wrong reasons). Neither the law nor reason supports such a fiction.

In "claims-made" settlements, there is no place for the "speculative and self-serving nature of Class Counsel's estimates" about settlement value. *Parker v. Time Warner Ent. Co.*, 631 F. Supp. 2d 242, 268 (E.D.N.Y. 2009), *aff'd*, 378 F. App'x 63 (2d Cir. 2010). Unlike common-fund settlements in which the defendant pays every dollar under the settlement no matter how many

claims there are, that is not true in a claims-made settlement. Rather, defendants in claims-made settlements pay the full amount of validated claims. *See McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 387–88 (S.D.N.Y. 2017). Accordingly, courts in this Circuit have regularly rejected a hypothetical, 100%-participation assumption as a basis for estimating fees in claims-made settlements. *Hart v. BHH, LLC*, No. 15-cv-4804-WHP, 2020 WL 5645984, at *8 (S.D.N.Y. Sept. 22, 2020); *McLaughlin v. IDT Energy*, No. 14-cv-4107, 2018 WL 3642627, at *16 (E.D.N.Y. July 30, 2018); *Cunningham*, 290 F. Supp. 3d at 224–25; *Bodon v. Domino's Pizza, LLC*, No. 09-cv-2941, 2015 WL 3889577, at *5 (E.D.N.Y. June 4, 2015); *Parker*, 631 F. Supp. 2d at 265–66.

Assuming 100% participation makes no sense because, on average, less than 10% of eligible class members participate in average claims-made settlements. *Oladapo v. Smart One Energy, LLC*, No. 14-cv-7117, 2017 WL 5956907-LTS-BCM, at *13 n.12 (S.D.N.Y. Nov. 9, 2017). The FTC, for its part, estimated that only around 9% of eligible claimants participate in consumer class actions. Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* 11, FTC (Sept. 2019), https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf. And here the claims rate is likely to be 6% or less. ClaimScore Decl. ¶ X. There is no basis in reality for pegging fees to a "purely hypothetical" estimate of class value when that "theoretical benefit dwarfs any real benefit the class receives." *Hart*, 2020 WL 5645984, at *8.

*Hart* is a particularly good example because there, too, Bursor & Fisher tried to persuade a judge in this District to award fees in a claims-made settlement based on the fiction of a "100% response rate." 2020 WL 5645984, at *7. But the court rejected this argument, because "[w]hen the parties agreed to the settlement, none of them could have credibly believed that they would achieve a response rate of 100%—or, frankly, anywhere close to that number." *Id.* at *8.

It is true that a few older cases adopted counsel's approach. ECF No. 62 at 8–9 (collecting cases). But every single one of these cases, to the extent they explained their reasoning at all, relied on a misinterpretation of the same Second Circuit case—*Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007).[3] That case involved a $22 million settlement fund that would go toward paying claimants, with any excess funds going to a cy pres award. *Id.* at 430–32. In other words, the defendant was paying $22 million no matter what; it was just a question of how much was going to claimants and how much was going to the designated cy pres charities. The Second Circuit held in that situation that fees should be based "on the entire Fund created by the efforts of counsel"—*i.e.*, including the cy pres award—rather than "on the basis of claims made against the Fund." *Id.* at 436–37.

The cases that Plaintiffs' counsel cites have mistakenly read this sound bite as a rule that counsel should be rewarded based on the total hypothetical value of a settlement, even in claims-made settlements where unclaimed funds—unlike the cy pres structure in *Masters*—simply revert to the defendant. But later courts have noticed the error and corrected course. For example, the court in *McLaughlin* explicitly disagreed with the previous cases and explained that the 100% rule from *Masters* should apply where "an entire settlement fund is going to be paid out for the benefit of the class"—but *not* cases where unpaid funds simply revert back to the defendant. *McLaughlin*, 2018 WL

---

[3] *Torres v. Gristede's Operating Corp.*, 519 F. App'x 1, 5 (2d Cir. 2013) (citing *Masters*); *Zink v. First Niagara Bank, N.A.*, No. 13-cv-01076, 2016 WL 7473278, at *7–8 (W.D.N.Y. Dec. 29, 2016) (same); *Hart v. RCI Hosp. Holdings*, No. 09-cv-3043-PAE, 2015 U.S. Dist. LEXIS 126934, at *45–46 (S.D.N.Y. Sept. 22, 2015) (same); *Behzadi v. Int'l Creative Mgmt. Partners, LLC*, No. 14-cv-4382-LGS, 2015 U.S. Dist. LEXIS 90117, at *6–7 (S.D.N.Y. July 9, 2015) (same); *In re Penthouse Exec. Club Comp. Litig.*, No. 10-cv-1145-KMWV, 2014 U.S. Dist. LEXIS 5864, at *32 (S.D.N.Y. Jan. 14, 2014) (same); *Velez v. Novartis Pharms. Corp.*, No. 04-cv-09194-CM, 2010 U.S. Dist. LEXIS 125945, at *58 (S.D.N.Y. Nov. 30, 2010) (same); *Diaz v. E. Locating Serv., Inc.*, No. 10-cv-04082-JCF, 2010 U.S. Dist. LEXIS 139136, at *20–21 (S.D.N.Y Nov. 29, 2010) (same); *Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 59 (E.D.N.Y. 2010) (same). In one of these cases, *Torres*, the district court evidently used the lodestar method, so this case doesn't support counsel's point at all. *See* 519 F. App'x at 4 (appellant faulted district court's reliance on "plaintiffs' proposed hours").

3642627, at *15–16.  And more recent cases have agreed with this approach.  *E.g.*, *Hart*, 2020 WL

5645984, at *8; *Cunningham*, 290 F. Supp. 3d at 224–25.  That is because in cy pres cases, the class

benefits from the entire award—but in claims-made settlements like this one, the class benefits only to

the extent that claimants come forward.  *McGreevy*, 258 F. Supp. 3d at 387–88.  *McLaughlin* and

similar cases recognize that class attorneys should benefit in proportion with the benefit actually

obtained by the class, not an impossible hypothetical.  The Court should adopt the same approach here.

### 2.      *Proper Methodologies Result in a Substantial Reduction in Fees.*

Counsel's $2.25 million request is far out of proportion with the work they have done and the

result they have achieved so far for the class.  A reasonable estimate of fees—*i.e.*, one that is not based

on a counterfactual assumption of 100% participation—yields a much more modest result.   In

calculating fees and costs, courts in this circuit may use either the lodestar method or a percentage of

the class recovery.  *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010).  But regardless

of the method chosen, fees may not "exceed what is 'reasonable' under the circumstances."

*Goldberger*, 209 F.3d at 47.   And here, both methods demonstrate a $2.25 million award is

astronomical under these circumstances.

(a)  The percentage-of-the-fund approach leads to a fee of $331,234.  Applying reasonable

estimates to a calculation of class benefit yields a much more modest fee relative to Plaintiffs' 100%

participation figure—just over $300,000.

As an estimate of the actual class benefit, the Court can look to how many *legitimate* claims

are likely to be paid out.  *Cunningham*, 290 F. Supp. 3d at 225 ("true value of the settlement" was

"[b]ased on the claims filed").  There were approximately 875,000 KidFit booster seats sold during the

class period.  ECF. No. 63 ¶ 35.  In a normal claims-made settlement—that is, one not plagued by

fraud—the FTC estimates that 9% of eligible claimants will participate.  FTC Report, *supra*, at 11.

And as explained in Artsana's concurrently filed Response to the Motion for Final Approval, the actual

claims rate is likely to be closer to 6%.

But using a 10% multiplier as a *generous* estimate and one that other courts have concluded to be reasonable, *e.g.*, *Oladapo*, 2017 WL 5956907, at *13, yields 87,500 legitimate claims. And since 99% of claims so far have been no-proof claims, valued at $25, the total value to class members can be fairly estimated as 86,625 products at $25 per claim or $2,165,625. Add in the 875 claims for $50, and $2,209,375 is the most that will likely be awarded to class members once the fraudulent claims are weeded out and all legitimate claims are processed.

Comparing the $2.25 million request against this number confirms that Plaintiffs' counsel is asking for more than 100% of the amount that class members stand to benefit, a "misallocated distribution" that the Court should not endorse. *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 410 (S.D.N.Y. 2019) (attorneys' fees of even *50%* of class would be excessive). That cannot be justified, and "[i]t would be anomalous and unacceptable for counsel to fare better than the Class." *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 390 (S.D.N.Y. 2005).

In choosing a percentage amount to award relative to this potential class benefit, the Court can consider "empirical evidence of attorney's fees awarded in similar cases as a starting point." *Grice*, 363 F. Supp. 3d at 407. One study estimated counsel has a median recovery of 24.6% of the settlement value in consumer class actions. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studs. 811, 835 (2010). And another analysis placed the median recovery for *cases in this District* at 22%, and the median in consumer cases at 20%. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Studs. 248, 259, 263 (2010); *see also Grice*, 363 F. Supp. 3d at 407 (citing both Fitzpatrick and Eisenberg & Miller studies).

But this is not a "median" class action: Plaintiffs' counsel did nothing more than recycle the House Report, oppose a motion to dismiss, and negotiate an early settlement. Where circumstances

merit it, courts have frequently reduced a percentage award to 15% or less. *E.g.*, *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13-cv-214-RMB-RLE, 2017 WL 2559230, at *3 (S.D.N.Y. May 22, 2017) ("four (routine) motions to dismiss" and "contentious settlement negotiations" were merely "the general hurdles of litigation" justifying no more than a 15% award). Given the simplicity of the issues and the relatively minimal work counsel accomplished, 15% would be more than adequate. Applying all of these generous assumptions in counsel's favor given the work they actually did, the circumstances of this case justify no more than 15% of a putative "fund" of $2,209,375—or $331,406.

(b) The Court should reduce the lodestar by at least 75% given the overstaffing and duplicative work. Turning in the alternative to their billing records, counsel asks the Court to nearly double the $1.3 million in fees that they claim those records justify—but the opposite result is more appropriate: To prevent a recovery by the attorneys that is far out of proportion with the value of the settlement to the class, and given the excessive and duplicative work those records reflect, the Court should trim this lodestar amount by 75%.

Although the lodestar method is often a reliable method to calculate fees, the Court is not required to accept Plaintiffs' counsel's billing records at their face value—far from it. Rather, "percentage cuts as a practical means of trimming fat from a fee application" are a "recognized practice" in this circuit. *Torres v. Gristede's Operating Corp.*, 519 F. App'x 1, 4 (2d Cir. 2013) (affirming 25% cut). Courts are empowered "simply to deduct a reasonable percentage of the number of hours claimed" where warranted. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998). And "some instances of waste and inefficiency are so egregious that their inclusion in a motion for fees casts a shadow over all of the hours submitted to the Court." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 393 (S.D.N.Y. 2013). For example, one judge in this District considered a fee request based on a purported lodestar of $2,686,811.80—but found that that number should be cut due to,

among other reasons, counsel's vague billing entries (such as "conv with [another attorney]"), time spent on unnecessary tasks, and the relative simplicity of the litigation. *Longwei*, 2017 WL 2559230, at *3. The court trimmed the request to just $316,000 in fees and costs, which it noted represented a "'negative' lodestar multiplier of .12"—an 88% cut. *Id.* at *4.

Here, the Court should reduce the lodestar because of (i) the minimal work required and completed, (ii) the overstaffing of this matter, and (iii) counsel's vague and unreliable billing entries.

i. <u>Minimal work required and completed</u>. As a threshold matter, any fee request should be compared with the work counsel has actually done in the case—which was scant here. *See Goldberger*, 209 F.3d at 50. Courts have held that cases stayed early in their lifespan, like this one, are not good candidates for fee enhancements, rejecting multipliers for that reason. For example, in *Varljen v. H.J. Meyers & Co.*, No. 97-cv-6742-DLC, 2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000), the court rejected a 1.6 multiplier "given the fact that there has been no trial and not even full discovery." *Id.* at *4. And even in cases where counsel defended *multiple* motions to dismiss, these efforts don't justify heightened fees, as they merely reflect the "'general hurdles' of litigation." *Longwei Petroleum*, 2017 WL 2559230, at *3 (quoting *Goldberger*, 209 F.3d at 54).

Here, the legal work that Plaintiffs' counsel are trying to parlay into a $2.25 million windfall involved preparing one complaint that largely relied on the House Report, a second complaint that varied from the first in style only, and a third complaint that merely combined the two previous ones. Counsel benefitted immensely from "the spadework done by federal authorities," *Goldberger*, 209 F.3d at 50—the House Report served up counsel's legal theories and factual allegations on a silver platter, giving them everything they needed to bring a class action. It's true that Milberg had to draft one brief in opposition to a motion to dismiss the *Sayers* Complaint, but routine motion practice is merely one of the "general hurdles" of litigation. *Id.* at 54. And here, Milberg was able to leverage their opposition brief in another case which they described as having "virtually identical claims." Opp.

to Mot. to Dismiss, *Sayers*, No. 5:21-cv-01876-JMG, ECF No. 27 at 9.

Moreover, this case settled in principle *one week* after the *Jimenez* lawyers entered the fray—and before any discovery or dispositive motion hearing had taken place. Joint Stay Request, *Sayers*, No. 5:21-cv-01876, ECF No. 32 at 1. In short, the *Sayers* lawyers did not have to do much to get the train moving, and the *Jimenez* attorneys jumped onto the train as it was pulling into the station.

    ii. Overstaffing. Firms have discretion to staff their cases appropriately, but there are limits, and "[a]mple authority supports reduction in the lodestar figure for overstaffing as well as for other forms of duplicative or inefficient work." *Seigal v. Merrick*, 619 F.2d 160, 165 (2d Cir. 1980). Counsel must use "billing judgment" and cannot present to the Court bills that a reasonable paying client would not accept. *Hensley*, 461 U.S. at 1939–40. Here, using 30 timekeepers was a "disaster from a reasonable billing point of view" that no paying client would accept. *Ramirez v. Marriott Int'l*, No. 20-cv-02397-PMH, 2023 WL 2447398, at *5 (S.D.N.Y. Mar. 10, 2023). In contrast, Artsana litigated this case with a core team of three lawyers. There was no reason that this action needed between three and ten times as many people to prosecute it as it did to defend it.[4]

This sprawling duplication of efforts resulted in excessive time spent on many tasks. Innumerable hours were spent checking and re-checking work across firms. For example, Vozzolo LLC and Bursor & Fisher split the work on the *Jimenez* Complaint, but even with the benefit of the House Report and the previous *Sayers* complaint prepared by Milberg, they staffed this project with seven timekeepers, including six attorneys. Smith Decl. Ex. C. Compare that with *Kapoor v. Rosenthal, 2*69 F. Supp. 2d 408 (S.D.N.Y. 2003), which concluded that employing "three attorneys in

---

[4]  It is true that some of the 30 timekeepers working on this matter were support staff, not lawyers. But they too were overly staffed *and—incredibly—billed at lawyers' rates*: Bursor & Fisher charged between $275 and $300 for these non-lawyer professionals, ECF No. 64-1 at 3–4, and Milberg charged between $150 and $225, ECF No. 65 at 3. These rates are excessive; another court in this District ruled that "[t]he prevailing hourly rate for non-attorney staff, including law clerks, paralegals, and clerical staff, is $100." *Ramirez*, 2023 WL 2447398, at *5.

preparing a complaint with relatively straightforward issues [was] duplicative and/or excessive." *Id.* at 414–15 (cutting fees). Here, it took *six* attorneys and two firms to draft the *Jimenez* Complaint when the legwork was already finished before they started.

iii. <u>Vague and unreliable billing records</u>. Counsel's records fall far short of the standard required in this circuit for clarity and description. Billing records must specify "the nature of the work done." *N.Y. State Ass'n for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). "A party seeking attorney's fees bears the burden of properly documenting the hours worked, and this obligation is not satisfied by a vague entry such as 'conference with' or 'call to' a particular person." *Ambac Assurance Corp. v. Adelanto Pub. Util. Auth.,* No. 09-cv-5087-JFK, 2013 WL 4615404, at *3 (S.D.N.Y. Aug. 29, 2013). For example, the court in *Ambac* found that "entries . . . labeled 'misc email' do not convey the general subject matter of the work completed." *Id.*

The billing records here are replete with this type of vague entry. Even where a nominal topic is provided—for example, "t/call with T Fisher re status update, litigation strategy," ECF No. 63-3 at 17—these broad descriptions do not provide the Court with the information it needs to assess whether those fees were well-earned. And often the Court and Artsana are left with almost no context whatsoever. For example:

- Numerous entries include time billed for abstract and undifferentiated tasks like "Research re related/similar matters" (1.4), ECF No. 63-3 at 13, "fact research" (1.3), *id.*, and "Research re: pre-suit investigation" (2.6), ECF No. 64-1 at 5.

- One attorney entered four identical billing entries within one week that each read "Drafting complaint," for a total of 11.3 hours and $4,802.50. ECF No. 64-1 at 5.

- Another billed $495.30 for "call re settlement agreement" without identifying who the call was with. ECF No. 65 at 41.

One particular named partner at Milberg is indicative. Billing at $919 per hour, this partner repeatedly billed for entries like "Emails with co-counsel re: settlement issues" (0.1) and "Work on settlement agreement and related issues" (1.7). The following chart summarizes these entries:

| Date | Time | Description | Value | Source |
|------|------|-------------|-------|--------|
| 11/10/2021 | 1.90 | Work on post mediation and settlement related issues | $1,746.10 | ECF No. 65 at 35. |
| 11/15/2021 | 1.70 | Work on settlement agreement and related issues | $1,562.30 | *Id.* at 36. |
| 11/16/2021 | 0.90 | Work on matters related to post settlement issues | $827.10 | *Id.* |
| 12/6/2021 | 0.90 | Work on settlement agreement and related issues | $827.10 | *Id.* |
| 12/7/2021 | 0.90 | Work on preliminary approval and settlement agreement | $827.10 | *Id.* |
| 2/28/2022 | 1.30 | Work on settlement agreement | $1,194.70 | *Id.* |
| 5/5/2022 | 1.20 | Extensive work on settlement agreement in light of lengthy conference call and review | $1,102.80 | *Id.* |
| 6/3/2022 | 1.30 | Review settlement agreement and work on mediation prep. | $1,194.70 | *Id.* |
| 6/9/2022 | 0.30 | Work on continued mediation and related issues. | $275.70 | *Id.* |
| 6/10/2022 | 1.40 | Emails with co-counsel re mediation status and continued work on related issues for mediation. | $1,286.60 | *Id.* |
| 11/16/2022 | 1.20 | Work on prelim approval issues. | $1,102.80 | *Id.* at 37. |
| 11/21/2022 | 1.60 | Work on prelim approval issues. | $1,470.40 | *Id.* |

*Representative entries by Milberg named partner.*

Where counsel's entries *do* include specifics, they highlight inconsistencies that make the billing records unreliable. For example, for the November 2021 mediation, seven attorneys attended, including two senior partners from Milberg. Smith Decl. Ex. A. Four of those attorneys billed 4.8 hours and another billed 3.3 hours. But one of the senior Milberg partners, billing at $919 per hour, reported the mediation as having lasted for *seven hours*. *Id.* Similarly, for the August 18, 2023 mediation, four class lawyers reported four significantly different amounts of time—2.7 hours, 3.7 hours, 4.6 hours, and 6.0 hours—leaving the Court unable to determine the appropriate amount (the fifth lawyer block billed his time, limiting the usefulness of his time entry). *Id.* It is telling that Plaintiffs' counsel did not bother to harmonize or reduce their entries before submitting them to the Court. But the cumulative impact of these inconsistencies undermines the reliability of other time entries, and "cast[] a shadow over all of the hours submitted to the Court—just as the thirteenth stroke of a clock calls into doubt whether any previous stroke was accurate." *Citigroup*, 965 F. Supp. 2d

at 393.

These errors, inconsistencies, and indiscretions merit a significant lodestar cut to bring counsel's fees into proportion with the class recovery. If the lodestar figure exceeds a reasonable percentage of the amount that the class has benefited from the settlement, a large percentage cut is appropriate. *See, e.g.*, *Kirsch*, 148 F.3d at 172 (73% cut); *Darby v. Sterling Home Care, Inc.*, No. 17-cv-5370-RMB, 2020 WL 29932, at *4 (S.D.N.Y. Jan. 2, 2020) (88% cut). For example, in *Darby*, class counsel requested 25.1% of a total settlement value of $330,873.41—but given the simplicity of the case and the rate in similar class actions, the court reduced the fee to 20%, or $66,174.68. *Darby*, 2020 WL 29932, at *2–3. The court noted that this "negative lodestar multiplier" of 88% was appropriate because of the "lack of case complexity, early settlement, minimal risk, and vague billing entries" and the relatively low settlement value. *Id.* at *4.

These factors counsel at least a 75% lodestar cut here. That reduction would bring counsel's fees to $330,010.13—almost exactly in line with the reasonable percentage-of-the-fund calculation discussed above ($331,234). And it is justified here by the same factors that have justified similar—and even greater—cuts in other cases in this Circuit: "lack of case complexity, early settlement, minimal risk, and vague billing entries." *Darby*, 2020 WL 29932, at *4.

## V. CONCLUSION

The Court should either (1) defer Plaintiffs' counsel's request for attorneys' fees and expenses until all claims are finalized and the Court can evaluate final approval of the settlement; (2) reject the request for fees altogether because there is no legal basis for the fees and Plaintiffs' counsel's conduct does not warrant the windfall they seek; or (3) at a minimum, substantially reduce the fees requested to no more than $331,234.

Dated:  September 25, 2023

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Christopher Chorba*

Christopher Chorba (*Pro Hac Vice*)
CChorba@gibsondunn.com
Jeremy S. Smith (*Pro Hac Vice*)
JSSmith@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: (213) 229-7000

Jason W. Myatt
JMyatt@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Tel.: (212) 351-4000

*Attorneys for Artsana USA, Inc.*