| | |
|---|---|
| MASHAYILA SAYERS, BRITTNEY TINKER, JENNIFER MONACHINO, KIMBERLY MULLINS, HILDA MICHELLE MURPHREE, and AMANDA JIMENEZ, on behalf of themselves and all others similarly situated, | Case No. 7:21-cv-07933-VB |
| | Hon. Vincent L. Briccetti |
| Plaintiffs, | |
| v. | |
| ARTSANA USA, INC., | |
| Defendant. | |

**ARTSANA USA, INC.'S RESPONSE TO PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

.

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    FACTUAL BACKGROUND ............................................................................... 3

     A.      The *Sayers* and *Jimenez* Class Actions ................................................ 3

     B.      The Claims Process Becomes Plagued by Fraud .................................... 4

     C.      Angeion's Preliminary Analysis Indicates Rampant Fraud ................... 9

     D.      ClaimScore Analysis ........................................................................... 11

     E.      Angeion's Updated Analysis ............................................................... 15

III.   LEGAL STANDARDS ...................................................................................... 16

IV.   ARGUMENT ..................................................................................................... 16

     A.      There Is Insufficient Information for the Court to Grant Final Approval at This Time ...................................................................... 16

     B.      The Court Should Close the Claims Period Immediately ..................... 20

V.     CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*In re Auction Houses Antitrust Litigation*,
  No. 00-cv- 0648-LAK, 2001 WL 170792 (S.D.N.Y. Feb. 22, 2001), *aff'd*, 42
  F. App'x 511 (2d Cir. 2002) ...................................................................................16

*In re Baby Products Antitrust Litigation*,
  708 F.3d 163 (3d Cir. 2013)....................................................................................17

*Brown v. Sega Amusements, U.S.A., Inc.*,
  No.-13-cv-7558-RMB, 2015 WL 1062409 (S.D.N.Y. Mar. 9, 2015) ....................17

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir.2001)........................................................................................16

*In re Diet Drugs Products Liability Litigation*,
  236 F. Supp. 2d 445 (E.D. Pa. 2002) ......................................................................22

*Hart v. BHH, LLC*,
  No. 15-cv-4804-WHP, 2020 WL 5645984 (S.D.N.Y. Sept. 22, 2020) ..................19

*Kuymar v. Salov North American Corp.*,
  No. 14-cv-2411, 2017 WL 2902898 (N.D. Cal. July 7, 2017) ...............................19

*In re Linerboard Antitrust Litigation*,
  Nos. 98-cv-5055, 99-cv-1341, 2004 WL 966236 (E.D. Pa. May 4, 2004)............22

*Malchman v. Davis*,
  706 F.2d 426 (2d Cir. 1983).....................................................................................16

*Martinez v. Gulluoglu LLC*,
  No. 15-cv-2727-PAE, 2016 WL 206474 (S.D.N.Y. Jan. 15, 2016) .......................16

*Moses v. New York Times Co.*,
  79 F.4th 235 (2d Cir. 2023) .....................................................................................17

*Mullins v. Direct Digital, LLC*,
  795 F.3d 654 (7th Cir. 2015) ..............................................................................17, 22

*In re Nissan Radiator/Transmission Cooler Litigation*,
  No. 10-cv-7493-VB, 2013 WL 4080946 (S.D.N.Y. May 30, 2013) ................15, 16

*Oladapo v. Smart One Energy, LLC*,
  No. 14-cv-7117-LTS, 2017 WL 5956907 (S.D.N.Y. Nov. 9, 2017) .......................10

*Plizga v. Little Poland Rest. Inc.*,
    No. 15-cv-08820-LAK-BCM, 2016 WL 9307474 (S.D.N.Y. July 18, 2016) ........................17

*In re Polyurethane Foam Antitrust Litigation*,
    168 F. Supp. 3d 985 (N.D. Ohio 2016)................................................................17

*In re Remicade Antitrust Litigation*,
    No. 17-cv-04326, 2023 WL 2530418 (E.D. Pa. Mar. 15, 2023) ...........................17

*Skeen v. BMW of North America, LLC*,
    No. 13-cv-1531, 2016 WL 4033969 (D.N.J. July 26, 2016) ....................................21

*Stinson v. City of New York*,
    256 F. Supp. 3d 283 (S.D.N.Y. 2017)..................................................................10

*Weber v. Government Employees Insurance Co.*,
    No. 07-cv-1332, 2009 WL 2496811 (D.N.J. Aug. 11, 2009) .................................22

## Rules

Federal Rule of Civil Procedure 23(e) ...........................................................15, 16, 23

## Other Authorities

*A Retrospective and Analysis of Settlement Campaigns* 11, FTC (Sept. 2019),
    https://www.ftc.gov/system/files/documents/reports/consumers-class-actions-
    retrospective-analysis-settlement-campaigns/class_action_fairness_
    report_0.pdf.........................................................................................................10

*Average Number of Own Children Under 18 in Families with Children in the
    United States from 1960 to 2022*, Statista,
    https://www.statista.com/statistics/718084/average-number-of-own-children-
    per-family/ (last visited Aug. 22, 2023)...............................................................11

Bonnie Eslinger, *Facebook Jurist 'Blown Away' By Record Reply To $725M Deal*
    (Sept. 7, 2023), https://www.law360.com/articles/1719282/facebook-jurist-
    blown-away-by-record-reply-to-725m-deal ........................................................10

Manual for Complex Litigation (Fourth) § 21.7 ........................................................22

Ross Weiner, *The Increasing Danger of Fraudulent Claims in Class Action
    Settlements*, N.Y.L.J. (July 26, 2023) ..............................................................17, 18

Staff of H. Subcomm. on Econ. & Consumer Pol'y, 116th Cong., Booster Seat
    Manufacturers Give Parents Dangerous Advice (Dec. 10, 2020),
    https://tinyurl.com/yk9daamv ..............................................................................3

## I.   INTRODUCTION

An unprecedented level of fraud has plagued this settlement.   Following this Court's preliminary approval order, the claims period opened in early March and is currently set to close 60 days after final approval.   But once media notice completed in April, the number of claims submitted increased dramatically (and unrealistically).   Artsana sold just under 875,000 of the booster seats that are the subject of the claims.   But over a three-day period from March 29 through March 31, there were 55,028 claims.   The pace of claims has not slowed since that time.   For example, from July 31 to August 26, claims averaged 78,265 claims *per week*.   And between August 27 and 31, the claim submission rates reached an all-time high average of 47,270 *per day*, or a pace of 330,920 claims *per week*.   As of September 19, there has been 2,159,699 claims for a total of 2,229,298 products.   ***That's more than 2.5 times the number of products sold***.   By mid-October, the products claimed will exceed *three times* the number of products sold:



Plaintiffs do not say a word about this fraud in their Motion for Final Approval.   And they cannot claim ignorance.   The Court-appointed settlement administrator, Angeion, has provided both parties with claims data reflecting all the numbers above, and even conducted a preliminary analysis of the claims process in July, which showed that, on first blush and without a detailed

analysis, at least *85% of the claims are fraudulent and/or otherwise ineligible*. Yet Plaintiffs omit any mention of these details, while asking for final approval and a massive and unjustified attorneys' fee award.

The evidence of fraud has only grown worse since Plaintiffs filed their Motion last month. Angeion has continued conducting fraud reviews, and it discovered that nearly two-thirds of the 153,244 products originally designated as "preliminarily eligible" in July are actually fraudulent. Specifically, only 61,582 product claims now may be eligible—and that number will likely decrease as Angeion continues to analyze the rampant fraud affecting this claims process. Angeion also determined that at least ***99.1%*** of the most recent claims it has analyzed are fraudulent.

While some fraud is not uncommon in class action settlements, this is extraordinary. A recent Federal Trade Commission study of consumer class actions with claims-made settlements, like the one here, reported that claims administrators ***approved*** on average 86% of submitted claims. Here, in contrast, Angeion is set to ***reject*** at least 93% of the claims. Yet even with that screening, the parties cannot say that customary fraud detection methods have captured all of the fraudulent claims. Artsana retained an outside consultant (ClaimScore) at its own expense to analyze the claims data independently and in depth—not because of any lack of faith in Angeion, but rather to ensure that all appropriate measures were taken to inform the Court of the results in advance of the final approval hearing. ClaimScore's analysis has confirmed that criminals targeted the claims process in this case using sophisticated methods to generate large numbers of fraudulent claims, many of which evaded the initial review.

Because of this rampant fraud, the difficult task Angeion faces in weeding out the fraud (the full cost of which has been charged to Artsana), and the fact that essentially all (***99%+***) of the hundreds of thousands of claims being submitted on a weekly basis are fraudulent, Artsana respectfully requests that the Court stop the claims period immediately to allow the parties and the

Court to address final approval with the benefit of a complete picture of the claims made in this case and the extent of the fraud. Artsana recognizes that this is a significant request, but the extraordinary circumstances here call for immediate action. Keeping the claims period open and approving the settlement now will only needlessly increase Artsana's expenses and invite further evasive maneuvers by the criminals who have targeted this settlement. It will benefit these criminals while harming the parties, the Court, and the legitimate claimants who are entitled to payment but will need to wait additional months to receive the settlement benefits. Artsana is available at the earliest opportunity for a conference should the Court wish to address the next steps in advance of the final approval hearing on November 8.

## II.    FACTUAL BACKGROUND

### A.    The *Sayers* and *Jimenez* Class Actions

In April 2021, five plaintiffs filed a putative class action complaint in the Eastern District of Pennsylvania, alleging Artsana engaged in misleading advertising regarding its booster seats. Complaint, *Sayers v. Artsana USA, Inc.*, No. 5:21-cv-01876 (E.D. Pa. Apr. 22, 2021), ECF No. 1. The Complaint relied in large part on a staff report from a subcommittee of the House Oversight Committee, which was published in December 2020. *See id.* ¶ 6 n.3 (citing Staff of H. Subcomm. on Econ. & Consumer Pol'y, 116th Cong., Booster Seat Manufacturers Give Parents Dangerous Advice (Dec. 10, 2020), https://tinyurl.com/yk9daamv). The *Sayer* plaintiffs alleged Artsana made two primary misleading advertising claims: (1) until late 2020, Artsana "assured parents that its booster seats were safe for children weighing as little as 30 pounds," and (2) Artsana's booster seats do not appreciably reduce the risk of serious injury from side-impact collisions. *Id.* ¶¶ 5, 8. But the *Sayer* plaintiffs also admitted that there are *no* federal standards or rules regarding a 40-pound weight minimum or side-impact collisions. *Id.* ¶¶ 50–55. And the *Sayers* plaintiffs never alleged that any Artsana booster seat failed in its essential mission to protect the vehicle occupants from injury, and

instead alleged they would not have paid as much for the booster seats absent the misleading advertising. *Id.* ¶¶ 98, 103, 108, 113, 118.

Artsana moved to dismiss a number of the *Sayers* plaintiffs' claims in July 2021. Defendant's Brief in Support of Mot. to Dismiss, *Sayers v. Artsana USA, Inc.*, No. 5:21-cv-01876 (E.D. Pa. July 28, 2021), ECF No. 20. In its motion, Artsana pointed out that Plaintiffs' own complaint revealed that the central assertion of their lawsuit was false. Artsana did not claim its boosters seats are "safe for children weighing as little as 30 pounds," but instead stated in its "Child Guidelines" that booster seats should "ONLY" be used when a child was at least 30 pounds *and* met a number of other requirements. *Id.* at 3. Artsana also never advertised that its booster seat protection was "special" or somehow fool-proof, but only that its booster seats came with "Duoguard Side-Impact Protection" and "two layers of side-impact protection," as the Complaint also made clear. *Id.* at 2.

The parties began mediation in September 2021, while Artsana's motion to dismiss was pending. On September 23, 2021, on the same the day that the parties' mediation briefs were due, Ms. Jimenez filed in this Court a substantially similar complaint to the *Sayers* plaintiffs. ECF No. 1.

After lengthy settlement negotiations, the *Sayers* and *Jimenez* plaintiffs filed a consolidated complaint in this Court and filed for preliminary approval of the settlement in January 2023. ECF Nos. 39, 40. This Court granted preliminary approval six days later and amended that order at the beginning of February 2023. ECF Nos. 45, 52.

## B.    The Claims Process Becomes Plagued by Fraud

Instead of a common-fund settlement, the parties agreed to a claims-made settlement. That means that Artsana has to pay only those claimants who submit valid claims; there is no "common fund" that is divvied up among those who make claims.

Under the terms of the Settlement, claimants with proof of purchase (such as a receipt or a registration with Artsana) are eligible to receive $50. ECF No. 42-1 ¶ 46. For claimants who may

have lost their proof of purchase or failed to register, the Settlement provides that they can receive $25 if they can provide specific information about their booster seat to verify their purchase. *Id.* ¶ 47. It is this latter "no proof" category that has driven the claims fraud.

During lengthy negotiations before the claims period commenced in March 2023, the parties and the settlement administrator, Angeion, discussed how "no-proof" claimants could provide the required information. Declaration of Jeremy S. Smith in Support of Opposition ¶ 2. Angeion eventually proposed a four-quadrant matrix:



**Figure 2**

Please complete at least TWO (2) of the 4 Groups (A-D) to continue.

**GROUP A**

A1. What is the model of the Eligible Product you purchased between April 22, 2015 and December 31, 2021? Please select one.

--Select--

A2. What is the PRIMARY and/or SECONDARY color of the seat covers? Please select up to two.

--Select--   --Select--

**GROUP B**

B1. Please type in the name of the RETAIL STORE or WEBSITE where the Eligible Product was purchased.

B2. What is the approximate month or season and year of purchase of the Eligible Product?

e.g. Fall 2018 or 09/2018

**GROUP C**

C1. Please fill in the SERIAL NUMBER of the Eligible Product below. The serial number is printed on the registration card or can be found on a white label sticker on the back of the booster seat.

**GROUP D**

D1. If not purchased online, please provide the State and municipality (city or town) of purchase and a photo of the product.

Select State

D2. Please type in the city or metropolitan area where you made the purchase of the Eligible Product.

D3. Please also upload a **photo** of the product (**Accepted file types are:** PDF, TIF, JPG, GIF, PNG. *Other file types will be rejected.*)

Please confirm in the grid below that your file has been successfully uploaded.

Select File for Upload:

Choose File   No file chosen

www.artsanaboosterseatsettlement.com/submit-claim

*Id.* ¶ 3. As shown above, "Group A" required the product model and colors; "Group B" required the retail store or website and approximate date of purchase; "Group C" required the serial number; and "Group D" required a photo and place of purchase. *Id.* ¶ 4. To be eligible for a $25 payment, claimants had to provide correct information for at least *two* of these four groups.

Artsana expressed its concern to Plaintiffs and Angeion that this matrix presented a low barrier for claimants. *Id.* ¶ 5. In particular, it appeared vulnerable to attempts to defraud the claims process by randomly picking a model and color from the settlement website's dropdown list, and guessing a retailer like Amazon or Walmart. *Id.* Artsana preferred a process by which no-proof claimants would first be directed to a screen asking for the booster seat serial number before they could select the other options on individual screens. *Id.* ¶ 6. But Plaintiffs did not want the serial number option to come first (even after Artsana offered to make a valid serial number alone sufficient for a $25 no-proof claim). *Id.* Artsana reluctantly agreed to this process.

In early March, the claims period opened. The online submission form went live, and Angeion mailed or emailed direct notice to over 100,000 people who registered their products with Artsana or the National Highway Traffic Safety Administration. ECF No. 60 ¶¶ 7–12. These individuals were the most likely to be honest claimants, as there was a record of their eligible purchase. From March 8–28, 2023, there were on average approximately 12,350 claims per week, which amounts to about 1,765 claims per day. Declaration of Bryan Heller ¶ 21. According to ClaimScore's analysis, approximately 41.3% of the claims in this three-week period were determined to be valid. *Id.* These numbers made some sense, and the process seemed to be working fine.

But once media notice began on March 24, claims spiked. In a three-day period from March 29 through March 31, 55,028 claims were submitted. *Id.* ¶ 22. Approximately 1% of the claims in this three-day period were valid. *Id.* 20,676 claims were submitted on April 1, 2023, and from April 2, 2023 to April 5, 2023, claim submissions averaged approximately 12,750 per day. *Id.* ¶ 23. Claims determined to be valid remained at approximately 1% during this period. *Id.*

This spike in claims may be attributable in part to significant online discussion of the

settlement early in the claims period, which were not sanctioned by the parties or Angeion, and which appeared to encourage fraud. For example, the website "The Krazy Coupon Lady" posted an article on March 15, 2023 titled: "Easily Get $25 - $50 in the Chicco Booster Seat Settlement" and included the following heading in bold:

**Even if you don't have proof of purchase, you can still get $25 by answering some questions.**

Smith, Decl. Ex. E. Similarly, on March 17, the website "Sweepstakesbible.com" posted an article "Open Class Action Settlements with No Proof of Purchase 2023," with the following image:



Smith Decl. Ex. F. On August 20, the website "Freebfinder.com" posted an article, "Car Seat Class Action Settlement, Claim $25 with No Receipts ($50 with!)" with the bolded heading:

**Car Seat Class Action Settlement, Claim $25 with No Receipts ($50 with!)**

Smith Decl. Ex. G. Other mentions include a tweet from Jamie M. Timbre (@jtimbre), a Twitter user with 129,600 followers, on March 11, stating: "You can get $25 from this Chicco Settlement with no proof of purchases necessary to file a claim!" Smith Decl. Ex. H. The post was retweeted 52 times, which has resulted in a total of 216,000 views to date. Smith Decl. Ex. I.

Beyond the significant spike in claims and troubling social media posts, there were other

concerning signs of fraud. As of March 22, more than 90% of claimants were selecting the two easiest categories: the model-year-color-retailer option ("Group A" plus "Group B"). Smith Decl. ¶ 7, Ex. A. Additionally, more than 50% of those claimants were inputting incorrect information and/or showing signs of fraud. *Id.* And by May 15, **99%** of claimants were picking the model-year-color-retailer option and more than **71%** were getting the answers wrong. *Id.* ¶ 8, Ex. B. In addition, although media notice ended on April 22, ECF No. 60 ¶ 14, claims hovered at nearly 33,000 per week from mid-April to mid-May, Heller Decl. ¶ 24.

Throughout these early weeks of the claims period and in light of the claims figures, Artsana repeatedly told Plaintiffs' counsel that the evident fraud could derail the settlement and pressed for meaningful changes to the claims process. Smith Decl. ¶ 9. Plaintiffs' counsel delayed agreeing to any adjustments and ultimately agreed only to a reshuffling of the claim matrix's order. *Id.*

But this half-measure did not reduce the fraud. In fact, things only got worse. Specifically, in late May—a month *after* the media notice ended—the fraud exploded further. From May 27 through September 2, claims have exceeded *65,000* every week. That means the claims rate during the past three-plus months has been roughly 7.4% of *all* products sold *every week*. In fact, between August 27-31, the claim submission rates reached an all-time high average of approximately 47,270 per day, or 330,920 claims per week. Heller Decl. ¶ 27. And from August 31 to September 19, an additional 591,741 claims were filed. That brings the grand total, as of September 19, to 2,159,699 claims filed claiming a total of 2,229,298 products, which is more than 250% of the approximately 875,000 total products sold. Declaration of Steven Weisbrot Regarding Preliminarily Eligible Products Claimed ¶ 7.

The fraud continues: Even projecting a conservative estimated rate of 100,000 per week for the remainder of the claims period, the claims are projected to more than **triple** the total number

of products sold by the end of the claims period.

**C.  Angeion's Preliminary Analysis Indicates Rampant Fraud**

Angeion, again the settlement administrator, has recognized the rampant fraud plaguing the settlement.  As of its Declaration on August 28, Angeion had preliminarily reviewed 1,012,624 claims submitted (as of July 21).  ECF No. 60 ¶ 27.  Of those claims, 854,962 were determined to be fraudulent or otherwise ineligible, which means that nearly *85%* of the claims were invalid, based either on various indications of fraud or claimants providing incorrect information.

| PRELIMINARY CLAIM VALIDATION & FRAUD ANALYSIS SUMMARY | | |
|---|---|---|
| **Status** | **Reason** | **Count** |
| *Eligible* | Correct information & not preliminarily suspicious for fraud | 153,244 |
| *Invalid* | Incorrect information | 419,193 |
| *Invalid* | Fraud flag(s) | 435,769 |
| *Pending* | Not suspicious for fraud but requires further document review | 4,418 |
| | **Total** | 1,012,624 |
| **Figure 6 – Report as of July 21, 2023 (source: ECF No. 60 ¶ 27)** | | |

That 85% figure is the inverse of the FTC's findings, where "86%" of "submitted claims in our sample [of a broad set of consumer class action cases] receive approval."  FTC Report at 11, 21–22 (93% median claim approval rate).

Angeion emphasized that its determination regarding "eligible" claims was preliminary, not final.  As Angeion CEO Steve Weisbrot explained, the 153,244 products "will be subjected to final audits."  ECF 60 ¶ 27 & n.1.  They are not "awaiting confirmation of validity," as Plaintiffs asserted in their Motion.  ECF 57 at 1, 22.

In fact, there was always strong reason to believe even the "preliminarily eligible" claims were infected by fraud.  Because only 874,538 products were sold, the "preliminary eligible" number would have amounted to an 18% claims rate.  That rate would be an extreme outlier—for

example, a 2019 FTC study that undertook a "systematic, empirical examination of a broad set of consumer class action cases" determined that the median claims rate was half that (9%) while the weighted mean was just 4%. Staff Report, *Consumers and Class Actions: A Retrospective and Analysis of Settlement Campaigns* 11, FTC (Sept. 2019), https://www.ftc.gov/system/files/ documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns /class_action_fairness_report_0.pdf ("FTC Report") (the average claims rate for email campaigns was 3%). And another federal judge noted recently that he was "blown away" by a 5.2% claims rate. Smith Decl. Ex. J (Bonnie Eslinger, *Facebook Jurist 'Blown Away' By Record Reply To $725M Deal*, Law360 (Sept. 7, 2023), https://www.law360.com/articles/1719282/facebook-jurist-blown-away-by-record-reply-to-725m-deal). Those findings are in line with the expectations of courts in this District, which have observed that "response rates of 10% or less are common." *Stinson v. City of New York*, 256 F. Supp. 3d 283, 290 (S.D.N.Y. 2017); *see also Oladapo v. Smart One Energy, LLC*, No. 14-cv-7117-LTS, 2017 WL 5956907, at *13 n.12 (S.D.N.Y. Nov. 9, 2017) (same). So the preliminary 18% claims rate well outstripped any reasonable expectations. In fact, before the opening of the claims period, Angeion conducted a statistical analysis applying the "specific conditions" of the Artsana settlement and determined with a "confidence interval of 99%, there is an upper bounds of liability of $1.5 [million]." Smith Decl. ¶ 10, Ex. C. That finding suggests the settlement process here should culminate in a claims rate of under 7%—nowhere close to 18%.

Moreover, Angeion informed the parties in August that the 153,244 figure includes nearly 11,000 claimants who claimed to have purchased four eligible products, over 2,000 claimants who claimed six products, and over 3,000 claimants who claimed nine products. Smith Decl. ¶ 11, Ex. D. While there may be a grandparent here or there who needs to buy nine booster seats because all of her nine grandchildren happen to have heights between 38 and 57 inches, it is implausible

that over 3,000 claimants purchased nine booster seat products. The average American family has less than two children,[1] and KidFit booster seats are a premium product (the suggested retail price at the time of the Settlement in 2021 ranged from $99.99 to $149.99). ECF No. 63 ¶ 8.

Because of the improbable number of products claimed, plus the many other concerning signs of fraud, Angeion recommended "implementing a deficiency process" and invited the parties to provide their "own thoughts as to the contours of the process." Smith Decl. ¶ 11, Ex. D. But the parties were unable to agree on the contours of a deficiency process, despite the extensive efforts by the counsel for all the parties and two mediation sessions (on August 18 and 28) before the Hon. Diane M. Welsh (JAMS).

### D.    ClaimScore Analysis

Faced with data showing that claimed products would well exceed the number sold and an improbable claims rate, as well as the mounting evidence of fraud, Artsana asked ClaimScore, a company specializing in rigorous analysis of claim submissions in class actions, to analyze the claims data. ClaimScore's technology uses a 20-plus point system to ensure an accurate, objective, and transparent review of each individual claim made in the settlement of consumer class actions. Heller Decl. ¶ 9. ClaimScore's validation system reviews each claim individually against all case-specific validation requirements (here, those in the Settlement Agreement), as well as against its own 20-plus criteria to detect fraud. *Id.* ¶ 10. Each criterion is weighted depending on both the correlation to fraudulent claims and correlation to valid claims. Every claim begins with a "score" of 1,000 and is reduced each time it fails a criterion. *Id.* If the score for a particular claim drops below 700, ClaimScore recommends that the claim be rejected. *Id.* ClaimScore does not reject claimants based on single indicators of fraud; rather, under the ClaimScore system, all claims are

---

[1] *Average Number of Own Children Under 18 in Families with Children in the United States from 1960 to 2022*, Statista, https://www.statista.com/statistics/718084/average-number-of-own-children-per-family/ (last visited Aug. 22, 2023).

assessed against all of the 20-plus criteria uniformly. *Id.* ¶ 16. Other than claims answering all the questions wrong, no one claim fails simply because they fail to meet a single criteria. *Id.* ¶ 11.

Over the last few weeks, ClaimScore reviewed all the claims submitted through August 31, 2023. *Id.* ¶ 6.[2] After separating out claims with proof of purchase, a serial number, or a photograph, ClaimScore ran each of the remaining 1,568,706 claims, which included 1,637,547 products, through its system. ClaimScore identified 35,081 valid claims (or claims with a ClaimScore above 700) containing 43,154 products. *Id.* ¶ 39. That would be a 4.9% claims rate. These 35,081 claims had a median ClaimScore of 900 and an average ClaimScore of 906. *Id.*

The main culprit of this overwhelming fraud—much of which is extremely hard to prevent —appears to be something called ███████████████ Heller Decl. ¶ 36. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████  ██  █████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████

---

[2] Artsana appreciates the additional week to file this brief, which not only allowed it to work with ClaimScore on its analysis, but it also yielded a new analysis from Angeion, which is discussed below and resulted in a reduction of claimed products from 153,244 to 61,582. Had Artsana had to file its brief last week, it would have had no choice but to oppose final approval altogether, given its strong suspicions of fraud have now been confirmed independently by two firms.



ClaimScore's analysis indicated that of the 1,529,813 claims that had a ClaimScore below 700, 97% had at least three of the above indicators, and 88.4% had at least four or more. *Id.* ¶ 48.

ClaimScore also ran an analysis of the subset of 153,244 product claims that Angeion labeled "preliminarily eligible" in July. As noted above, there was reason to doubt the validity of the 153,244 number given the implausible claims rate and number of KidFit booster seats supposedly purchased by many claimants.

ClaimScore's analysis validated Artsana's concerns. Using the algorithm described above, ClaimScore determined that of the 153,244 preliminarily "eligible" products, 120,788 of the product claims were invalid. *Id.* ¶ 52. And of these rejected claims, 88.2% of these claims failed at least three of the indicators of fraud described above, and 74.7% had at least four or more. *Id.* In other words, these claims were clearly fraudulent, yet they hadn't been detected by the existing anti-fraud measures.

The fraud can easily be seen without any advanced algorithms. For example, below are a series of claims randomly selected amongst the data set. They were all submitted on July 12, 2023 between 5:06 a.m. and 5:25 a.m. Eastern time. *Id.* ¶ 53.

The claims with ████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████ ██████████████████████████████████████████████

██████████████████████

██████████████████████████ ████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ But this is just an

example of the type of pervasive fraud that has plagued this settlement, and that caused Artsana to sound the alarm many months ago.

## E.    Angeion's Updated Analysis

Angeion also continued its fraud analysis after Plaintiffs moved for final approval.  In a declaration concurrently submitted with this Response, Angeion reported the results of its additional fraud analysis of the 153,244 preliminarily "eligible" products.  Weisbrot Decl. ¶ 4. That review identified that 61,582 products of the 153,244 products claimed were preliminarily valid (13,612 of which were submitted by individuals that matched to the Class List).  *Id.*[3]  Angeion reported that 91,662 of the products have now been identified as fraud.  *Id.* ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ ███████With these revised numbers, the claims rate now is around 7%.

Angeion also analyzed a subset of 403,386 of the new claims filed from September 1–15 using a partial fraud analysis.  Weisbrot Decl. ¶ 8–9.  It concluded that of the 408,386 claims, 24,992 claims passed a partial fraud analysis, but of that number, only 3,673 were not using a suspicious domain.  *Id.* ¶ 9.  Thus, 404,713, or 99.1%, of the claims received during this period are indicative of fraud under Angeion's preliminary and partial fraud analysis, but will need to be reviewed further.  *Id.*

---

[3] Plaintiffs' counsel acknowledged this reduction on the morning this brief was due.  ECF No. 77 at 1.

### III. LEGAL STANDARDS

Unlike settlements in other types of cases, class action settlements must be approved by a court. Fed. R. Civ. P. 23(e) ("a class proposed to be certified for purposes of settlement [] may be settled . . . only with the court's approval"). A court may provide that approval only if it finds that the settlement is "fair, reasonable, and adequate." *Id.* And the court must make "findings of fact and conclusions of law whenever [as here] the propriety of the settlement is seriously in dispute." *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10-cv-7493-VB, 2013 WL 4080946, at *4 (S.D.N.Y. May 30, 2013) (Briccetti, J.) (citing *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983)). "When a settlement is negotiated prior to class certification, as is the case here, it is subject to a higher degree of scrutiny in assessing its fairness." *Id.* (quoting *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir.2001)).

### IV. ARGUMENT

Given the rampant fraud that has inundated the claims process, this Court should not grant final approval of the settlement at this time. Rather, the Court should defer final approval of this settlement until after the claims period closes, to allow all claims to be properly evaluated for fraud. The Court should also close the claims period immediately to stem the flow of fraudulent claims, which would serve only to cause greater difficulties in rooting out fraud and delay class members receiving payment.

### A. There Is Insufficient Information for the Court to Grant Final Approval at This Time

The Court's preliminary approval order expressly contemplates that the settlement must be "finally approved by this Court." ECF No. 52 ¶ 4. And the Court cannot grant final approval unless the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e). In light of the severe, ongoing fraud that has plagued the claims process, approving the settlement now, as Plaintiffs request, would not be "fair, reasonable, [or] adequate." The Court should not approve

the settlement at this time, and it should defer its ruling until after the claims period closes.

Courts in this district routinely withhold final approval of class-action settlements when the circumstances require it. *See In re Auction Houses Antitrust Litig.*, No. 00-cv- 0648-LAK, 2001 WL 170792, at *11 (S.D.N.Y. Feb. 22, 2001), *aff'd*, 42 F. App'x 511 (2d Cir. 2002) (conditioning final approval of settlement upon parties' improvement of a proposed mechanism to develop a secondary market for discount certificates); *Martinez v. Gulluoglu LLC*, No. 15-cv-2727-PAE, 2016 WL 206474, at *2 (S.D.N.Y. Jan. 15, 2016) (denying final approval unless parties amend confidentiality provisions); *Plizga v. Little Poland Rest. Inc.*, No. 15-cv-08820-LAK-BCM, 2016 WL 9307474, at *6 (S.D.N.Y. July 18, 2016) (similar); *see also Brown v. Sega Amusements, U.S.A., Inc.*, No.-13-cv-7558-RMB, 2015 WL 1062409, at *3 (S.D.N.Y. Mar. 9, 2015) (denying preliminary approval where settlement did not provide adequate means to weed out non-class members, because "[t]he potential for fraudulent claims is meaningful").

The circumstances here warrant such a deferral. Class action settlements are fair only when "they provide real benefits to consumer *class members*"—not to criminals seeking to exploit a court settlement. *Moses v. New York Times Co.*, 79 F.4th 235, 247 (2d Cir. 2023) (emphasis added). Defendants, too, have "a due process right not to pay in excess of its liability." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 669 (7th Cir. 2015). So final approval should not be granted if the benefits of the settlement would end up in the hands of criminals. *See In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (noting that "the need to 'avoid encouraging fraud'" is "without doubt . . . a good goal" for class action settlements); *see also In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 998 (N.D. Ohio 2016) (finding that claims process that required class members to provide social security numbers was valid, in order "[t]o prevent fraud"); *In re Remicade Antitrust Litig.*, No. 17-cv-04326, 2023 WL 2530418, at *18 (E.D. Pa. Mar. 15, 2023) (same).

As Angeion has explained, "fraudulent claim submissions in certain types of class action settlements are becoming increasingly prevalent." ECF No. 60 ¶ 29. That declaration cited a recent article on the increased risk of fraudulent no-proof claims discussed three recent consumer class actions where the rate of invalid claims was determined to be 12.5%, 47%, and 49%, which the author deemed "startling" and remarkable. Ross Weiner, *The Increasing Danger of Fraudulent Claims in Class Action Settlements*, N.Y.L.J. (July 26, 2023) (cited at ECF No. 60 ¶ 29).[4]

The invalid or fraud rate here is at least **_93%_**—and still growing as each day passes. As explained above, Angeion's preliminary review of claims submitted through July 21 determined that more than 43% of products claimed were potentially fraudulent, and that more than 41% of the claims were otherwise ineligible because they provided incorrect information (which is highly suggestive of fraud). ECF No. 60 ¶ 27. Angeion's updated analysis indicates that an even higher percentage of claims display multiple indicia of fraud. Angeion's review identified only 61,582 products claimed are preliminarily valid, down from 153,244. Weisbrot Decl. ¶ 4. This means that Angeion has determined that more than **_93%_** of the claims analyzed as of July 21 are invalid.

ClaimScore independently examined the same data and found even more fraud. It determined that 1,529,813 of the 1,568,706 claims through August 31 should be rejected, or 97% of all claims. Heller Decl. ¶ 48. Even more troubling, ClaimScore found that the vast majority of claims had indicators of ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ ClaimScore reports that of the 1,529,813 claims with a score below 700 (and therefore failed its criteria), 97% had at least three of the indicators of ████████████████ and 88.4% had at least four or more. *Id.* ¶ 48.

---

[4]    Available online at: https://www.law.com/newyorklawjournal/2023/07/26/the-increasing-danger-of-fraudulent-claims-in-class-action-settlements/?slreturn=20230631175338.

In short, two analyses by independent and respected firms have confirmed that at least 93% claims already submitted are fraudulent.  And the problem is getting worse.  Angeion determined that ***99.1%*** of the most recent claims—those submitted from September 1 to 15, 2023—appear fraudulent.  Weisbrot Decl. ¶ 9.  We are now five months removed from media notice and the follow-on social media notice—a time when claims should be decreasing.  But the number of claims has been increasing exponentially (330,920 *per week* in the last report), and at least 99.1% of the new claims are fraudulent.

Artsana does not know whether Plaintiffs' counsel will withdraw the pending motion in light of these overwhelming data.  But in the past, they have suggested that Artsana's concerns reflect a "regret" for the volume of claims, or an attempt to renegotiate the settlement.  Of course, no part of the settlement requires Artsana to pay out fraudulent claims; in fact, the Settlement Agreement expressly requires the claims administrator to "identify and reject duplicate and/or fraudulent claims."  ECF No. 42-1 ¶ 86.  Plaintiffs' counsel also cannot argue that the risk of fraud is baked into every settlement process.  To Artsana's knowledge, no court has ever addressed, much less granted final approval when presented with a fraud rate even approaching the one in this case; the case law shows a much lower rate of fraudulent claims, which could be addressed using normal means.  *See, e.g.*, *Hart v. BHH, LLC*, No. 15-cv-4804-WHP, 2020 WL 5645984, at *2 (S.D.N.Y. Sept. 22, 2020) (granting final approval where claims administrator flagged just over 10% of claims as duplicative, invalid, or fraudulent); *Kuymar v. Salov N. Am. Corp.*, No. 14-cv-2411, 2017 WL 2902898, at *3 (N.D. Cal. July 7, 2017) (claims administrator denied just 18% of claims as duplicative or otherwise invalid).  The 10% to 18% rejection rate in those cases is far lower than the 93% rejection rate in this case, and the total will only grow as we get farther and farther away from the notice period.

Plaintiffs' request for final approval therefore is premature.  The appropriate course is to

defer final approval and await full reports, potentially from both Angeion and ClaimScore, on all the claims submitted. With that information in hand, hopefully the Court (and the parties) will have confidence that class members, not fraudsters, are obtaining the benefits of the settlement. That approach will also allow this Court to assess whether additional countermeasures are necessary, short of denying final approval, that can resolve the fraud if concerns persist. For example, the Court could order a deficiency and verification process, as Artsana had planned to propose before Angeion submitted its updated numbers. *See* ECF No. 75 (forecasting a potential request for "this Court to order a deficiency process to adequately address the fraud"). That step may well be unnecessary given the recently deployed and more advanced methods of fraud detection employed by Angeion, along with robust and claim-by-claim analysis performed by ClaimScore. But only time will tell. The Court should allow this process to play out before assessing final approval.

**B.      The Court Should Close the Claims Period Immediately**

The one step the Court can and should take now is to close the claims period immediately. According to the preliminary approval order, the claims period is currently set to end 60 days after final approval. Dkt. 52 ¶ 11 (referencing the "Bar Date" as defined in ECF 42-1). But the only thing accomplished by keeping the claims period open is to allow criminals to continue to exploit this settlement. Here are the percentage of rejected claims since the claims period opened until August 31:

| Time Period | Percentage of Rejected Claims |
|:---:|:---:|
| 3/8/23 – 3/28/23 | 58.7% |
| 3/29/23 – 3/31/23 | **99.0%** |
| 4/1/23 – 4/5/23 | **99.0%** |
| 4/6/23 – 5/20/23 | **97.6%** |
| 5/21/23 – 6/13/23 | **99.0%** |
| 6/14/23 – 7/30/23 | **98.3%** |

| Time Period | Percentage of Rejected Claims |
|---|---|
| 7/31/23 – 8/26/23 | **98.9%** |
| 8/27/23 – 8/31/23 | **99.8%** |

Heller Decl. ¶ 30.

Add in the most recent two weeks—September 1 to 15—and the total fraudulent rate jumps to 99.1%. Weisbrot Decl. ¶ 9. Moreover, and as the graph below shows, it is clear that the overwhelming majority of valid claims were submitted back before April—meaning these legitimate claimants have already waited more than five months for their payment:



Heller Decl. ¶ 20.

Closing the claims period now will benefit the actual class members, virtually all of whom have already made claims (as shown above) and now have to wait for their payment for no apparent purpose other than to allow hundreds of thousands of fraudulent claims to be submitted every week. Nor would legitimate claimants suffer any prejudice—the claims period has been open since March 8, meaning that by the date of this filing, class members would have had 201 days to

submit claims. Such a lengthy claims period is more than enough time to allow submissions; in fact, a court can "grant final approval of a proposed settlement as early as 90 days after notice is given" to class members and appropriate officials. *Skeen v. BMW of N. Am., LLC*, No. 13-cv-1531, 2016 WL 4033969, at *13 (D.N.J. July 26, 2016) (rejecting argument that 120-day claims period was unreasonably short); *see also Weber v. Gov't Emps. Ins. Co.*, No. 07-cv-1332, 2009 WL 2496811, at *1 (D.N.J. Aug. 11, 2009) (class members were required to submit claims within 90 days of preliminary approval). And as Angeion has previously testified, its Notice Plan has "exceeded expectations by delivering an approximate 86.77% reach with an average frequency of 5.62 time each." ECF No. 60 ¶ 23. The settlement website, for example, has had 1,973,411 page views as of August 28. *Id.* ¶ 20. There is no reason to think that class members have not been notified, and an update to the website could easily inform those few honest claimants who, for whatever reason, wish to wait until the very last day to submit their claims.

It is well established that "courts are not without tools to combat [fraudulent claims] during the claims administration process," such as "various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court." *Mullins*, 795 F.3d at 667. A "[c]ourt's equitable powers may be necessary to deal with other problems that commonly arise during administration of settlements but might not be covered by the terms of the agreement." *In re Linerboard Antitrust Litig.*, Nos. 98-cv-5055, 99-cv-1341, 2004 WL 966236, at *3 (E.D. Pa. May 4, 2004) (quoting the Manual for Complex Litigation (Fourth) § 21.7). Such "involvement therefore acts to preserve the bargain struck," and this oversight "is consistent with the powers of the court to administer a massive class action settlement such as this." *In re Diet Drugs Prod. Liab. Litig.*, 236 F. Supp. 2d 445, 462 (E.D. Pa. 2002).

The Court should exercise its oversight by closing the notice period immediately. The parties can update the settlement website with the new deadline, which already prominently tells class members to "Please check this Website periodically for updates." https://www. artsanaboosterseatsettlement.com; *see also* ECF No. 60 Exs. B, C, F, and G (noting information would be provided on website). And although another round of media notice would be cost prohibitive (around $250,000) and counterproductive as it could encourage further fraud, Artsana is willing, if the Court believes it is necessary, to have another round of targeted, direct notice to those class members who have not yet made claims. If the claims period ends by October 17, then there should be sufficient time for the parties to prepare a final report and for the Court to be in a position to determine if the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e).

## V. CONCLUSION

In light of the rampant fraud in the claims process, the Court should not grant Plaintiffs' Motion for Final Approval at this time. Rather, the Court should close the claims period immediately to reduce the number of additional fraudulent claims (which are rapidly increasing), and defer its consideration of final approval until after the close of the claims period. That will allow the Court to assess the results of the entire claim period and the anti-fraud measures.


Dated: September 25, 2023     Respectfully submitted,

           GIBSON, DUNN & CRUTCHER LLP

           By: */s/ Christopher Chorba*

           Christopher Chorba (*Pro Hac Vice*)
           CChorba@gibsondunn.com
           Jeremy S. Smith (*Pro Hac Vice*)
           JSSmith@gibsondunn.com
           333 South Grand Avenue
           Los Angeles, CA 90071-3197
           Tel.: (213) 229-7000

Jason W. Myatt
JMyatt@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Tel.: (212) 351-4000

*Attorneys for Artsana USA, Inc.*