UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------x
AMANDA JIMENEZ, et al.,

                          Plaintiff,

                                    21 CV 7933
       -vs-

ARTSANA USA, INC., et al.,

                          Defendants.

--------------------------------------x

                              United States Courthouse
                              White Plains, New York

                              November 8, 2023

Before:  THE HONORABLE VINCENT L. BRICCETTI, District Judge

A P P E A R A N C E S:

VOZZOLO LLC
       Attorneys for Plaintiffs
       345 Route 17 South
       Upper Saddle River, New Jersey 07458
ANTONIO VOZZOLO
ANDREA L. CLISURA
       --and--
MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
       Attorneys for Plaintiffs
       900 West Morgan Street
       Raleigh, North Carolina 27603
MARTHA GEER

BURSOR & FISHER, P.A.
       Attorneys for Plaintiffs
       1330 Avenue of the Americas
       32nd Floor
       New York, New York 10019
ALEC M. LESLIE

1  APPEARANCES:  (CONT.)

2  GIBSON, DUNN & CRUTCHER, LLP
        Attorneys for Defendants
3        333 South Grand Avenue
        Los Angeles, California 90071-3197
4  CHRISTOPHER CHORBA
   JEREMY S. SMITH

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE DEPUTY CLERK:  In the matter of Amanda Jimenez, et

2    al. versus Artsana USA, Incorporated, et al.

3          Will counsel please note their appearance for the

4    record?

5          MR. VOZZOLO:  Good morning, Your Honor.  Antonio

6    Vozzolo for Vozzolo LLC on behalf of plaintiffs and the class.

7          THE COURT:  Okay.  Welcome.  Have a seat.

8          MS. GEER:  Martha Geer of Milberg, Coleman, Bryson,

9    Phillips & Grossman on behalf of the plaintiffs.

10          THE COURT:  Okay.  Welcome.  Have a seat.  We have

11    somebody in the back here?  Who is that?

12          MS. CLISURA:  Andrea Clisura with Vozzolo LLC for

13    plaintiffs.

14          THE COURT:  Bear with me.  You are going to have to

15    speak up a little bit because I didn't hear you.

16          MS. CLISURA:  Andrea Clisura with Vozzolo LLC for

17    plaintiffs.

18          THE COURT:  Okay.  Welcome.  Have a seat.

19          MR. LESLIE:  Good afternoon, Your Honor.  Alec Leslie

20    of Bursor & Fisher on behalf of plaintiffs.

21          THE COURT:  Okay.  Welcome.  Have a seat.

22          All right.  Who is going to be speaking on behalf of

23    plaintiffs?  We have four lawyers here.  I am not going to hear

24    from four lawyers.

25          MS. GEER:  Your Honor, I am, and with your permission,

1  Mr. Vozzolo.  We would split the two arguments.  The motion for

2  final approval I would handle, and he would handle the motion

3  for attorneys' fees.

4           THE COURT:  Thank you for that.  All right.  Got

5  plaintiffs out of the way.

6           Defense counsel.

7           MR. CHORBA:  Good afternoon, Your Honor.  Chris Chorba

8  on behalf of defendant, and with me is my colleague Jeremy

9  Smith.  We would also divide the argument between us if that's

10 permissible.

11          THE COURT:  Yes.  It is permissible, but I want to

12 know who's doing what.

13          MR. CHORBA:  I will handle final approval, and

14 Mr. Smith will handle fees.

15          THE COURT:  Got it.  Welcome.  Have a seat.

16          All right.  Well, let me just generally observe at the

17 beginning that having reviewed the voluminous materials that you

18 have each submitted, this is truly unprecedented in my

19 experience.  I have only been here about 13 years, but I have

20 never seen anything like this, and when I say that, I mean I

21 have never seen anything like -- well, I have certainly had

22 numerous let's called them consumer product class action cases,

23 I think with Mr. Vozzolo; I think with certainly with Bursor &

24 Fisher.  I am not sure if the other lawyers have appeared before

25 me on those kinds of cases, but for sure Mr. Vozzolo has.

1  Right?  You have had other cases in front of me?

2          MR. VOZZOLO:  Yes, Your Honor.  I have had a number of

3  cases before you.

4          THE COURT:  And Bursor & Fisher, big firm.  I don't

5  know specifically about Mr. Leslie, but certainly other

6  attorneys from his firm.  And I've never had a situation where

7  the amount of almost certainly fraudulent claims has been as

8  high as it is here, and I certainly want to address that.  I

9  think that's really the thing that we have to address the most

10 today.

11          So it's unprecedented.  Because it's unprecedented,

12 it's hard for me to sort of scratch my head and figure out what

13 the best thing to do is, and to be brutally honest, I haven't

14 gotten a lot of help from the lawyers on this.  Essentially, the

15 defendants say -- strike that -- the plaintiff says, well, yeah,

16 there is a lot of fraud, but, you know, that's what we agreed

17 to, and that's life in the big city, so you should just approve

18 it, and we will sort out the fraud as time goes on.  That's the

19 gist of it from plaintiffs' counsel.

20          Ms. Geer, I mean, that's really what you are saying;

21 you are saying, we made a deal.  There is a process for sorting

22 out legit claims from fraudulent claims.  Yeah, it does appear

23 like the number of legitimate claims is a tiny fraction of the

24 number of claims that have been submitted, that the vast amount

25 of claims submitted have been fraudulent, but it's just the way

1   it goes.  It's something that was sort of apparent to -- not

2   sort of -- that was apparent as a possible problem to defense

3   counsel, and they signed the agreement.  They negotiated the

4   details of it with us.  It was, you know, sophisticated parties

5   working together to come up with a process for how the claims

6   can be submitted, what sort of proof has to be submitted, and

7   how fraudulent claims would be weeded out in the fullness of

8   time.  So go ahead and approve it, and it's great.  And I think

9   that's the gist of what you are saying.  You can tell me if I am

10  wrong, but that's the way I see it.

11            MS. GEER:  Your Honor, I --

12            THE COURT:  I want to cut through the baloney.  I want

13  to get to the heart of this.

14            MS. GEER:  I understand, Your Honor.  What I would say

15  is that the -- as the cases that -- when you look --

16            THE COURT:  There are no cases that are relevant here.

17  None.  Zero.  So don't talk to me about cases.  The facts are

18  unique, period.

19            When you cite to some case from California, which has

20  some -- basically it has a -- the judge there saying, well, you

21  know, why don't we pause this for 30 days?  But in that case the

22  fraudulent claims were -- yeah, there were fraudulent claims,

23  but they weren't 99 percent of the claims, I don't think.  So

24  how is that relevant here?

25            Anyway, don't talk to me about cases.  Talk to me

1  about -- just confirm for me, or if I'm wrong about this, tell

2  me why I am wrong; that what you are saying is, you can approve

3  this settlement, Judge, even though we all agree there is a

4  large number of fraudulent claims, and the reason you can do

5  that is because this was negotiated.  The possibility of fraud

6  was, obviously, taken into consideration, as it always is in

7  consumer class action cases, particularly in class action cases

8  in which the claimant doesn't have to prove that they actually

9  purchase it.  They just have to say they purchased it and answer

10 a couple of questions to, you know, maybe show that this is a

11 legitimate claim.  And so there's fraudulent claims, for sure,

12 but that was anticipated, and importantly, not only was it

13 anticipated, but there is an actual procedure, a very fulsome

14 procedure that's in place to deal with that.  Right?  You are

15 saying that, correct?

16         MS. GEER:  Yes, Your Honor.

17         THE COURT:  So you are saying that the settlement

18 should be approved as fair and reasonable because the potential

19 of fraud was there.  There is fraud, but it's being dealt with.

20         MS. GEER:  Yes, Your Honor.  And it will continue to

21 be dealt with.  I think the issues, when you are looking at

22 the -- I wouldn't say that it -- just because it's been agreed

23 upon, you know, we are just going to ignore the problem.  That's

24 not the case at all.  But walking through the structure that the

25 courts have given us and Congress has given us, you know, I

1   think 23(e) of the advisory committee notes make a very

2   important point, which we --

3           THE COURT:  Which is what?

4           MS. GEER:  -- which we cited, which is that one of the

5   goals of 23(e), and one of the goals that is supposed to be for

6   the courts in considering whether to grant final approval is to

7   balance the, you know, desire to ensure that people who have, in

8   fact, been harmed are compensated along with ensuring people

9   that -- who have not, you know, who are not entitled to

10  recover -- fraudsters as they get called -- are not compensated.

11  And the way to do that is not by simply saying, okay, we are not

12  going to approve this settlement because it allows for people to

13  recover who don't have proof of purchase.

14          And that is effectively what is the consequence of

15  what Artsana is arguing here; is that if you don't have proof --

16  and I think the reality of the situation -- this is not -- I

17  mean, Mr. Weisbrot, by the way, was not able to be here in

18  person with Angeion, but he has -- I have his cellphone number,

19  and he would be happy to talk to the Court by phone and --

20          THE COURT:  Didn't I just get an affidavit like two

21  days ago?

22          MS. GEER:  Yes, you did.

23          THE COURT:  Not from him, but from somebody else.  Why

24  did you do that?  Why didn't you just stick with Weisbrot?

25  Wouldn't that make more sense?  But anyway, you didn't, so there

1  you go.

2        MS. GEER:  Because she was -- she was actually going

3  to do a declaration on the issues of opt-outs and exclusions

4  confirming that, you know, there had been no opt-outs, and there

5  had been only three exclusions; and then when there were

6  discussions amongst the parties about updating the data, and the

7  result actually is, unfortunately, in the rush to get that in

8  for both sides, there were some errors made.  So we are going to

9  have to do an amended declaration, and I would like to

10 clarify --

11       THE COURT:  Hold on a second.  Hold on a second.

12 Let's assume for the moment that I have read everything you have

13 submitted.  Start with that.  Okay.  So you don't have to hold

14 my hand on this one.  I think it's better for me to run the show

15 rather than for you to walk through as if I hadn't even looked

16 at it.

17       My only question is -- well, it's not even a question.

18 It's more of an observation.  It would have been better if Mr.

19 Weisbrot, who had submitted I think three -- wasn't it three?

20 -- three separate affidavits.  Let me just check because I have

21 them right here.  One on August 28th in favor of settlement; two

22 on September 25th in opposition to settlement.

23       MS. GEER:  I don't believe it's opposition.  I think

24 it was simply an update of the numbers.  He was not --

25       THE COURT:  Submitted by the defendants in opposition

1  to settlement, am I right?

2          MR. CHORBA:  That's correct, Your Honor.

3          THE COURT:  So it was in opposition to settlement.  So

4  that's what it was.  I mean, but he is not -- Weisbrot and the

5  company Angeion, they are not advocates here.  They were hired

6  by both sides.  I'm just saying, the first affidavit was

7  submitted with your papers in favor.  The second affidavit was

8  submitted with defendants' papers in opposition.  That in and of

9  itself is unprecedented for me, but it is what it is.  That's

10 what it says.

11         Then of course I got an affidavit from the person from

12 ClaimsCorp, which is the company hired by defense counsel, to

13 say what the heck is going on here? and trying to sort it out.

14         And then I got a third affidavit from Weisbrot on

15 October 16th regarding ongoing fraud detection efforts, and then

16 I've got a fourth Angeion affidavit, but it's not Weisbrot.

17 It's from Jenny Shawver, S-H-A-W-V-E-R, and that's on

18 November 3rd.  I think those are all the affidavits that I have

19 received so far.

20         Now, when I say November 3rd, that's the date of the

21 affidavit.  I received it a couple of days ago, but it's dated

22 November 3rd.  Am I right about that so far?

23         MS. GEER:  Yes, Your Honor.

24         THE COURT:  All right.  With all due respect, what you

25 are saying is essentially what I am saying, which is:  The

1  settlement was negotiated by both sides.  The possibility of

2  fraud was anticipated by both sides, and I think you even

3  enclosed an email or something from somebody on the defense side

4  which acknowledges the possibility of fraud.  The point is,

5  fraud was -- of course it's possible.  These are -- you are

6  saying to 300 million people in this country, listen, you can

7  get money, but you don't have to actually prove definitively

8  that you are entitled to the money.  You just have to say you

9  are entitled to the money, and you got to answer a couple of

10 questions to help us figure out whether you are or are not

11 entitled to the money.  So that's pretty easy to do, right?

12 Pretty much anybody can submit claims, or multiple claims even,

13 saying I bought eight, I bought 15, I bought a hundred of these

14 products, and they are gray, and I bought them in Connecticut.

15 Give me the money.  That's basically what it says, but it's

16 built into the agreement.  So, obviously, there is the

17 possibility of fraud.

18         Am I right about that, Mr. Chorba, that it's obvious

19 to you that there was the possibility of fraud?

20         MR. CHORBA:  Absolutely, Your Honor.

21         THE COURT:  That's all I need to know.

22         That's Step 1.  So Step 2, plaintiffs' position is

23 there is a -- well, Step 2 is there is fraud.  How do we know

24 that?  Well, there are 875,000 products made that could qualify,

25 but there have been some number of millions of claims,

1  3.3 million according to Ms. Shawver, claims including 28

2  million products.  Now maybe you were about to correct that.  Is

3  it really 28 million products?

4          MS. GEER:  That's what I was told, yes.

5          THE COURT:  Or is it something different than that?

6  But hold on.  Bear with me.  We will get to that.  We will drill

7  down.

8          Even if it's not 28 million, there are way more

9  products that have been identified in these claims than were

10  actually sold and could be eligible in this -- for money in this

11  case.  I think we all agree on that, right?  You agree on that?

12          MR. CHORBA:  Yes, absolutely.

13          THE COURT:  That's Step 2.

14          Step 3 is, okay, there's fraud.  We knew there would

15  be fraud; didn't know there was going to be this much fraud, but

16  we knew there was going to be fraud, but Step 3 is:  We have a

17  process for that.  I think -- and maybe I'm wrong about this --

18  but you -- both of you phrase it in different ways:  Claims

19  processing, fraud detection, even deficiency processing.  I

20  don't know what that means.  That's not defined anywhere.  I'm

21  guessing -- maybe I'm wrong -- that deficiency -- I mean, you

22  say it in multiple places.  What is that?  What is a deficiency

23  process?  Is that the process to weed out fraudulent claims?  Is

24  that what that means?

25          MS. GEER:  No, Your Honor.  The deficiency process is

1  a process by which you ensure that legitimate claimants don't

2  get caught up in this fraud net.  And so that what will happen

3  as provided in the settlement agreement is that Angeion will

4  provide notification to all of the --

5          THE COURT:  Rejected claims.

6          MS. GEER:  -- rejected --

7          THE COURT:  And there is a subsequent process between

8  the lawyers to sort that out.

9          MS. GEER:  Well, actually, the claimants then have an

10  opportunity to --

11          THE COURT:  Contest that.

12          MS. GEER:  -- contest it.  And it's a short timeframe,

13  and if they choose not to contest it, they are out.  If they

14  choose to contest it, then we have a process to --

15          THE COURT:  So it's sort of -- it's a part of the

16  fraud detection process because if Angeion says, this is a

17  fraudulent claim or this is an invalid claim, which would

18  include fraudulent claims, the claimant can say, no, it's not.

19  You made a mistake.  You are wrong.  And then there is a

20  deficiency process to, in effect, adjudicate that, whether it's

21  legit or not legit, after the claimant has contested it.

22          So that's part -- if you think about my brain, that's

23  just sort of a tag-on tag to a legitimate -- I don't know.  I'm

24  looking for the right word.  It's a part of the whole process of

25  figuring out what are the legitimate claims and what are not the

 1  legitimate claims.  It's part of that, right?

 2          MS. GEER:  That's correct.

 3          THE COURT:  So what you are saying is -- and I think

 4  you're saying it.  I'm not trying to -- I'm not taking issue

 5  with anything you've said.  I think you are saying the same

 6  thing I am saying, which is, we negotiated a deal.  We

 7  anticipated fraud.  There is fraud.  There is a process for

 8  sorting out the fraud, and even when there is a decision made

 9  that a claim is not valid, a claimant can contest that.  And

10  there's a further process to sort out those contested-by-

11  the-claimant claims.  And therefore, it's all -- it's fine.  You

12  know, we can approve it.  The amount of money involved is fine.

13  The -- you know, all of the factors that have to be addressed in

14  Rule 23(e) can be addressed, and that the bottom line is that I

15  should go ahead and approve the settlement.  And then, by the

16  way, also approve the attorneys' fees.

17          MS. GEER:  I would actually disagree with the last

18  part.

19          THE COURT:  Okay.

20          MS. GEER:  Because when -- the reason that we cited

21  the California case, the *Ramirez* case, was for one proposition,

22  which is at the final approval stage, yes, there may be issues

23  of fraud and so forth, but the issue on final approval is

24  whether this deal should be approved.  And that it's a --

25  *Ramirez* said it was an up or down, and if -- but what --

 1          THE COURT:  The judge there didn't approve it on that

 2   day, right?

 3          MS. GEER:  Not on that day, and that's one option.

 4   That is to say, I want to have more information.

 5          The attorneys' fees, you know, motion depends on

 6   whether you approve the -- finally approval the settlement.

 7          THE COURT:  So let me stop you there.  Final approval

 8   also depends on the attorneys' fees because there's a recent

 9   case in the Second Circuit, *New York Times* against -- what is

10   it, Emma?  *Moses*, the *Moses* case.  Doesn't that case say that

11   one of the factors in deciding whether the settlement is fair is

12   deciding whether the fees are fair?  In other words --

13          MS. GEER:  Your Honor --

14          THE COURT:  -- they are interconnected.  You don't do

15   one and then just say, okay, I will worry about the other one

16   later.  You've got to do both.

17          MS. GEER:  If they are linked, and I think the *Wawa*

18   case that was just cited as supplemental authority by the Third

19   Circuit explains it very well because the question is:  Was the

20   settlement a result of collusion?  And in fact, Rule 23(e)

21   specifically requires the Court to, in deciding whether to

22   approve a settlement, to look at the attorneys' fee.

23          The only agreement in this case regarding attorneys'

24   fees was that they -- that Artsana would pay for them, and there

25   is no kicker.  There is no clincher.

1           THE COURT:  I have to decide whether they are

2   reasonable.

3           MS. GEER:  Exactly.  And that is the sole --

4           THE COURT:  If you ask for $10 billion in attorneys'

5   fees, you're probably not going to get that, right?

6           MS. GEER:  That's right.  But you don't have to -- but

7   the -- in terms of considering the attorneys' fees in the

8   context of is this settlement -- the settlement, is that

9   something that should be approved, what the courts are looking

10  at, and what Second Circuit and what the Third Circuit have

11  focused on is:  Is the fee agreement that is part of the

12  settlement agreement one that raises issues of collusion?  You

13  know, are the plaintiffs' lawyers --

14          THE COURT:  Well, what it gets to is, are the

15  claimants getting screwed somehow?

16          MS. GEER:  Right.

17          THE COURT:  That's what it's about.

18          MS. GEER:  That's right.

19          THE COURT:  What you're saying is, here claimants

20  aren't going to get screwed.  Artsana might get screwed, but

21  that's not the claimants, yet you are saying they are not

22  getting screwed.  It's a fair and reasonable fee.  I am joking.

23  That's a bit of a joke.  Relax.

24          MS. GEER:  I understand.

25          THE COURT:  But that the question is:  Are the

1   claimants getting screwed?  If the claimants are getting screwed

2   in some way by the attorneys' fees agreement, the agreement with

3   respect to attorneys' fees, well, then that's something that

4   would be a problem in terms of approving a settlement.

5            MS. GEER:  That's correct.

6            THE COURT:  You are saying here -- I think what you

7   are saying here is -- the claimants are making claims.  If the

8   claims are approved, they are going to get the money.  That's

9   fine.  The claimants are not paying the attorneys' fees.  It's

10  not coming out of their pocket.  It's coming out of Artsana's

11  pocket, but I still have to decide whether it's reasonable.  I

12  mean, and just the hypothetical that I gave is, you know, I'm

13  not going to approve a $10 billion attorneys' fees application.

14  I may approve the application that you made or I may not.  I may

15  say, no, that's too much and here is why.  The defense counsel

16  has explained why it's too much having to do with, you know,

17  excessive billing and duplicate work, and the way that you have

18  calculated it has to do with a common fund, but this is not a

19  common fund case.  It's a claims-based.  They made all sorts of

20  arguments as to why -- and they are entitled to make these

21  arguments because the money is coming out of their pocket -- as

22  to why I should approve I think they said zero.  That's -- if I

23  approve the settlement, I'm not going to say you get no fees.

24  That's ridiculous.  I don't know how you could come up with

25  that, but anyway, that's what defense counsel says.

 1            That's the thing about lawyering.  You know, I was a

 2    lawyer for 31 years, so I know a little something about

 3    lawyering.  Okay.  And I know something about strategy, and I

 4    know something about tactics, and I know something about

 5    posturing.  And one of the things I learned as a lawyer -- and I

 6    definitely see this as a judge -- is that lawyers take extreme

 7    positions.  It's unusual for them to be so extreme in a case

 8    that has settled.  That's odd.  But okay.  Fair enough.  Lawyers

 9    take extreme -- you know, one side says, "Black, Your Honor,"

10    and the other side says, "White, Your Honor," and neither side

11    is right.  And it's a product of the adversarial process that we

12    have, and that's why being a judge is a lot harder than it is to

13    be a lawyer, at least in terms of deciding outcomes.

14            It's less hard in other ways because I don't have to,

15    you know, get clients and keep them happy and keep time records

16    and bill them and collect from them and suffer the slings and

17    arrows of judges who, you know, question me; and so I don't have

18    to do that anymore because I am not a lawyer anymore, but in

19    terms of deciding what the right answer is, it's actually a lot

20    harder to be a judge than it is to be a lawyer because all

21    lawyers have to do is make arguments that are, you know, ethical

22    and not frivolous, and then there's a lot of:  Plaintiff says

23    "black" and defendant says "white" and it's just so clear to

24    both sides that it's neither black nor white.

25            Anyway, I don't know why I'm digressing on that, but

1  if I approve the settlement, it's not that you are going to get

2  zero fees, but by the same token, it may not be what you asked

3  for, right?  You've asked for something.  You said, here is why

4  we think we are entitled to it.  Perfectly fine.  Nothing wrong

5  with that.

6          Defense counsel have said, well, we are paying it, and

7  let me tell you why they shouldn't get it and why they should

8  get a lot less.  Perfectly fine for them to do that.  I suspect

9  that the right answer is somewhere in between.  That's what I

10  think is probably the right answer.

11          Anyway, we are getting a little bit afield because

12  your point simply is, you should be -- you can approve the

13  settlement without really taking into consideration the question

14  of whether the fee request is reasonable because whatever you

15  approve, Judge, whatever you approve on the fee request is not

16  coming out of the pockets of the claimants.  It's not going to

17  undermine in any way, shape or form what the claimants do or do

18  not get as a result of the settlement.  I think that's what you

19  are saying, right?

20          MS. GEER:  Yes, but one other little piece, which is

21  that because even though in the cases like the *Wawa* case, where

22  the money is not coming -- it's a separate agreement that there

23  is this agreement that we will not -- you know, that the

24  agreement that we will not oppose -- defense counsel or

25  defendant will not oppose your fee if you request that, and we

 1  will pay for that and it will not come out of the class members'
 2  pocket, and that those kinds of, you know, what the -- a side
 3  agreement, which is we will agree to pay X amount, we will not
 4  oppose X amount, and suggest that there could be some collusion,
 5  you know, between the parties to -- that would mean -- and I
 6  think the analysis for the way it goes -- is that by agreeing to
 7  this amount of money, you are effectively taking away more money
 8  from the class members because basically companies only want --
 9  they want to look at the bottom line.  How much is the total
10  amount I'm going to be responsible for?  And in the kind of
11  claims-made cases where -- that *Moses* involved, *Wawa* involved,
12  you have the problem of a separate agreement.  Okay.  But we
13  will pay you -- we will agree pay you up to X amount, and well,
14  why didn't you pay class members more?  Well, no, we wanted,
15  let's say, you know, a round number.  You know, the company, we
16  only want to pay $10 million to deal with this case.  So if you
17  are going to do two and a half million in fees, then we are only
18  going to do seven and a half --

19          THE COURT:  You are saying there is none of that here.
20          MS. GEER:  No.
21          THE COURT:  All right.  I get that.  I do understand
22  that point.  All right?  That's fine.  But I still want to get
23  back to really what this is principally about, which is whether
24  to approve a settlement where everybody agrees that there is a
25  lot of fraudulent claims, and that they are still being filed;

1  and so at this point I think I need to turn to Mr. Chorba

2  because I understand your position, but -- so you can have a

3  seat.

4          MS. GEER:  Okay.

5          THE COURT:  And Mr. Chorba wants me to cut off the

6  claims as of today, which is a little bit tricky because that's

7  not what the settlement agreement says.  The settlement

8  agreement says you cut -- you terminate.  You have a bar date.

9  Let's call it a bar date.  In other words, the last day to file

10  a claim is 60 days after the settlement is approved.  So we do

11  have a hearing today.  If I were to approve the settlement

12  today, the bar date would be 60 days from today.  That's in the

13  agreement.  That's in the notice.  That's what the claimants

14  have been told, right?  But you want me to say, you know, forget

15  that.  Change that.  Change it because of these extraordinary

16  circumstances.  Let's make the bar date today.  That's what you

17  want me to do, right?

18          MR. CHORBA:  Well --

19          THE COURT:  Yes or no, is that what you want me to do?

20          MR. CHORBA:  No.  Can I clarify?

21          THE COURT:  I could have sworn that's what you wanted

22  me to do.  What am I missing?

23          MR. CHORBA:  Well, we did ask that it be closed

24  immediately, Your Honor, but --

25          THE COURT:  The answer is yes, not no.

1        MR. CHORBA:  No, because what we said -- in our

2   papers, Your Honor, we gave a date that was three weeks out from

3   the filing.  We understand you can't --

4        THE COURT:  Three weeks out from the what?

5        MR. CHORBA:  From the filing of the opposition.  And

6   we did use the phrase "immediately," and perhaps that's why that

7   was probably not the best choice of phrase.

8        We know that we can't stop it today.  Okay?  But what

9   we are saying is, we should set a date certain, and our ultimate

10  relief that we are asking for in our opposition is just to defer

11  final approval, so that both sides can come to you with the aid

12  of Angeion with accurate data and say, here --

13       THE COURT:  Let me interrupt you.  That's not what you

14  said in the papers, but I accept your modification.  What you

15  are now saying is -- I mean, you said, just don't approve it.

16  That's -- don't approve it.  But anyway, what you are now saying

17  is, defer approval.  Let's add some time to this process.  Let's

18  have a final date for claims to be made.  We can work out what

19  that date is.  Let's have a final date for that.  And then let's

20  see where we are at that point in terms of, you know, the claims

21  that have been made, the claims that have been rejected, how

22  well the process -- the fraud detection process is working, and

23  let's just get some more information before we decide -- before

24  you, Judge, decides whether to approve the settlement.  We don't

25  have enough information yet.  We need more time to figure this

 1  out because of this unprecedented situation of not just

 2  fraudulent claims, but the volume of fraudulent claims.  The

 3  word "fraudulent" is not good enough.  You have to put the word

 4  in front of it, meaning the number of, or the volume, or the --

 5  even the unprecedented volume because every case involves some

 6  amount of fraudulent claims because, you know, human beings are

 7  funny that way, right?  Oh, you want to give me money?  Sure.

 8  Where do I go to get my free money that I am not entitled to?

 9  Sorry.  That's the way people are sometimes.  None of us in this

10  room would do that, of course.

11          MR. CHORBA:  No.

12          THE COURT:  But people do do that.

13          MR. CHORBA:  Your Honor, they do, but I want to just

14  clarify, if I can make three brief points?

15          THE COURT:  Sure.

16          MR. CHORBA:  First of all, fraud is always anticipated

17  in class action settlements, and one of the questions you asked

18  me is:  We anticipated that there would be fraud, and I said

19  yes.

20          The thing that the parties -- and, frankly, Angeion --

21  did not anticipate is a different beast, which is programatic

22  fraud, the type of fraud that evades traditional fraud

23  detection.  I think collectively we have probably more than a

24  hundred years of experience in this room dealing with class

25  action settlements, and I don't think anyone has ever seen

1  anything like this.  It is truly unprecedented.  We have never

2  seen it.  We can't find anything even close to it.  So it's that

3  programatic fraud --

4          THE COURT:  One of the fun things about this job is

5  that every day you learn something new.  This qualifies as one

6  of those days.

7          MR. CHORBA:  Your Honor, 22 years doing this, this

8  specific work, and it was new to me as well.  So that's the only

9  caveat I want to give to the second point that you asked Ms.

10 Geer and myself, which is we anticipated it.  This is a

11 different beast, and that's why we had to hire an additional

12 consultant.  That's why we had to work with Angeion, and you

13 have seen Angeion's declaration where they said, it's actually

14 not 153,000; it's 60-some thousand came on the morning before we

15 filed our brief.  We had to get the brief ready.  We tried to

16 work and say, can we just defer final approval and let Angeion

17 do its thing so we are going into court and we know what the

18 actual volume is?  Okay.

19         THE COURT:  You asked for an adjournment and extension

20 of time to file --

21         MR. CHORBA:  And you gave us that.

22         THE COURT:  They opposed it.

23         MR. CHORBA:  You gave us that, and we are grateful.

24         My point is we wanted to --

25         THE COURT:  The opposition was nonsense.  I mean, are

1  you kidding me?  So that was an easy one.

2          MR. CHORBA:  That's my second point, which is --

3          THE COURT:  By the way, you know, lawyers' credibility

4  with the Court is really important, and when you make

5  nonsensical arguments, that undercuts credibility.  I would give

6  you some advice.  Don't do it.  All right.  Continue.

7          MR. CHORBA:  No.  I would be remiss if I didn't say

8  when they needed more time, the answer was "of course," even

9  though, you know, every instinct was the opposite.

10         My second point is, you've said, well, how can the

11  class possibly know?  Here is what the settlement website

12  says --

13         THE COURT:  Wait a minute.  How could the class?

14         MR. CHORBA:  How could the class know if we cut the

15  claims period immediately?

16         THE COURT:  Yeah, well, how could they know that?

17         MR. CHORBA:  Here's what the settlement -- first of

18  all, the settlement website, the notices, the Court's order

19  advises class members to check the settlement website for

20  updates.  We moved this hearing.  Okay.  We updated it on the

21  settlement website.  We didn't do another round --

22         THE COURT:  They were notified.

23         MR. CHORBA:  We didn't do another round of notice.

24         Your Honor, I'm going to try to bottom-line this.  At

25  a minimum what we would ask is that the claims period be closed

1  January 7, 2024.  That is the date that is on the website

2  because that is 60 days from today.  You're exactly right, it's

3  60 days from final approval, which is an unknown date.  But the

4  website says, check back, but as of right now, it's January 7th.

5          What I would propose to you this morning is we use

6  that as a hard cutoff; we come in to you within 30 days,

7  hopefully jointly, and I say that not with undue optimism, but

8  with realism.

9          And my third point, I want to just draw attention to

10 this.

11         THE COURT:  Let me just -- before you move off of the

12 second point, though, but I will let you make the third point,

13 but --

14         MR. CHORBA:  Of course.

15         THE COURT:  Section -- or I should say paragraph 113

16 of the -- well, actually 112 and 113.  112 says, "The terms and

17 provisions of this stipulation of settlement may be amended,"

18 et cetera, et cetera, et cetera, "by written agreement of the

19 party and approval of the Court."

20         This would be an amendment or a modification because

21 that's not exactly what it says in the settlement agreement,

22 but -- hold on.  Bear with me.  Then paragraph 113 says, "In the

23 event the terms or conditions of this stipulation of settlement

24 are materially modified," the key word there is actually

25 "material," because in the previous paragraph it just talked

1  about modified; it doesn't say materially modified.  But in 113

2  it says, "In the event the terms and conditions of this

3  stipulation of settlement are materially modified by any court,

4  either party may walk away from the deal."  Walk away, say, all

5  right, never mind.  I'm out.  And then it gives a list of things

6  that would be considered material modifications, in other words,

7  by the Court.  Forget about what the parties agreed to.  Just

8  they don't agree.  It's just the Court saying, I'm going to

9  modify this agreement.  And here is a list of things that are

10 deemed to be material modifications.

11         But of course lawyers write "include, but are not

12 limited to," so the "but are not limited to," that's where the

13 battles are, but anyway, what it says is, "Material

14 modifications include, but are not limited to, any modifications

15 to the definitions of the class, class members or released

16 claims."  So modifications to the definitions of the class,

17 class members or released claims.  There is a comma there, but

18 you could think of it as a semicolon.  "Changes to the notice

19 plan described in paragraphs 54 to 64, or any exhibit thereto."

20 There's a comma, but you could put a semicolon there.  "And/or

21 any modifications to the terms of the settlement considerations

22 described in paragraphs 46 to 47."

23         So my question to you is:  If I were to do what you

24 say, which is to set an effective bar date of January 7, 2024,

25 which is different from what the agreement currently says; it's

1  different because you are saying, set that date even if I don't

2  finally approve it today.  In fact, you want me to not finally

3  approve it today.  So, Judge, just defer final approval.  Don't

4  reject it.  Just defer it, right?  I think that's what you are

5  saying.

6              MR. CHORBA:  Yes, and that's --

7              THE COURT:  Right.  Bear with me.  So defer it.  But

8  that is -- it is a modification, right?  Because the current

9  agreement says that the bar date is 60 days after final

10 approval.  So what if there is no final approval?  You are

11 saying it's a modification, but I think you are saying it's not

12 a material modification because the claimants have already been

13 told as of now, your outside deadline is January 7th.  So to

14 just say, okay, your outside deadline is January 7th regardless

15 of whether I approve it today is not really prejudicing them in

16 any way.  It's telling them, you got to make a claim by

17 January 7th, which is what you knew was the case anyway.

18             MR. CHORBA:  That was the only date that was out

19 there, Your Honor.  Our view is it would be a modification, but

20 so is moving today's hearing date was a modification to what was

21 presented to you in the agreement, in the supporting papers.

22 However, it's not a material --

23             THE COURT:  No.  I guess you didn't agree on it.

24             MR. CHORBA:  And, Your Honor, that's my point is this

25 would fall in the same lines.  However, even if we were to

1 accept that it somehow was a material modification, I'm hopeful

2 that the parties could agree to that because I honestly think

3 it's in -- I truly think it's in all of our interests to get

4 accurate data, and that's my third point.

5          THE COURT:  Okay.  You don't have to make it because

6 I'll make it.

7          It is in everybody's interests to get accurate data.

8 It is, of course, because of this unprecedented programatic

9 fraud.  I agree with you on that.  How could it not be in

10 everybody's interests?  It's in the interests of the claimants

11 because claimants who have legitimate claims want to get their

12 money and the risk, it seems to me, when you have this volume of

13 fraud is that, you know, some people are going to get denied

14 their money, not because they are not eligible, but because

15 there is this dark cloud of fraud overhanging the whole thing,

16 and what would -- that would be terrible, too.

17          MR. CHORBA:  Your Honor --

18          THE COURT:  If even one person didn't get their money

19 because millions of other persons are greedy and willing to

20 commit fraud, and they don't care.  Just give me the money.

21 Even if one legitimate claimant didn't get their money, that

22 would be bad.

23          MR. CHORBA:  Your Honor, notice --

24          THE COURT:  It would be immoral.  Immoral is what it

25 would be.

 1            MR. CHORBA:  I am going cheat and make a second and a

 2   half point.  This isn't my third point.

 3            THE COURT:  That was your third point, right, to just

 4   say --

 5            MR. CHORBA:  Here is my third point --

 6            THE COURT:  -- let's just get some more information

 7   here.

 8            MR. CHORBA:  Here is my third point:  The declaration

 9   filed on Monday, Docket 97-1, and I want to be clear --

10            THE COURT:  Who is -- time out.

11            MR. CHORBA:  This is the Jenny Shawver --

12            THE COURT:  Got it.  I have it now.  Got it.

13            MR. CHORBA:  -- dated November 6th, and I want to be

14   clear before I say this.  This is not a criticism of her.  I

15   think this was, as you stated, fast-moving.  In paragraph 4, she

16   states that as of October 30th, Angeion has received a total of

17   3.3 million claim forms submissions claiming a total of

18   28,658,800 products purchased.  We said, whoa, hold on.  A

19   couple of weeks ago you told us it was around 2 to 3 million.

20   What the heck is going on and what --

21            THE COURT:  That's what I said when I read that.

22            MR. CHORBA:  Your Honor, it's wrong.  It's wrong.

23   They told us last night while Mr. Smith and I were traveling to

24   this lovely state, it's actually 3 million 582 --

25            THE COURT:  You don't mean that in a pejorative way.

1  This is a lovely state.  Where did you travel from?

2         MR. CHORBA:  From the --

3         THE COURT:  Los Angeles?

4         MR. CHORBA:  People's Republic.

5         THE COURT:  It's not the People's Republic.  It's the

6  city of Los Angeles.

7         MR. CHORBA:  Yes, it is.

8         THE COURT:  You are welcome to be here.  You can enjoy

9  the --

10        MR. CHORBA:  As a Giants fan, I mean it sincerely.  I

11  drove by MetLife Stadium and took a picture for my son, so --

12        THE COURT:  Well, we don't care about MetLife Stadium,

13  but the Southern District of New York has two courthouses, and

14  the White Plains courthouse, catchment area you might say, are

15  the six lower Hudson Valleys, and we think they are -- it's a

16  pretty spectacular place, both historically where most of the

17  revolution occurred in our counties, most of it; where the

18  Hudson River, one of the greatest, Hudson River runs right

19  through it; where there is incredible history, including the

20  country's oldest military academy, and the country's oldest

21  continuously operated prison, all here in the six northern

22  counties -- forget about Bronx and Manhattan -- the six northern

23  counties of Southern District of New York, welcome.  Okay.

24        MR. CHORBA:  Thank you, Your Honor.

25        THE COURT:  Sorry.  Continue.

1          MR. CHORBA:  Anyway, what I was about to say is that

2     number is actually one-seventh or less.  It's 3.5 million.  So

3     you are getting information two days before this hearing that is

4     just stupendously wrong.

5          THE COURT:  Okay.

6          MR. CHORBA:  How can we possibly --

7          THE COURT:  Hold on.  Wait a second.

8          Ms. Geer, is the number more like 3.5 million products

9     rather than 28 million products?

10          MS. GEER:  Yes, Your Honor.

11          THE COURT:  That's really -- I was -- when I got this,

12     I am thinking, wait a minute.

13          MS. GEER:  Right.  Yes.

14          THE COURT:  How did that happen?

15          MS. GEER:  Yes.  We all did, and it is a matter of

16     trying to rush to get something done, I think --

17          THE COURT:  How could she put in an affidavit saying

18     it was 28 million when it's ten times --

19          MS. GEER:  As I understand, from what she emailed both

20     sets, both parties, is that they ran a query that they were

21     running because when you are dealing with this kind of data, you

22     run -- you have to run queries.

23          THE COURT:  Right.

24          MS. GEER:  And the query that they ran pulled more

25     rows than it should have.  And then the other thing, the other

1  change is that the 81,535 eligible products is actually 77,518

2  products because someone, in doing a duplication analysis, had

3  added -- tweaked it, which, you know, these aren't lawyers.

4  They -- they shouldn't have tweaked anything right before the --

5  they ran it, and so they came out with a higher number of the

6  eligible products.  It should be 77,518.

7          And I think that -- you know, what -- I think

8  something that everybody is in agreement on is that we need to

9  have the accurate data.  The claims administrator needs to have

10 the time to accurately run the processes.  The technology is

11 changing.  This is programatic fraud.  This is not going to be

12 unique to this case.  This is going to be what we see in every

13 class action consumer product case from now on.  And so, I mean,

14 this -- we just happen to be --

15         THE COURT:  We are cutting edge.  Yippee.  But, of

16 course, lawyers are pretty smart.  Their clients are pretty

17 smart, and I think what's going to happen is that there is going

18 to be much more attention paid to the, you know, the claims

19 process.

20         In other words, sure, we don't want to limit it only

21 to people that have a receipt.  That's kind of unfair.  It might

22 have been years ago, and you don't really have a receipt or you

23 don't have a credit card record or you might have bought the

24 thing with cash.  I mean, that's too limited.  That's a too-

25 limited system.  But -- maybe I am wrong, but my recollection is

1  if you didn't have a receipt, all you had to do is say where you

2  bought it and what color it was, which is kind of a joke, right?

3           MR. CHORBA:  Well --

4           THE COURT:  Especially since you can Google and see

5  what color the product is.  Oh, they make gray ones and blue

6  ones.

7           MR. CHORBA:  Can I address that, Your Honor?  Because

8  that's the type of fraud that I think you were envisioning when

9  we were talking about people just lying to get a free check.

10 The programatic is different.  It's being run by bots.  But we

11 still have what you identified, and Angeion still needs to work

12 through that.  You still do have -- now there's limited ability

13 for us to actually prove, but that's why Ms. Geer and I agree.

14 There will be a deficiency process in these circumstances

15 because just as some people got it wrong, I've always envisioned

16 a scenario where it's in the basement or you gave it to your

17 sister-in-law, and you don't have the serial number, so you are

18 trying to remember the color.  You are looking at an old photo,

19 and you get that wrong.  There are people who will be denied who

20 actually can substantiate it, and we want to give them an

21 opportunity, too.  It may be against our --

22          THE COURT:  Here is what I am hearing both of you say,

23 and I appreciate that this is -- this is kind of unprecedented.

24 That's the problem.  It's like when you cite cases, it's just

25 not that helpful because it's just not -- there is no precedent

1  really for this.  But what you are saying is you both agree that

2  we should get a better handle on this, right?  Everybody agrees,

3  and I certainly agree with that.

4          MR. CHORBA:  Yes.

5          THE COURT:  When I first saw this, I thought to

6  myself, how could I possibly approve a settlement when there is

7  a huge amount of fraud?  I mean, even if it's only

8  3.5 million -- only -- "only," that's a funny word -- only

9  3.5 million claims with, let's say, approximately 80,000

10  eligible products.  I just -- you know, I just use my

11  calculator.  That's still like 98 percent.  I mean, 80,000 -- I

12  mean, you just do it in your head, right, 3.5 million, 10

13  percent of that would be 350,000.  This is 80,000, so that's

14  roughly two percent.  So roughly two percent of the claims, at

15  least as of now, appear to involve eligible products.

16          MR. CHORBA:  Your Honor --

17          THE COURT:  Am I right?

18          MR. CHORBA:  And what I want to flag for you -- this

19  is the point I was trying to make --

20          THE COURT:  That's a pretty small number.

21          MR. CHORBA:  It's a very small number.

22          THE COURT:  But it's bigger than .2 percent, which is

23  what it was before.  Okay.

24          MR. CHORBA:  But here is what we think -- what I

25  personally think is the most compelling statistic.  Notice --

1  the notice process concluded in the spring, and one of the

2  reasons we hired ClaimsCorp is we said, let's try to identify

3  when did this start and how has it ended.  Since the end of

4  March, 99 percent of the claims have been fraudulent, and that's

5  the reason why we think we need to close this, get a handle on

6  it.  Have it --

7          THE COURT:  Here is what I propose doing, okay,

8  because -- go ahead, Ms. Geer.  You wanted to say.  Go ahead.

9          MS. GEER:  I wanted to say one thing.

10          What we pointed out in Mr. Weisbrot's third

11  declaration, and it appears in two places, but it's easy to

12  miss, the one in the footnote.  As he pointed out in --

13          THE COURT:  Let me find it.  Okay.  Bear with me a

14  second.  I have it right here.

15          MS. GEER:  It is -- let me see.

16          MR. CHORBA:  It's the September 25th?

17          MS. GEER:  The one that --

18          MR. CHORBA:  The next one after that.  October 16th.

19          THE COURT:  I have it in front of me.  Now tell me

20  what you wanted to say.

21          MS. GEER:  There is a footnote at the very -- on the

22  second page of that, and I am having trouble finding it, which I

23  can't believe, but at any rate, where he says that in his

24  experience and in Angeion's experience, there is an initial

25  increase or that claims are initially high at the very

1  beginning, but then they also typically see an increase before

2  the claims period ends; and he also says it in the body of his

3  declaration as well, is that they typically see an increase in

4  claims when you get towards the end of the claims period, and

5  one of the arguments --

6          THE COURT:  Because people procrastinate.  That's

7  another human characteristic.

8          MR. CHORBA:  All the more reason --

9          THE COURT:  Hold on.  Wait.  One at a time.  Just

10  relax.  I will hear from you.  Don't worry.  I want to hear from

11  Ms. Geer now, and I apologize for interrupting, but I interrupt

12  only because for clarification.  So I apologize, but I don't do

13  it for the wrong reason.  I hope you appreciate that.

14          MS. GEER:  Absolutely.

15          THE COURT:  What you are saying is that there is an

16  uptick in claims near the end of the claims period?

17          MS. GEER:  That's right.

18          THE COURT:  That's just the way it is.  That's what

19  you are saying.

20          MS. GEER:  That's correct.  That's what they see, and

21  so that if you -- but the argument that was made in the Artsana

22  brief, which is, oh, there are only going to be a few people

23  that procrastinate at the end.  That's, in fact, not true.  It

24  is like a bell curve.  It starts up high, goes way down, that's

25  what we're seeing, and then it goes back up.

 1            THE COURT:  See, I don't have to be a statistician to

 2    know that.  I just have to be a human.  So I am a human, and I

 3    know that people procrastinate.  So people procrastinate, by

 4    definition, there is going to be an uptick in claims.  Doesn't

 5    really matter to me whether it's just a little or a lot.  There

 6    is going to be an uptick.  So what's your point, though?

 7            MS. GEER:  So the point is by just terminating the

 8    claims period, which can't be done, I mean --

 9            THE COURT:  I am not terminating the claims period --

10            MS. GEER:  No, no, no, no.

11            THE COURT:  -- today.  So that's clear.

12            MS. GEER:  Okay.  But even if we took the approach

13    that says, okay, let's cut it off on January 7th, that's still

14    altering the settlement agreement, and, you know --

15            THE COURT:  It is, but is it unfair under the

16    circumstances to the claimants?  It doesn't appear to be because

17    they are being told, you know what?  You need to get your claims

18    in by January 7th.

19            MS. GEER:  It's not as bad as what was being asked for

20    before.

21            THE COURT:  Okay.

22            MS. GEER:  But it is still -- there is a question of

23    whether it is permissible under the --

24            THE COURT:  Well, are you saying you are going to walk

25    away from the agreement and say, never mind, we want to litigate

1  this case for the next five years?  If I were to just do that

2  even without your agreement, are you telling me you don't agree

3  to the notion that I should simply -- well, there's two ways to

4  do it:  Either you agree, the two of you agree, we agree to

5  modify the terms of the settlement to now say, not that it's 60

6  days after the final settlement -- excuse me -- after the

7  settlement is approved, but rather that the deadline is now

8  January 7th, or some other date that we can agree on.  Maybe

9  it's not January 7th.  Maybe there is some other date.  Either

10 you are going to agree to that or you are not going to agree to

11 it; and then if you can't agree, I have to decide.  And if I

12 decide, the question then becomes whether it's a material

13 modification authorizing either side to walk away.  It might

14 authorize you to walk away, but that doesn't mean you are going

15 to walk away because you've got a lot of skin in this game.  You

16 made a claim for attorneys' fees of $2.2 million or something.

17 That's -- you would like to get that, I would assume, or

18 something like that.

19        So even if I did do "material modification" on my own,

20 absent the agreement by the parties, are you going to then walk

21 away from the settlement?  Because you say, oh, that's just so

22 bad that -- it's so material that we can't stick around anymore.

23 We are done.  Let's go back to litigation mode.

24        MS. GEER:  Well, I can't speak for all of my

25 colleagues, but I mean, I think that, you know --

 1          THE COURT:  Let's be clear.  What if I just said, bar

 2  date is January 7th.  That's it.  I am modifying the agreement

 3  without consent of the parties.  This is what -- I

 4  think Mr. Chorba is okay with that.  He is the one that proposed

 5  it.  So he proposes I modify the agreement -- strike that --

 6  that the agreement be modified to say January 7th is the final

 7  date to file a claim, and then that's either a modification with

 8  your agreement, with plaintiffs' agreement, or if it's not with

 9  your agreement, then it's -- he is proposing that I impose it

10  anyway.  He doesn't really care how it comes out.  He just wants

11  either an agreement to January 7th, or if there is no agreement,

12  for me to impose it.  I think that's --

13          MR. CHORBA:  Can I just say one thing?

14          THE COURT:  Hold on.  Bear with me.  Go ahead.

15          MR. CHORBA:  All I want to say is, I don't disagree

16  with anything she said about deadlines motivating people.  Then

17  let's set a deadline, okay?  Because now we don't have one,

18  except January 7th, which is on the website.  If we keep it

19  trailing final approval, we are going to be chasing our tail for

20  another seven months.

21          THE COURT:  That's what I am worried about.

22          MR. CHORBA:  Thank you.

23          THE COURT:  Because we've got to come to a deadline

24  here.

25          So then my question to you is:  Can you agree to a

1 deadline?  It's a modification, I agree.  It is a modification.

2 But can you agree to a deadline?  And I am willing to hear what

3 you think that deadline ought to be if it's not January 7th.

4          MS. GEER:  We would be willing to agree to a deadline,

5 but we are not prepared -- I mean, we have our colleagues that

6 we have to discuss, and the Devil is in the details because one

7 of the things that happens when lawyers agree to X, and then you

8 may get, okay, but if we are going to do X, we are going to have

9 to do all of this other stuff, too.  And so I think agreeing to

10 an issue on -- an issue that is so fundamental to a settlement

11 agreement, which is the date that the claims period ends.

12          THE COURT:  And it would require notice.

13          MS. GEER:  Yes.  And --

14          THE COURT:  Same kind of notice that was done before,

15 I think, right?

16          MS. GEER:  And that's one of the aspects that we would

17 need to consider, and, you know, I would like --

18          THE COURT:  But you can do it, right?  It's doable.

19 You already did do it, right?

20          MS. GEER:  That's right.  There was notice.

21          THE COURT:  That doesn't seem like a heavy lift to me.

22          MS. GEER:  But I would like to just point out that in

23 the *Dahingo* decision, which we cited in our reply brief, that --

24 that that court, Southern District of New York, said you can't

25 terminate a claims period that was established by settlement.

1  In that case you had the plaintiffs who said, well, they are

2  late.  Let's extend it a little bit.  And no, you can't.  And

3  you can't -- you can't terminate a claims period for a

4  defendant, either.  I mean, it's going to be -- you know, if you

5  can't do it for one of the class members --

6           THE COURT:  Well, but hold on a second.

7           MS. GEER:  We can agree, as you pointed out, but we

8  would not want to agree by just changing what's on the website

9  because, you know, I think that --

10          THE COURT:  So what's your proposal about that?

11          MS. GEER:  That's what we have to work through, and it

12 may be something that we can discuss.  Right now all we've got

13 is a proposal from, you know, defense counsel is, no, it's too

14 expensive.  We will do -- just put it on the website.  They are

15 supposed to look at it anyway.

16          THE COURT:  I'm sorry.  What -- separate from that --

17 he did say that, that's true.  But what would be the really

18 expensive way to do it?

19          MS. GEER:  Well, the really expensive way is to do a

20 form of some kind of a, you know, social media advertising so

21 that people, in fact, will, you know, hopefully see it the same

22 way we did the initial notice as to when it is.

23          It's fundamentally different when you are talking

24 about the final approval hearing versus the deadline to file

25 your claim because the way it's fundamentally different is that

1  if they do not file a claim within the claims period, they not

2  only don't get anything, they are also bound by the release.

3  There is more consequences, and maybe they wouldn't want to have

4  sued over their booster seat, but if you have anybody out there,

5  you know, it's -- they are going to be bound -- when you are

6  binding somebody by the release.

7          THE COURT:  I agree that there is a -- binding people

8  who are not technically parties to the lawsuit is a big deal.

9  This is what this is all about.  I agree, but it's got to be

10 reasonable.

11         MS. GEER:  Yes.

12         THE COURT:  Hold on a second.  Let me just think out

13 loud for a moment.  Just bear with me for a moment.  All right?

14         Another sort of data point to consider on what

15 Ms. Geer just said about, you know, people are going to be bound

16 by something, and they need to know ahead of time, you know,

17 what the deadline is with respect to that, I am told that there

18 is exactly three people out of the certainly tens of thousands

19 of people at a minimum who bought this product or -- what was

20 the total number of products?  875,000, right?  So hundreds of

21 thousands of people probably bought this product.  I don't know

22 if all of them have been notified, but a lot of people have been

23 notified, and there's been three people who have said, I don't

24 want to be bound by this settlement, right?

25         MS. GEER:  That's correct.

1          THE COURT:  A total of three.  That's not very many.

2     That's really nothing.  Nobody has objected to it.  Nobody has

3     filed an objection.  So three people have said, I don't -- no

4     thanks.  I'll handle it myself basically is what they are

5     saying.  Doesn't seem like there is a likelihood of a large

6     number of people being harmed by -- you know, by setting a

7     deadline of some kind.  I want to set a deadline.

8          If we are going to have -- if we are -- we, meaning

9     mainly you, but ultimately me, are going to figure out the

10    bottom line here, which is:  How many legitimate claims are

11    there?  How many illegitimate claims are there?  How many people

12    are getting paid; what it's going to cost?  They are entitled to

13    know what it's going to cost.  If we are going to do that, we

14    have to have a deadline.  We have to.

15         MS. GEER:  And we sort --

16         THE COURT:  The question is:  How do we get that

17    deadline, and when is it?  What is the deadline, and what are

18    the other -- I agree with you.  I completely agree that there's

19    other terms.  To me, the most important term is, how do you

20    notify?

21         So what do you want me to do?  Do you want me to just

22    continue the hearing to a date?  I'm not -- it should be fairly

23    obvious I am not approving the settlement today, nor am I

24    approving attorneys' fees today.  But that doesn't mean I won't

25    approve the settlement.  That's got to be clear to everybody.

1 │ And it doesn't mean I won't approve attorneys' fees.  It just

2 │ means I'm not doing it today.  I want more information.  You

3 │ want more information.  You are working very hard with really

4 │ capable people to get that information.  We need more time to do

5 │ that.  We don't want to let it go on forever.  We also don't

6 │ want to chase our tails, as like what Mr. Chorba is saying, that

7 │ if you make the deadline depend on the final approval, well,

8 │ when are we ever going to get there? because the final approval

9 │ is going to include, to some extent, an understanding of what

10 │ the -- what the scope of the problem -- and, by the way, before

11 │ I forget, I got to make this point on the record.

12 │         To plaintiffs' credit -- and with all due respect,

13 │ Mr. Chorba, this cuts against your -- you know, the quality of

14 │ your arguments.  It was plaintiffs or plaintiff, plaintiffs,

15 │ plural, who in their reply brief -- I will find it here at some

16 │ point, eventually -- here it is.  Plaintiffs point out that the

17 │ relevant language in Rule 23(e) that might warrant -- although

18 │ they say it doesn't warrant -- but they at least point out that

19 │ the relevant language -- trying to find the page number.  Here

20 │ it is, page 9 of the reply brief.

21 │         It says, "Although Artsana fails to address the

22 │ specific requirements of Rule 23(e), Rule 23(e)(2)(C)(ii) does

23 │ require the Court to consider the 'effectiveness of any proposed

24 │ method of distributing relief to the class, including the method

25 │ of processing class member claims.'"

 1          And then I think you alluded to this earlier,

 2  Ms. Geer, that there is an advisory committee note with respect

 3  to that section, although I don't think you included that in

 4  your brief.

 5          MS. GEER:  I believe it's in the opening brief, Your

 6  Honor.

 7          THE COURT:  Okay.  Maybe.  But I found the advisory

 8  committee note because we looked at this, too.  And the 2018

 9  advisory committee note says, quote -- so this is not part of

10  the rule, but as we all know, the advisory committee notes are

11  very helpful because they are not binding exactly, but they

12  provide persuasive rationale for why certain rules are the way

13  they are and what they mean.

14          So what that says is, the 2018 advisory committee note

15  is -- strike that -- says -- let me just go to it.  Bear with

16  me.  23 -- I'm sorry.  2018 advisory committee note says, "Often

17  it will be important for the Court to scrutinize the method of

18  claims processing to ensure that it facilitates filing

19  legitimate claims.  A claims processing method should deter or

20  defeat unjustified claims, but the Court should be alert to

21  whether the claims process is unduly demanding."

22          So essentially what that says to me is that in

23  deciding or in evaluating substantive fairness, because we are

24  talking about, you know, 23(e)(2)(C), that's what this is a

25  reference to.  In evaluating substantive fairness, I have to

1  scrutinize the method of claims processing to ensure that

2  legitimate claims are filed and that unjustified claims are not

3  accepted, but when I do that, I got to make sure that I am not

4  unduly demanding -- making an unduly demanding claims

5  processing.

6          So unduly demanding, for example, might be:  You don't

7  get a dime unless you have a receipt.  That sounds like unduly

8  demanding.  That's too demanding.  But on the other hand, if the

9  process is, as we know, such that 98 percent of the claims have

10 got to be invalid because it -- that's the extent to which it

11 exceeds the number of products, well then, it sounds like there

12 is a lot of unjustified claims, and I'm supposed to evaluate the

13 effectiveness, or lack thereof, of this process in determining

14 the ultimate substantive fairness of the settlement.

15         You did cite that in your brief.  You didn't -- I

16 don't know -- well, you said you cited to the advisory committee

17 note in your opening brief.  Certainly in your reply brief you

18 cited what I think is the relevant section of 23(e).

19         You didn't cite it.  You should have.

20         MR. CHORBA:  We should have, Your Honor, and I

21 apologize for that, but it's -- I think it's fully consistent

22 with what we are saying is all the information is --

23         THE COURT:  It is.  It is consistent.  I'm just giving

24 Ms. Geer some credit here.  Okay?  Good lawyers, ethical lawyers

25 say, Judge, you know, the other side didn't cite this, but you

 1 ought to know about this.  We don't think this really controls

 2 exactly because we think you can still approve the settlement

 3 but, you know, as a matter of good lawyering and good -- being a

 4 real professional, I want to let you know about this section

 5 because the defendants didn't let you know.  She deserves credit

 6 for it, that's all I am saying.

 7            MR. CHORBA:  She does, absolutely, Your Honor.

 8            THE COURT:  So I am giving you that publicly.  I am

 9 giving you credit for that.

10            MS. GEER:  Thank you.  And this is why Judge McMahon

11 and Judge Kaplan really trained me well.

12            THE COURT:  I'm sorry.  Say that one more time?

13            MS. GEER:  Judge McMahon and Judge Kaplan know that

14 they trained me well.

15            THE COURT:  How so?

16            MS. GEER:  I worked with Judge McMahon when she was at

17 Paul Weiss.  I went to work at Paul Weiss because I was a summer

18 associate and worked with Judge Kaplan.  I learned an awful lot

19 from both of them.

20            THE COURT:  Well, guess who else learned an awful lot

21 from Judge McMahon?  Not so much Judge Kaplan.  Oh, that would

22 be me.  So, and the reason I say that is because I didn't know

23 her when she was in private practice, but I was a lawyer here in

24 White Plains and very active in this courthouse and met her I

25 think the day she showed up here in 1998 in the White Plains

1  courthouse, and she was here for nine or ten years.  I tried

2  multiple cases in front of her, including three -- not one, not

3  two -- three two-month or longer trials, three.  That's a lot.

4           MS. GEER:  Uh-huh.

5           THE COURT:  In the course of that, I became friends

6  with her.  I just was -- I was there all the time, and we have

7  become very good friends.  She has been without a doubt by

8  far -- it's not even close, there is nobody else, there is

9  nobody in second place -- by far the most important mentor to me

10  as a judge.  So, you know, you dropped the name here.  You did a

11  good job because you hit the nail on the head.  You didn't know

12  that I was going to say what I just said.

13           MS. GEER:  And I quote Judge McMahon with every single

14  associate I work with.  There is something that she said to me,

15  and --

16           THE COURT:  She was Colleen then.

17           MS. GEER:  When she was Colleen.

18           THE COURT:  What did she say?

19           MS. GEER:  She -- the very first brief I ever wrote

20  was a motion to compel brief, and she did not edit it.  She

21  annotated it, scrawled all over the whole thing, and across the

22  top it says, "You are going to learn how to write the same way I

23  did or write well the same way I did, rewrite it."  And it would

24  have taken her probably three or four times as long to do what

25  she did than just editing it.  And she -- it continued.  She had

1  me doing a deposition when I was a third-year associate, which

2  was just unheard of.  That was the executive vice president of

3  TIAA-CREF, so I owe her a lot.

4          THE COURT:  While we are telling Judge McMahon

5  stories, when I was in private practice, I wrote her a letter

6  once in one of my cases asking for some very reasonable thing.

7  I don't even remember it was, but believe me, it was reasonable.

8  And she wrote on the top of the letter, "N-O exclamation point."

9  Didn't sign it.  Just docketed it.

10         MS. GEER:  Oh, gosh.

11         THE COURT:  True.  This is my friend, but she said

12 "No," but not just no.

13         MS. GEER:  Exclamation point.

14         THE COURT:  Does that sound like Judge McMahon?

15         MS. GEER:  Yup.

16         THE COURT:  Does this sound like Colleen McMahon?

17         MS. GEER:  She also told me, make sure you know how to

18 use every single piece of equipment in this office.  The

19 telecopier people won't let you know how to use theirs, but make

20 sure you know everything else because if you need to, you are

21 going to -- you need to be -- if you are in trouble, you may

22 need to be able to do it yourself.

23         THE COURT:  I had a small firm, so that wasn't a

24 problem because I effectively cleaned the bathrooms, too.

25         MR. CHORBA:  Your Honor, I have no Judge McMahon

1  story, but can I make a proposal?

2          THE COURT:  We have got to get to the bottom line.

3          MR. CHORBA:  I am sorry to do that.

4          THE COURT:  No, don't be sorry.  We're on a roll here.

5          MR. CHORBA:  On notice, I think -- I think we are in a

6  very unique circumstance because, as you pointed out, the

7  opt-out and objection deadlines have passed.  We are not

8  proposing anything to adjust those.  What we are proposing is to

9  fix the same date that's on the website now, the only date

10 that's been out there, which is January 7, 2024.

11         What I would propose in terms of notice is that we

12 update the website, and we would also propose that we send

13 direct notice to those claimants for whom we have either mailing

14 or email addresses, and if they have not made a claim, we notify

15 them directly.  Here is my concern --

16         THE COURT:  Let me -- I'm just jotting this down.

17         MR. CHORBA:  Sure.

18         THE COURT:  Direct notice to claimants with email

19 addresses.

20         MR. CHORBA:  Or mailing addresses.  Artsana has some.

21 It is not everybody, but those who registered their products, we

22 have that contact info.  At the initial round almost a year ago

23 now, they sent a round of notice.

24         Our concern, honestly, is just with publication

25 notice, and it's not just the cost.  Our concern is it's going

1  to sow confusion because the notice period concluded in March.

2  In addition to costing about $250,000, on top of all the

3  additional unanticipated expenses my client has had, it's going

4  to confuse people because there is no more opt-out.  There is no

5  more objection deadline.  It's just to make claims, and the same

6  fraudsters that have sort of capitalized on this settlement,

7  it's just going to reignite all of that problem.

8          So we are happy to work with plaintiffs on a proposed

9  notice plan if you agree or they agree to the January 7th

10  deadline, but I don't think a robust full score what we did

11  before is appropriate because certain deadlines have passed.  No

12  one is suggesting that they should be extended.  It's just a

13  deadline for that last group of stragglers to make claims, and

14  so we think the website --

15          THE COURT:  And it cost $250,000.

16          MR. CHORBA:  Well, yes, but --

17          THE COURT:  I mean, that's a legitimate argument.

18          MR. CHORBA:  Absolutely, and I'm not hiding from that.

19  I'm not hiding from that, but there are other concerns because

20  every time Angeion analyzes, you know, 28 million products -- it

21  is, by the way, even though they are saying that's not the right

22  number, they still got claims for that, and we have to pay for

23  that.  That's coming out of our client's pocket.  So to sort of

24  do anything that would draw unnecessary attention when, again,

25  we're only talking about fixing the same date that's been on the

 1  website since day one as the projected date.  We're just talking

 2  about cementing that.  I think updating that site, which is what

 3  we did for today's hearing, and then doing a round of direct

 4  notice, that's what we would recommend, and that's what our

 5  client would be willing to do.  Again, I just --

 6            THE COURT:  Not doing the full-scale so-called

 7  publication notice that you did when you did the original

 8  notice.

 9            MR. CHORBA:  Because of the cost, but equally

10  importantly, Your Honor, is the amount of attention we are going

11  to bring to this when there's been so much programatic fraud.

12  We are going to end up with millions more that we are going to

13  have to pay Angeion in the process when again, since March, 99

14  percent have been confirmed fraudulent.  No one disputes those

15  statistics.

16            So, again, we are in a very unique circumstance, but I

17  think that would be reasonable, and again, the touchstone of

18  Rule 23 is notice, and the class settlement needs to be

19  reasonable.  And again, the deadline to object or opt-out, which

20  is I think the primary deadline we would be worried about

21  because right now it's just about those people who would release

22  their claims, didn't opt out, got notice.  Angeion's testified

23  that it's reached 88 percent of the class, so it satisfies due

24  process, just that additional round to make claims.

25            I actually disagree that we are going to have

1 stragglers coming in because it's been an ethereal deadline from

2 day one, but to the extent there are, it will be updated on the

3 website, and there will be direct notice.

4           THE COURT:  That sounds pretty reasonable to me.

5           MS. GEER:  It is.

6           THE COURT:  The details you can work out, but -- and

7 what he is proposing seems -- I'm trying to be reasonable here.

8           MS. GEER:  And we are willing to -- and, Your Honor,

9 we are willing to agree to that.  I think I swirled around.

10           MR. CHORBA:  Terrific.

11           THE COURT:  All right.  But -- okay.  You are willing

12 to agree to that, but you need to put that in writing, it seems

13 to me.

14           MS. GEER:  Yes.

15           THE COURT:  I mean, technically is it --

16           MS. GEER:  We have to do a --

17           THE COURT:  -- a modification to the settlement

18 agreement?

19           MS. GEER:  Yes.

20           MR. CHORBA:  Your Honor, what we have done -- and we

21 can discuss this with Ms. Geer and Mr. Vozzolo -- but what we

22 have done before is we've done a stipulation in these

23 circumstances -- not these exact circumstances, but analogous

24 circumstances -- and the stipulation and court order effects a

25 modification.  It will be posted to the settlement website.  It

1  will spell out exactly what we are doing and --

2            THE COURT:  I am fine with that.

3            MR. CHORBA:  -- if we both sign it, and Your Honor

4  signs it, I don't think we need to go back to the parties.  I

5  think counsel can do this, and it will cite all the provisions

6  in the agreement that you noted.

7            THE COURT:  Do you agree with that, Ms. Geer?

8            MS. GEER:  Yes.

9            THE COURT:  All right.  All right.  Let's do that.

10           So let's see, how long do you think it will take you

11 to get that stipulation to me?  Just because I want to keep --

12 you know, I want to be prepared.

13           MR. CHORBA:  Can we say by next Friday, but I

14 anticipate we'll have it done earlier?

15           MS. GEER:  Could we possibly -- our firm retreat is

16 next week.

17           MR. CHORBA:  Sure.  Sure.

18           THE COURT:  Where are you going?

19           MS. GEER:  Pardon me?

20           THE COURT:  Where are you going?

21           MS. GEER:  Puerto Rico.

22           THE COURT:  I am giving her more time.  So how about

23 two weeks from today?

24           MS. GEER:  I have to speak twice, and I'm going, why

25 are you doing this to me?

1          THE COURT:  It will be warm there.  It will be nice.

2          MS. GEER:  It will be nice.

3          MR. CHORBA:  We will take the first stab to alleviate

4    Ms. Geer, but if I could get two weeks from today?

5          MS. GEER:  That would be great.

6          MR. CHORBA:  We will get it done this week.

7          THE COURT:  Let's do that.  So today is what, the 8th?

8          MR. CHORBA:  The 22nd, Your Honor.

9          THE COURT:  Today is the 8th, right?  Today is the

10   8th.  So -- well, the 22nd, that's good because that's the day

11   before Thanksgiving, and you are going to be motivated to get

12   this done.

13         MR. CHORBA:  Let's do it earlier.

14         THE COURT:  You can do it earlier.  I'm not saying you

15   can't do it earlier, but do it by November 22nd.

16         MR. CHORBA:  It's in our interest --

17         THE COURT:  I think when I set deadlines that are

18   immediately before national holidays, they are really good

19   deadlines because people want to just get it out of the way.

20   They don't want to think about it.  They want to meet with

21   their -- well, maybe -- I don't know about you guys -- but most

22   people want to see their family the next day, and you don't want

23   to think about stuff like this.

24         MR. CHORBA:  We are motivated because we want to

25   update the website.  And Angeion reported to us it's a matter of

1  a week or so to do the other round of direct notice.  So I think

2  given the agreement on the record, we can start that process,

3  but we won't officially update the website until we have your

4  signature on there.

5           THE COURT:  Now, there is another piece of this,

6  right, which Mr. -- I am sorry -- Mr. Chorba proposed, which is

7  to set another date for a continuation of the fairness hearing.

8           Now, it seems to me that if we're going to come up

9  with this January 7th deadline, whatever the date -- I think

10 it's January 7th, that's consistent with 60 days after today,

11 right?  Yes.  That's exactly 60 days from today.  My law clerk

12 is giving me a hard time because I am sort of a savant.  I'm not

13 patting myself on the back.  It's just some weirdness in my

14 brain.  I'm really good at calculating dates.  They are terrible

15 at it.  They have to use, you know, the Internet because they

16 use the Internet for everything.  I didn't have the Internet

17 when I was their age, so I just figured it out.  Anyway, doesn't

18 matter.

19          So you are going to give me the stipulation, but we

20 have to set another date for a continuation of this hearing,

21 right?

22          MR. CHORBA:  We do.

23          THE COURT:  Some day after January 7th, so --

24          MR. CHORBA:  Perhaps we can put that in the

25 stipulation, but to avoid what happened this week -- and I'm

 1  hoping Ms. Geer will agree -- we want to make sure Angeion has

 2  time to do this.  So I would like to confer with them.  I'm

 3  thinking 30 days for the report to at least a week out from that

 4  hearing, a final report from Angeion, because this will be final

 5  because they will have had -- I should say it's subject to

 6  verification and the deficiency process we noted.

 7          THE COURT:  It's complicated.

 8          MR. CHORBA:  The fraud, but we will basically come in

 9  and say, like today I think we are coming in and saying it's

10  between 60 and 80,000 claims.  We will be able to say that to

11  you subject to deficiency.  We may have people who can't.  We

12  may have people who can.  So it will fluctuate, but it won't be

13  a material deviation, but again, I want to be in a position

14  where we can both come to you, and we're not uncertain or we're

15  making corrections the night before the hearing.

16          So my thought is 30 days, if we target early February,

17  like that first week we should be in a good position.

18          THE COURT:  Thirty days from January 7th, which

19  happens to be a Sunday, by the way, but that's 60 days from

20  today.  So that will be the deadline.  People can file a claim.

21  They do it online, right?

22          MR. CHORBA:  It's all online, actually.

23          THE COURT:  It's not with me.  They can't -- it's not

24  filing it in court.  If it was something to file in court, I

25  wouldn't make a deadline for a Sunday.  I just wouldn't.  But

1  it's not a court filing.  It's entirely separate.

2          Anyway, so January 7th is fine.  So 30 days after that

3  would be February 6th.  So sometime that week.  What do we have?

4  Yes, I have a trial a couple of weeks after that, but not that

5  week.

6          MR. CHORBA:  Your Honor, can we actually -- my

7  colleague just mentioned -- can we confer with Angeion?  I just

8  want to make sure 30 days is enough, which I think it should be.

9  But --

10          MS. GEER:  But we can't know for sure because they

11  have all of these things that they are doing, and I think it

12  would be helpful to confer with Angeion and say, okay, really,

13  how long do you need for sure because Steve has to confer with

14  the top person who then has to confer with the bottom people who

15  are doing all of this.

16          MR. CHORBA:  So I think in the stip we can propose a

17  date, and if it's acceptable to Your Honor.  If not, you can

18  give us a different date, but at least we won't have to set a

19  second date.

20          THE COURT:  It's a much colder White Plains in

21  February than it is now, I am sorry.

22          MR. CHORBA:  I'm from northeastern Pennsylvania.  I

23  actually miss it.  So --

24          MS. GEER:  I grew up in the Berkshires, and I miss the

25  Saw Mill River Turnpike.

1            THE COURT:  It's not the Saw Mill River Turnpike.

2  It's the Saw Mill River Parkway.  Parkway, not Turnpike.

3            MS. GEER:  We always called it Turn -- well, I think

4  it was a Massachusetts thing.  They did Mass Turnpike, too.

5            THE COURT:  That's in Massachusetts.  We don't care

6  about Massachusetts.

7            MS. GEER:  Yes, you don't care.  I know, but it was

8  beautiful.

9            THE COURT:  Not part of our state.  Anyway, it's fine.

10           Okay.  I guess so, but let me just give you

11  tentatively so that you can kind of -- let me give you a

12  tentative date right now.  If it doesn't work, you will let me

13  know and tell me it doesn't work, after you speak to Angeion,

14  that is.

15           Donna, can we give them a tentative date that we know

16  works for us, and hopefully will work for them, and if it

17  doesn't, they will let us know, and we will get a new date.

18           THE DEPUTY CLERK:  You want to say February 8th, which

19  is a Thursday, and we could do the time is 11:00.  We could do

20  it at 11:00.

21           THE COURT:  Tentatively, does that work for you

22  subject to your conversation with Angeion?

23           MR. CHORBA:  It does, Your Honor.  And I want to make

24  sure Mr. Weisbrot is also available.  Is there any way we could

25  have a Zoom option?  If not, I will check that he could be here

1  in person.

2          THE COURT:  Well, I don't want to do a Zoom option,

3  but I could allow him to be on the telephone.

4          MR. CHORBA:  That gives us flexibility.  Thank you,

5  Your Honor.

6          THE COURT:  It's just easier for us to do it that way,

7  and it's just as good as Zoom.  But yes, the answer is I will

8  allow that.

9          MR. CHORBA:  Thank you.

10          THE COURT:  I'm not a fan of remote proceedings, to be

11  honest.  I wasn't when we were all doing remote proceedings

12  because I thought it undermined the due administration of

13  justice, and the beauty of doing things in court -- first of

14  all, we have the facility.  I know you have to travel.  I get

15  it.  It's little more expensive, but you can handle it.  But the

16  beauty of it is that we are all in the same place at the same

17  time, and we are having an organic conversation, and you can

18  talk in the hallway, and there is a lot of justice that gets

19  done in the halls of justice, meaning in the hallway.

20          So I'm very old-fashioned about this, but having said

21  that, Mr. Weisbrot would be more than welcome to attend, of

22  course, in person.  Where are they located?  Where is Angeion?

23          MR. CHORBA:  They are up here, but he is in Florida,

24  actually.

25          THE COURT:  Of course he would be welcome to be here,

1  but he would also be welcome to appear by telephone, and we can

2  arrange for that.

3              MR. CHORBA:  Thank you, Your Honor.

4              THE COURT:  Either way is fine with me.

5              MR. CHORBA:  We just want to make sure if you have

6  questions that he is available.

7              THE COURT:  I do have some questions because I -- 28

8  million, what the heck is that?  Anyway, whatever.

9              So I am going to issue an order today, and my order is

10  simply going to say that -- well, I can't -- I'm not drafting

11  the order in my mind right now, but the gist of it is going to

12  be that the parties -- all counsel appeared for the fairness

13  hearing today.  The Court has continued the fairness hearing to

14  February 8, 2023, at 11:00 a.m., subject to confirmation by the

15  parties that -- I don't know.  I'll come up with some language

16  that that's a suitable date.

17              In the meantime, the parties have agreed to submit a

18  stipulation and proposed order setting a deadline -- I don't

19  know what the language should be -- deadline for the submission

20  of claims of January 7, 2024, and also providing for notice, and

21  you'll leave that a little bit vague because you are going to do

22  that in your stipulation.  But I like to issue orders that

23  summarize essentially what happened today.  It's a public

24  document.  It's on our website.  If some programatic bot out

25  there sees that and decides to file a bunch of -- there's

1 nothing I can do about it.  This is a public proceeding.

2          I will note -- let me just note for the record that

3 there are no plaintiffs or claimants here in the courtroom.  I'm

4 looking around.  There is nobody here.  Sometimes they do show

5 up for these kinds of hearing.  Nothing wrong with that.  They

6 are welcome to be here but -- in fact, they are invited to be

7 here.  Doesn't the notice say they can show up?  But for the

8 record, I am noting that nobody has shown up today.

9          Anyway, it's a public proceeding, so I feel the need

10 to put something on the docket, and I'm going to do that.

11          And then I will expect to hear by November 22nd, but

12 you can do it sooner than that of course.  By that date I will

13 expect you to provide me with a proposed -- with a stipulation

14 and proposed order regarding these various matters, and I will

15 figure out how to say it in a better way when I issue my order

16 today.

17          Does that work for you, Ms. Geer?

18          MS. GEER:  Yes.

19          THE COURT:  Mr. Chorba?

20          MR. CHORBA:  Yes, Your Honor.

21          THE COURT:  All right.  Have a seat.  Let me just see

22 if there is anything else in my notes here that I have questions

23 about before we cut.

24          Yes.  And seven days prior to the continuation of the

25 fairness hearing, the parties will submit -- is it the parties

1 or is it the defendant?  I guess it's the parties because

2 Angeion works for both of you, right?  They are not an advocate

3 here.  Am I right about that?

4         MS. GEER:  Yes, Your Honor.

5         THE COURT:  So the parties will submit an updated

6 affidavit from Angeion regarding the status of the claims

7 process.  Again, that's a little bit generic, but you know what

8 that means.  Whatever seems to be relevant, including the number

9 of claims, the number of products, the number of frauds,

10 everything that we have talked about here today.

11        And that's what you propose, right, Mr. Chorba?  Seven

12 days prior to this, whatever the fairness hearing date is?

13        MR. CHORBA:  Yes.

14        THE COURT:  So I am not even going to give you a

15 specific date.  I'm just going to say seven days prior to the

16 fairness hearing because that accounts for the fact that we

17 might change that date.  All right?  So that will be in my order

18 as well, and it should be in your stipulation.

19        Let me just look at my notes here and see if there is

20 anything else I wanted to ask you about.  I wanted to ask you

21 about the deficiency process.  You've explained that to me.

22        Oh, this is -- I mean, we can address this when we

23 reconvene, but in defendants' response to the attorneys' -- the

24 opposition to the attorneys' fees motion, defense counsel says

25 that there has "been no discovery in this matter," which

1  mitigates against approval of the -- well, I guess it -- now

2  this is two different things I'm getting at now.  Hold on.  Bear

3  with me one second.  Let me just find the actual document.  78,

4  Document 78, page 1.

5              (Pause)

6              MR. SMITH:  Is it page 22, Your Honor?

7              THE COURT:  No, it's page 1 of Artsana's opposition to

8  the motion for attorneys' fees.  It just says that there's been

9  no discovery in the matter.

10              Is that true, there was no discovery in this matter at

11  all?

12              MS. GEER:  Yes.  That is correct, Your Honor.  We --

13  we filed -- we filed suit in April of 2021 -- yes, 2021,

14  April 2021, and they filed a motion to dismiss.  We --

15              THE COURT:  In my case I had a motion?

16              MS. GEER:  No.  Actually, originally the case that was

17  brought by Greg Coleman Law and Whitfield Bryson, and we merged

18  subsequently.

19              THE COURT:  So that case was brought --

20              MS. GEER:  That was brought in the Eastern District of

21  Pennsylvania.

22              THE COURT:  And eventually this one was brought, and

23  that one --

24              MS. GEER:  And that was combined with this one.  There

25  was a motion to dismiss pending, fully briefed, in the Eastern

1  District of Pennsylvania at which point the parties agreed to go

2  ahead and file a -- proceed with mediation, and everything since

3  then has been vigorous negotiations with respect to it now.

4         But I would say, Your Honor --

5         THE COURT:  That's certainly true.  I just wanted to

6  verify that one thing.  That's all.

7         MS. GEER:  That's correct.  But in terms of what we

8  did --

9         THE COURT:  It doesn't mean I won't approve the

10 settlement.  I just want to know what the facts are, that's all.

11        MS. GEER:  Sure.  But one of the things is I am

12 co-lead counsel.  I was appointed co-lead counsel at MDO

13 involving Evenflo booster seats saying tons of allegations.  I

14 am co-lead counsel in the North District of Georgia appointed

15 for that against Graco, and have handled another case against

16 Britax filed in the District of South Carolina, which has also

17 settled.  And in the course of all of that work, contrary to

18 what Artsana has argued, this is not a cookie-cutter case.  This

19 is very different factually, but also very different in terms of

20 the legal issues that arose, but we did a lot of outside -- both

21 also counsel for Ms. Jimenez -- that we did outside

22 investigation ourselves to figure out exactly what was going on

23 with Artsana, and how is it different, and what the claims

24 should be.

25        Then, in addition, as part of the settlement

1  negotiations, the parties agreed to confirmatory discovery,

2  informal discovery, so we proceeded with that.  So we felt that

3  we had both, because of our own independent investigation and

4  work, and together with the confirmatory discovery, had a sound

5  basis for making a decision on whether or not to move forward.

6          THE COURT:  So basically, what you are saying is that

7  when they say there was no discovery, and the bulk of the work

8  related to negotiating and policing the settlement and, you

9  know, plaintiffs' counsel -- the main contribution and not

10  copying and pasting from a congressional report into three

11  successive complaints, you are saying that's just not true?

12          MS. GEER:  Well, certainly the bulk of the -- the time

13  spent in this case --

14          THE COURT:  Is negotiating.

15          MS. GEER:  -- has been in negotiation.

16          THE COURT:  So it's not fair to say that there is no

17  discovery because you have to really think -- to put it in the

18  context of all of these cases and all of the investigations and

19  discovery -- you know, that's the funny thing.  Like "discovery"

20  is a term of art.  Obviously, if you went out on the street and

21  you ask a hundred people, what's discovery?  I don't think you

22  would get the right answer -- I mean, in terms of what we do for

23  a living -- from any of them.  Maybe one or two.  There's lot of

24  lawyers in White Plains.  So you would probably get more than

25  that.  But it's broader than that.  It's investigation.  There

1  is obtaining information.  There is figuring out, you know, all

2  the regulations and how these different products are made and

3  blah, blah, blah.  That's kind of what you are saying.

4          So it's a little unfair to say there was "no

5  discovery."  Even though technically that might be true, it

6  understates the work that you have done.  Is that a fair

7  statement?

8          MS. GEER:  Yes, Your Honor.

9          THE COURT:  That's fine.

10          MS. GEER:  I would say if I were in Artsana's shoes, I

11  would be grateful because it sure saved a lot of time, a lot of

12  hours that we -- if you go look at what we have in the Evenflo

13  and the Graco cases --

14          THE COURT:  Again, you know, this is really something

15  that should be discussed at the -- when we actually talk about

16  the various things that I need to discuss on the issue of

17  substantive fairness.

18          But, you know, I agree with you on that as well.  I

19  mean, what's wrong with resolving a legal dispute quickly and

20  simply and without a lot of fuss and time and effort and money?

21  It's not a bad thing.  That's actually kind of a good thing, and

22  it does bear on -- I think what their point was is it bears some

23  extent on the attorneys' fees issue, right?  Because you are

24  asking for attorneys' fees.  So in order to decide what

25  attorneys' fees to give you, I have to think about what you

1 actually did.  I mean, it's good that you didn't technically

2 have to do discovery here, but what you did actually do bears on

3 the fees that I would award.

4         What were you going to say?

5         MR. CHORBA:  I am sorry, Your Honor.  All I was going

6 to say is, while we make those points, our principal issue is

7 that when you are in that world of a settlement, there is less

8 policing.  When there is lead counsel appointed, a lot of times

9 courts will require periodic reports to make sure there is not

10 overstaffing, and here we had -- we learned for the first time

11 when the motion was filed there were 30 timekeepers, and there

12 is a lot of --

13         THE COURT:  Does seem like a lot of timekeepers.

14 Let's table that now.  I don't want to argue that.  I just

15 really don't.  We have done enough today.  Okay.  It felt like a

16 lot, but I'm sure you've got good reasons for that, and I'll

17 read your papers.

18         MS. GEER:  Your Honor, I could just briefly say there

19 were two different law firms that ultimately merged.  Both law

20 firms staffed at the beginning of -- Chris, why are you shaking

21 your head?

22         THE COURT:  Listen, don't.  Don't.  First of all, you

23 learned from Judge McMahon you don't cross-talk.

24         MS. GEER:  That's true.

25         THE COURT:  You want to cross-talk, do it in the

1  hallway.  It's fine with me, but you're not doing it in front of

2  me.  Let's hold that.  Let's just -- I don't want to divert into

3  areas that involve disputes when I want to -- what we really got

4  here is an agreement on how to proceed.

5          Hold on.  Let me look at my note here.

6          Yeah, I mean, all I am getting at is that the amount

7  of discovery, among other things, is one of the *Grinnell*

8  factors, so I will address it.  Don't worry about it.  And I

9  will also address it in terms of attorneys' fees.

10         Let me look at my notes here.  Bear with me.  Have a

11 seat, please.

12         A note I have to myself is that, you know, I decline

13 at this time to approve the class settlement without a full

14 understanding of how many valid claimants there are and further

15 assurances that the settlement funds are primarily going to be

16 paid to valid claimants.  That's kind of what this is about,

17 which is why we need to both adjourn this hearing and set a date

18 for, you know, to close the claims.  Set a date for the

19 submission of claims, a deadline, I should say.  Set a deadline

20 for the submission of any claims so that there is a hard

21 deadline.  Then once we have a hard deadline, after that,

22 Angeion and the lawyers can sort out what you learned and make a

23 report to me, and we can have our continued fairness hearing.

24         So let me just see if there is anything else I need to

25 say.  Bear with me.

1              Okay.  Talked about notice.  That's it.  Those are all

2    of my notes.  Is there anything else that any of you would like

3    to say before we adjourn?

4              MS. GEER:  No, Your Honor.  Thank you very much.

5              MR. CHORBA:  Not from us.  Thank you much for your

6    attention to this.

7              THE COURT:  All right.  Thank you as well, and you are

8    always welcome in White Plains, and if you need a restaurant

9    recommendation, I am happy to give you that as well.

10             All right.  Have a good day, everybody.  I will abide

11   by these dates, and I will see you hopefully on February 8th.

12             THE DEPUTY CLERK:  All rise.  This court will be in

13   recess.

14                          -o0o-

15

16

17

18

19

20

21

22

23

24

25