# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MASHAYILA SAYERS, BRITTNEY TINKER, JENNIFER MONACHINO, KIMBERLY MULLINS, HILDA MICHELLE MURPHREE, and AMANDA JIMENEZ, on behalf of themselves and all others similarly situated, | Case No. 7:21-cv-07933-VB |
| | Hon. Vincent L. Briccetti |
| Plaintiffs, | |
| v. | |
| ARTSANA USA, INC., | |
| Defendant. | |

**ARTSANA USA, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES**

## TABLE OF CONTENTS

I.    INTRODUCTION ......................................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................................... 2

    A.    Plaintiffs Crib from Congressional Report to File Lawsuits .................................. 2

    B.    The Parties Settle Five Months into *Sayers* and One Week into *Jimenez* ............. 3

    C.    Fraud Has Plagued the Settlement Claims Process................................................. 4

    D.    Plaintiffs' Counsel Seek $2.25 Million in Fees Without Mentioning the
        Fraud ..................................................................................................................... 5

    E.    The Parties Address the Ongoing Fraud ............................................................... 6

    F.    Plaintiffs' Counsel Again Seek $2.25 Million in Fees ......................................... 7

III.  ARGUMENT ............................................................................................................. 11

    A.    Plaintiffs' Counsel's Actions Justify a Substantial Reduction of the Award ...... 12

    B.    Both the Lodestar Method and the Percentage of the Fund Approach
        Justify a Substantial Reduction of the Fee Award ............................................... 13

        1.    Plaintiffs' Counsel's Requested Fees Are Not Supported by the
            Lodestar Method ........................................................................................ 14

        2.    Plaintiffs' Counsel's Requested Fees Are Similarly Not Supported
            by the Percentage of the Fund Approach .................................................. 20

    C.    Artsana Preserves Its Objection That There Is No Legal Basis to Award
        Fees ..................................................................................................................... 25

IV.   CONCLUSION........................................................................................................... 26

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Alleyne v. Time Moving & Storage Inc.*,
264 F.R.D. 41 (E.D.N.Y. 2010) ............................................................................. 21

*Ambac Assurance Corp. v. Adelanto Pub. Util. Auth.*,
No. 09-cv-5087-JFK, 2013 WL 4615404 (S.D.N.Y. Aug. 29, 2013) ..................... 17

*Behzadi v. Int'l Creative Mgmt. Partners, LLC*,
No. 14-cv-4382-LGS, 2015 WL 4210906 (S.D.N.Y. July 9, 2015) ....................... 21

*Bodon v. Domino's Pizza, LLC*,
2015 WL 3889577 (E.D.N.Y. June 4, 2015) .......................................................... 20

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .......................................................................................... 21, 25

*Buffington v. Progressive Corp.*,
No. 20-cv-07408-VB (S.D.N.Y. Sept. 6, 2024) ..................................................... 21

*In re Cal. Pizza Kitchen Data Breach Litig.*,
--- F.4th ---, 2025 WL 583419 (9th Cir. Feb. 24, 2025) ....................................... 23

*Carder v. Graco Children's Products, Inc.*,
No. 2:20-cv-00137, ECF 70 (N.D. Ga. Aug. 31, 2021) ........................................... 3

*In re Citigroup Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013) ............................................................... 14, 19

*Cunningham v. Suds Pizza, Inc.*,
290 F. Supp. 3d 214 (W.D.N.Y. 2017) ..................................................... 20, 22, 23

*Darby v. Sterling Home Care, Inc.*,
No. 17-cv-5370-RMB, 2020 WL 29932 (S.D.N.Y. Jan. 2, 2020) .......................... 19

*Diaz v. E. Locating Serv. Inc.*,
No. 10-cv-04082-JCF, 2010 WL 5507912 (S.D.N.Y Nov. 29, 2010) .................... 21

*Drazen v. Pinto*,
106 F.4th 1302 (11th Cir. 2024) ........................................................................... 23

*Dubin v. E.F. Hutton Grp., Inc.*,
878 F. Supp. 616 (S.D.N.Y. 1995) ........................................................................ 12

*In re Excess Value Ins. Coverage Litig.*,
598 F. Supp. 2d 380 (S.D.N.Y. 2005) ................................................................... 12

*Fleisher v. Phoenix Life Ins. Co.*,
No. 11-cv-8405-CM, 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015) ..................... 21

*Fogerty v. Fantasy, Inc.*,
    510 U.S. 517 (1994)..................................................................................12

*Goldberger v. Integrated Res., Inc.*,
    209 F.3d 43 (2d Cir. 2000)................................................................13, 15, 16

*Grice v. Pepsi Beverages Co.*,
    363 F. Supp. 3d 401 (S.D.N.Y. 2019)..........................................11, 23, 24

*Hart v. BHH, LLC*,
    No. 15-cv-4804-WHP, 2020 WL 5645984 (S.D.N.Y. Sept. 22, 2020) ................20, 21, 22, 23

*Hart v. RCI Hosp. Holdings, Inc.*,
    No. 09-cv-3043-PAE, 2015 WL 5577713 (S.D.N.Y. Sept. 22, 2015) ....................................21

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983)..................................................................................16

*J.G. v. New York City Dep't of Educ.*,
    719 F. Supp. 3d 293 (S.D.N.Y. 2024)......................................................16

*Kapoor v. Rosenthal*,
    269 F. Supp. 2d 408 (S.D.N.Y. 2003)......................................................17

*Kirsch v. Fleet St., Ltd.*,
    148 F.3d 149 (2d Cir. 1998)................................................................14, 19

*Kurtz v. Kimberly-Clark Corp.*,
    2024 WL 184375 (E.D.N.Y. Jan. 17, 2024) ............................................22

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
    No. 13-cv-214-RMB-RLE, 2017 WL 2559230 (S.D.N.Y. May 22, 2017) ....................14, 24

*Luciano v. Olsten Corp.*,
    109 F.3d 111 (2d Cir. 1997)......................................................................15

*Martinez v. Paramount Country Club, LLC*,
    No. 18-cv-04668-VB-JCM, 2019 WL 2450856 (S.D.N.Y. Apr. 1, 2019) ............................14

*Masters v. Wilhelmina Model Agency, Inc.*,
    473 F.3d 423 (2d Cir. 2007)..................................................................21, 22

*McDaniel v. Cnty. of Schenectady*,
    595 F.3d 411 (2d Cir. 2010)......................................................................13

*McGreevy v. Life Alert Emergency Response, Inc.*,
    258 F. Supp. 3d 380 (S.D.N.Y. 2017)....................................................20, 21

*McLaughlin v. IDT Energy*,
    2018 WL 3642627 (E.D.N.Y. July 30, 2018)........................................20, 22, 23

*Motorola Credit Corp. v. Uzan*,
    561 F.3d 123 (2d Cir. 2009)......................................................................12

*Parker v. Time Warner Ent. Co.*,
   631 F. Supp. 2d 242 (E.D.N.Y. 2009) ........................................................20

*In re Penthouse Exec. Club Comp. Litig.*,
   No. 10-cv-1145-KMW, 2014 WL 185628 (S.D.N.Y. Jan. 14, 2014)....................21

*Raja v. Burns*,
   43 F.4th 80 (2d Cir. 2022) ...................................................................17

*Ramirez v. Marriott Int'l*,
   No. 20-cv-02397-PMH, 2023 WL 2447398 (S.D.N.Y. Mar. 10, 2023)................16

*Run Guo Zhang v. Lin Kumo Japanese Rest. Inc.*,
   No. 13-cv-6667-PAE, 2015 WL 5122530 (S.D.N.Y. Aug. 31, 2015)...................23

*Sands v. CBS Interactive Inc.*,
   No. 18-cv-7345-JSR, 2019 WL 1447014 (S.D.N.Y. Mar. 13, 2019) ..................12

*Savoie v. Merchants Bank*,
   84 F.3d 52 (2d Cir. 1996)....................................................................25

*Seigal v. Merrick*,
   619 F.2d 160 (2d Cir. 1980)..................................................................16

*Torres v. Gristede's Operating Corp.*,
   519 F. App'x 1 (2d Cir. 2013) .........................................................14, 21

*United States v. E. River Hous. Corp.*,
   90 F. Supp. 3d 118 (S.D.N.Y. 2015)........................................................25

*Varljen v. H.J. Meyers & Co.*,
   No. 97-cv-6742-DLC, 2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ..................15

*Velez v. Novartis Pharmaceuticals Corp.*,
   2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010).........................................21, 24

*Williams v. Reckitt Benckiser LLC*,
   65 F.4th 1243 (11th Cir. 2023) ..............................................................11

*Zink v. First Niagara Bank, N.A.*,
   2016 WL 7473278 (W.D.N.Y. Dec. 29, 2016)........................................21, 24

**Rules**

Fed. R. Civ. P. 23 .................................................................................25

**Other Authorities**

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their
   Fee Awards*, 7 J. Empirical Legal Studs. 811 (2010) .............................24

Staff of H. Subcomm. on Econ. & Consumer Pol'y, 116th Cong., Booster Seat
   Manufacturers Give Parents Dangerous Advice (Dec. 10, 2020),
   https://tinyurl.com/2txp7dmf .......................................................2

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Studs. 248 (2010) ...............................24

## I.    INTRODUCTION

Plaintiffs' counsel request $2.25 million in fees and costs, but that amount is not reasonable given the early settlement, effort expended, result achieved for class members, and counsel's initial refusal to address the fraud that plagued the claims process.

Before this Court decided Artsana's motion to dismiss and before any discovery had taken place, the parties reached a settlement.  Much of the work came from policing what this Court correctly recognized as the "unprecedented" fraud afflicting the claims process.  ECF 105 at 4–5, 23, 29.  When the fraud became obvious early on, Artsana repeatedly tried to work with Plaintiffs' counsel to address it, to no avail.  Notwithstanding that overwhelming fraud, in August 2023 Plaintiffs moved for final approval.  Counsel did not mention the fraud and claimed they had achieved an "excellent" result for the class, even though that assertion was based on claims Plaintiffs knew had *not* been validated by the settlement administrator (indeed, it turned out over 65% of those "preliminarily valid" claims were fraudulent).  It was only after Artsana opposed final approval and brought the fraud to the Court's attention by hiring at its own expense a third-party firm (ClaimScore) to detail the fraud, and this Court forcefully noted at the first final approval hearing that the fraud was a problem, that Plaintiffs' counsel relented in their effort to push the settlement through and collect their fees.

Working together, ClaimScore and Angeion (the settlement administrator) determined 99.4% of the claims submitted were fraudulent.  Counsel again seek the maximum fees permitted, in part because they "devoted significant time . . . to assess the fraud detection methods and claims determinations."  ECF 128 at 1.  But the detection of the fraud happened not because of, but *in spite of*, the efforts of Plaintiffs' counsel, and Artsana should not be saddled with fees incurred because of counsel's objections.

This Court should reject Plaintiffs' counsel's request for $2.25 million in fees, which amounts to nearly 95% of the funds that will be paid to class members, and instead award no more than $725,000, which is justified by both the lodestar and percentage-of-the-fund methods. This roughly 66% reduction of the $2.16 million lodestar is more than justified. In addition to ignoring the fraud, counsel's records are, as they were before, riddled with inconsistency, inefficiency, and error. For example:

- Counsel employed *33* timekeepers across *three* firms.

- Two partners spent *more than 72 hours* talking *only to each other*.

- Entries are vague—for example, "updates," "case organization," and "Numerous emails."

- Two firms recorded $232,602 *before filing a complaint*.

An award of no more than $725,000 is also reasonable by looking to the percentage-of-the-fund method because the Court should award no more than 20% of the settlement value, in line with how other courts in this District treat cases that settle early in litigation. And contrary to counsel's assertion, the Court should not ascribe "value" to claims that *could have* been made by class members but were not. That would contravene the caselaw in this Circuit and economic reality.

In sum, a substantial reduction of the requested fee award is warranted here.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs Crib from Congressional Report to File Lawsuits

In December 2020, the staff of a House subcommittee published a report about booster-seat marketing. Staff of H. Subcomm. on Econ. & Consumer Pol'y, 116th Cong., Booster Seat Manufacturers Give Parents Dangerous Advice (Dec. 10, 2020), https://tinyurl.com/2txp7dmf. The report claimed this marketing was in tension with federal guidelines, which sometimes recommend a minimum weight of 40 pounds. *Id.* at 27–28.

Plaintiffs represented by Milberg Coleman filed suit against Artsana in April 2022. *Sayers v. Artsana USA, Inc.*, No. 5:21-cv-01876-JMG, ECF 1 (E.D. Pa.). Like the House Report, the complaint alleges Artsana misrepresented that its booster seats were safe and provided side-impact protection for children weighing 30 pounds or more. *Id.* ¶¶ 6, 9–12, 47, 55–57, 68, 71–72, 79, 89–94. It adds little fact investigation beyond what the House Report already provided, adding only the history of car-seat regulation and a few additional Artsana promotional materials. *Id.* ¶¶ 27–54, 58–88. The complaint provides few individualized facts about plaintiffs other than that each plaintiff allegedly bought a booster seat for a child that weighed under 40 pounds. *Id.* ¶¶ 95–120.

Artsana moved to dismiss several claims in July 2021. *Sayers*, ECF 20. Plaintiffs filed an opposition of just over 17 pages, *id.*, ECF 27, making many of the same legal arguments as the 50-page motion-to-dismiss opposition in *Carder v. Graco Children's Products, Inc.*, No. 2:20-cv-00137, ECF 70 (N.D. Ga. Aug. 31, 2021), which the same lawyers prepared and which involved "virtually identical claims against another booster seat manufacturer," *id.* at 9.

With that motion pending, the parties mediated before the Honorable Diane M. Welsh (Ret.). The day mediation briefs were due, Bursor & Fisher and Vozzolo LLC filed another complaint in this District on September 23, 2021. ECF 1. These attorneys had coordinated with Milberg (counsel in *Sayers*) since at least April 2021. ECF 63-3 at 13–15; ECF 64-1 at 5–7. Their complaint thus drew on the House Report, ECF 1 ¶¶ 6–8, 11–16, 69–76, and also borrowed from the *Sayers* Complaint, *e.g.*, *id.* ¶¶ 80–87.

## B. The Parties Settle Five Months into *Sayers* and One Week into *Jimenez*

At the mediation before Judge Welsh, seven attorneys for Plaintiffs appeared, including five partners. ECF 79 ¶ 7. Artsana, by contrast, sent one partner and one associate. *Id.* The parties reached a tentative settlement and requested a stay. ECF 6. To that point, there had been no court hearings, and no discovery had taken place. The parties participated in a second mediation

on November 8, 2021, to discuss non-monetary relief.  Plaintiffs again had seven attorneys present, while the same two lawyers participated for Artsana.  ECF 79 ¶ 7.

Artsana drafted the bulk of the settlement papers, including the initial draft of the agreement. *Id.* ¶ 16.  And Artsana, together with the settlement administrator, Angeion, drafted most of the exhibits, while Plaintiffs' counsel drafted two exhibits.  *Id.*  Plaintiffs filed for preliminary approval of the settlement in January 2023, ECF 40, which the Court granted six days later, ECF 45, 52.

## C.    Fraud Has Plagued the Settlement Claims Process

The parties agreed to a claims-made settlement structure, meaning Artsana pays only those claimants who submit valid claims.  Claimants with proof of purchase are eligible to receive $50.  ECF 42-1 ¶ 46.  Claimants who have no proof of purchase or failed to register may receive $25 if they provide specific information to verify their booster seat purchase.  *Id.* ¶ 47.  It is this latter "no proof" category that drove the claims fraud.

During negotiations before the claims period commenced in March 2023, the parties and Angeion discussed how "no-proof" claimants could provide the required information.  ECF 85 ¶ 2. Angeion proposed a four-quadrant matrix:  "Group A" required the model and colors; "Group B" required the retailer and approximate date of purchase; "Group C" required the serial number; and "Group D" required a photo and place of purchase.  *Id.* ¶¶ 3–4.  Eligible claimants had to provide correct information for *two* groups.   Artsana expressed concern that this matrix appeared vulnerable to fraud because people could randomly pick a model and color from the settlement website's dropdown list and guess a retailer like Amazon or Walmart.  *Id.* ¶ 5.  Artsana preferred a process by which no-proof claimants would be asked first for the product serial number before they could select other options on individual screens.  *Id.* ¶ 6.  But Plaintiffs' counsel objected.  *Id.* Artsana reluctantly agreed to Angeion's matrix.

Once Angeion instigated media notice, claims exploded.  In three days, from March 29 to 31,

55,028 claims were submitted.  ECF 86 ¶ 22.  By May 15, 99% of claimants were picking the model-year-color-retailer option and over 71% were getting the answers wrong.  ECF 85 ¶ 8, 85-2.  Claims continued to accumulate at an unbelievable pace even *after* media notice ended, peaking at roughly 47,270 per day, or 330,920 per week, in late August.  ECF 87 ¶ 28.

Artsana repeatedly told Plaintiffs' counsel the evident fraud could derail the settlement and pressed for meaningful changes to the claims process.  ECF 79 ¶ 15.  Artsana convened no fewer than four conferences with Plaintiffs' counsel, including one attended by the CEO of Angeion.  *Id.* And during the parties' final mediation session, Artsana did not "refuse" to discuss fees.  ECF 128 at 13.  Rather, Artsana raised the problem of fraud and how it would preclude final approval. Plaintiffs' counsel disagreed, which precluded further discussion of fees.  Decl. of Jeremy S. Smith ¶ 20.[1]

### D.    Plaintiffs' Counsel Seek $2.25 Million in Fees Without Mentioning the Fraud

Despite Artsana's request to wait until the fraud was addressed, Plaintiffs' counsel moved for final approval and sought $2.25 million in fees and costs in August 2023.  Those motions omitted any mention of the ongoing fraud.  ECF 57, 62.  Rather, counsel argued the settlement was "outstanding" and achieved an "excellent result," based on an initial report of 153,244 products claimed.  ECF 62 at 1, 14.  Artsana raised the fraud in response, explaining that at the then-current rate, the number of products claimed would be *three times* the actual products sold:

---

[1]  Nonetheless, both before and after the Court denied final approval, Artsana's counsel has discussed attorneys' fees directly with opposing counsel.  Smith Decl. ¶ 22.



ECF 84 at 1. Artsana also submitted an expert declaration from ClaimScore, which Artsana paid for, detailing the pervasive fraud. ECF 87. ClaimScore reviewed the data on claims submitted through August 31, 2023, determining that of the 1,568,706 claims submitted only 35,081 were valid. *Id.* ¶ 39. Angeion performed its own preliminary analysis on a subset of 408,534 claims filed between September 1 and September 15, 2023, and it determined that 404,713 (99.1%) appeared to be fraudulent. ECF 82 ¶¶ 8–9.

Still, Plaintiffs' counsel minimized the fraud in their reply (ECF 91), arguing, as this Court summed up at the November 8, 2023 hearing: "yeah, there is a lot of fraud, but, you know, that's what we agreed to, and that's life in the big city, so you should just approve it." ECF 105 at 5. At that hearing, the Court called the fraud "unprecedented" and noted it had "never seen anything like this." *Id.* at 4. As a result, the Court "decline[d] . . . to approve the class settlement without a full understanding of how many valid claimants there are and further assurances that the settlement funds are primarily going to be paid to valid claimants." *Id.* at 70; ECF 101.

### E.    The Parties Address the Ongoing Fraud

The Court's observations led to greater cooperation from Plaintiffs' counsel. The claims period closed on January 7, 2024. ECF 102 at 1. On March 25, Angeion informed the parties that it had received 8,988,214 claims for 9,600,156 products and that ***99.4%*** were fraudulent. Smith Decl., Ex. A. The total number of products claimed was ***nearly 11 times*** the actual products sold.

The parties then discussed an appeals and deficiency process. Plaintiffs' counsel suggested a broad deficiency process, covering not only claimants who submitted invalid claims, but also many claimants who were flagged for submitting fraudulent claims. Smith Decl., Ex. B. Artsana's position was that any appeals/deficiency process should be limited to claimants whose submissions were not flagged for fraud; fraudsters should not be allowed a second opportunity to defraud. *Id.*, Ex. C. In the interest of moving the settlement forward, Artsana agreed to Angeion's suggested plan of sending direct notice to 244,771 claimants. ECF 114 at 1.

Artsana's concerns that the deficiency process would invite more fraud were borne out. On August 9, 2024, Angeion notified the parties it had received 6,929 responses, of which 4,327 claims for 7,216 products were tentatively approved. Smith Decl., Ex. D. Artsana determined several of the "approved" claimants still showed indicia of fraud, including one (who appears to be a convicted felon) who submitted claims for 39 booster seats. Smith Decl. ¶ 7; *id.*, Ex. E. Further investigation revealed that the eligibility criteria was not being applied correctly to the deficiency submissions. ECF 118; Smith Decl., Ex. F. Angeion audited the results and reduced the number of valid claims to 4,162 for 5,718 products. ECF 126 ¶ 12. Artsana reviewed the claims data again and challenged 12 claims for 74 products. Smith Decl., Ex. G; ECF 126 ¶ 13. Angeion agreed. ECF 135 ¶ 44. Plaintiffs' counsel never responded to Artsana's concerns regarding this new fraud. Smith Decl. ¶ 9.

Of the 8,988,981 claims for 9,600,807 products, Angeion ultimately determined only 52,648 claims for 65,174 products are valid—around **0.05%**. Based on the settlement's provision of $25 without proof and $50 with proof, the class will receive $2,390,825 in total. ECF 134 ¶ 46.

### F.    Plaintiffs' Counsel Again Seek $2.25 Million in Fees

Plaintiffs' counsel argue they should be awarded $2,250,000 "[i]n light of the exceptional benefits achieved and significant work undertaken." ECF 128 at 1–2. This "excellent" result of

65,174 products claimed is less than half (~40%) of the 153,244 preliminarily eligible products counsel claimed supported the "excellent" result in their first fee motion.

Plaintiffs' counsel attempt to justify an award that amounts to nearly 94% of the monetary benefit to class members in several ways. *First*, counsel argue the hours they worked on the matter justify the fee award. ECF 128 at 11–12. But 1,705 hours (of 2,890), accounting for over $836,000 of fees, were recorded *after* the last fee motion. A review of the records shows that at least 103 hours were spent addressing the millions of fraudulent claims. Smith Decl. ¶ 18.

*Second*, counsel recorded different time for the same events. For example, for a mediation on November 8, 2021, one attorney logged 3.3 hours (ECF 130 at 44), and four others recorded 4.8 hours (ECF 129-1 at 6, 136-5 at 12). A sixth attorney, claiming $919/hour, recorded 7.0 hours for the same mediation—almost 1.5 times the others. ECF 130 at 36. A seventh attorney block billed, but at any rate recorded only 5.6 hours for *both* "mediation and follow up." *Id.* at 49.

The records are also vague. One attorney recorded $900/hour for "Fact research re potential new matter (3.10)," without identifying the research or its relevance. ECF 136-5 at 6. The records are rife with this type of entry: no fewer than 164 entries refer to discussions of "next steps." Smith Decl. ¶ 15. One Bursor & Fisher partner has two entries on consecutive days for "Research re potential claims and venue" (a total of 10.5 hours, $7,087.50), another for "Research re potential claims" (5.7 hours, $3,847.50), and another for "Pre-suit investigation" (5.9 hours, $3,982.50). ECF 129-1 at 1. Other entries include "Call w/ Anthony," "case organization," "contact w/ client," "Email re: next steps," and "Discussed next steps with Anthony Vozzolo." *Id.* at 6, 11, 12, 15, 17. Lawyers at the Milberg firm recorded for "Emails w/ team re: status report," "call re settlement agreement," and "Call with referring counsel re status of case." ECF 130 at 47, 48, 50, 64. One entry, for $398.80, just says "Numerous emails." *Id.* at 70.

The most notable feature, however, is the sheer number of people that worked on this case across the three firms—33 timekeepers, including 18 lawyers:

| | Timekeeper | Role | Time Recorded | Recorded amount |
|---|---|---|---|---|
| 1 | Anthony Vozzolo | Named partner | 476.8 | $   429,120.00 |
| 2 | L. Timothy Fisher | Named partner | 242.5 | $   242,500.00 |
| 3 | Martha A. Geer | Partner | 520.4 | $   510,474.40 |
| 4 | Alec M. Leslie | Partner | 244.3 | $   164,902.50 |
| 5 | Gregory F. Coleman | Named partner | 101.3 | $     94,685.90 |
| 6 | Jonathan B. Cohen | Partner | 85.9 | $     66,874.10 |
| 7 | Arthur Stock | Partner | 9.7 | $       9,004.40 |
| 8 | Neal J. Deckant | Partner | 0.4 | $          320.00 |
| 9 | Jeremy R. Williams | Senior associate | 0.7 | $          325.50 |
| 10 | Ryan McMillan | Senior counsel | 23.2 | $     15,600.00 |
| 11 | Andrea Clisura | Associate | 684.90 | $   445,185.00 |
| 12 | Sarah J. Spangenburg | Associate | 104.9 | $     39,897.00 |
| 13 | Sean Litteral | Associate | 67.7 | $     25,387.50 |
| 14 | Blair Reed | Associate | 34.2 | $     14,535.00 |
| 15 | Katharine Batchelor | Associate | 142.1 | $     60,261.30 |
| 16 | Amanda Murphy | Associate | 9 | $       3,429.00 |
| 17 | Erin J. Ruben | Associate | 1 | $          340.00 |
| 18 | Laura Godly | Associate | 0.6 | $          322.80 |
| 19 | Judy Fontanilla | Staff | 44.1 | $     12,127.50 |
| 20 | Sherry Helminiak | Staff | 41.5 | $       9,281.40 |
| 20 | Jordon Crowe | Staff | 11.4 | $       1,791.20 |
| 21 | Tracy M. Smith | Staff | 10.5 | $       1,575.00 |
| 22 | Cathy Bryant | Staff | 6.9 | $       1,434.20 |
| 23 | Molly C. Sasseen | Staff | 4.2 | $       1,260.00 |
| 24 | Rebecca S. Richter | Staff | 10.0 | $       3,000.00 |
| 25 | Cathy Holmes | Staff | 2.9 | $          693.10 |
| 26 | Jeff S. Steen | Staff | 1.8 | $          354.60 |
| 27 | Renee Pothier | Staff | 0.6 | $          123.60 |
| 28 | Sarah Davis | Staff | 0.3 | $            62.40 |
| 29 | Dawn L. Holt | Staff | 0.7 | $          157.50 |
| 30 | Debbie L. Schroeder | Staff | 0.1 | $            30.00 |
| 31 | Lisa Maxwell | Staff | 0.1 | $            22.50 |
| 32 | Jade A. Greer | Staff | 4.6 | $       1,265.00 |
| 33 | Unidentified B&F support staff | Staff | 0.2 | $            55.00 |
| | **Total** | | 2889.5 | $ 2,156,397.40 |

ECF 129-1 at 2; ECF 130 at 3–4; ECF 136-3 at 2; Smith Decl. ¶ 12.

Plaintiffs had 12 attorneys, including six partners, and two support staff record more than 15 hours to this matter.  By contrast, Artsana had six attorneys, including only two partners (one who was an associate during the lion's share of the case).  Smith Decl. ¶ 19 (Artsana only had this many attorneys because one went on multi-month parental leave and two left the firm).  And while Plaintiffs claimed to have recorded nearly 2,900 hours to this matter, Artsana's attorneys billed roughly 1,700, and had to take the unusual and time-consuming process of opposing final approval. *Id.* ¶ 21.  Had Plaintiffs not sought final approval of a settlement plagued by fraud, Artsana's attorneys would have billed a fraction of that—likely around 1,000 hours.

The entries also show the amount of time that this sprawling enterprise required for lawyers to communicate with one another across firms.  One of the named partners, for instance, spent 44.1 hours over the life of the case exchanging emails and phone calls with *one of his counterparts* at a different firm—recording a total of $39,690 for this time.  Smith Decl. ¶ 17.  The attorney receiving these calls and emails, a named partner at another firm, claims considerably less time for them—28.5 hours, or 15.5 hours less—but nonetheless hopes to earn $28,500 for time speaking to one counterpart.  *Id.*  These entries total $68,190—approximately 3% of the entire lodestar amount. *Id.*  And these conversations were memorialized with generic entries like "Corresp with T Fisher re plaintiff."  ECF 136–5 at 7.  Plaintiffs' counsel argued that because "one partner did not bill time for certain phone calls that occurred with his co-counsel" was to Artsana's "benefit."  ECF 92 at 10.  But that does not address the core problem—the overstaffing and resulting inefficiency represented in the records.

The sheer number of lawyers who worked on tasks is noteworthy: seven lawyers worked on the *Jimenez* Complaint, which borrowed heavily from *Sayers*, and *nine* worked on the very simple task of preparing the consolidated complaint.  ECF 79 ¶ 12; ECF 79-3.

The inefficiency is also reflected in the *amounts* recorded.  For example, Bursor & Fisher and Vozzolo LLC incurred $232,602 in fees before they filed the complaint in this action, despite having the benefit of the *Sayers* Complaint and the House Report that supplied the lion's share of the allegations.  ECF 79 ¶ 9.  Tallying up their time across all three firms and 33 timekeepers, Plaintiffs' counsel generate a lodestar of $2,156,471.30.  ECF 128 at 12.  Counsel ask for nearly $100,000 extra because of "the excellent result obtained here."  *Id.*

*Third*, Plaintiffs' counsel alternatively argue the percentage of the fund method supports the fee request.  They suggest the settlement is worth $24,622,450—which they calculate by multiplying $25 by 874,538—an estimate of the total products sold, and adding costs.  ECF 128 at 16.  In other words, counsel urge the Court to assess fees in an alternate reality in which *every single class member* has submitted a claim for $25.  *But see* ECF 134 ¶ 45 (only 65,174 products validly claimed).  Using this fictional denominator, counsel calculate their fee request as "only 9% of the total estimated value of the Settlement."  ECF 128 at 16.  But counsel ask for nearly the same amount in fees ($2,250,000, or 94%) as what class members will receive ($2,390,825).  And even assuming counterfactually that the class members are "receiving" the attorneys' fees, then counsel is asking for 44%—2.25M / (2.39M (claims) + 2.25M (fees) + 500k (settlement administrator) + 9k (incentive awards)).  *Id.* at 17.

## III.    ARGUMENT

The Court should substantially reduce counsel's request for $2.25 million, which nearly equals the total monetary relief class members will receive.  *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1261 (11th Cir. 2023) (noting, where Milberg Coleman served as plaintiff's counsel, that a settlement may not be fair if "proposed attorneys' fees are disproportionately large compared to the amount of relief reasonably expected to be provided to the class").  That award would be the sort of "misallocated distribution" courts have warned against.  *Grice v. Pepsi*

*Beverages Co.*, 363 F. Supp. 3d 401, 410 (S.D.N.Y. 2019) (fees of *50%* of net payout would be excessive); *see In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 390 (S.D.N.Y. 2005) ("It would be anomalous and unacceptable for counsel to fare better than the Class.").

A reduction is particularly warranted here, given counsel's unwillingness to police the obvious fraud, which they allowed to proliferate and tried (unsuccessfully) to profit from. In determining fees, the Court should apply an across-the-board cut to counsel's inflated lodestar. Alternatively, the Court could reduce the award by applying a percentage of the fund that appropriately accounts for the stage of litigation when this matter settled. By either method, counsel is not entitled to an award approaching the amount they requested.

### A.    Plaintiffs' Counsel's Actions Justify a Substantial Reduction of the Award

The "paramount consideration in awarding attorneys' fees . . . is the protection of the interests of the class members and the achievement of equity." *Dubin v. E.F. Hutton Grp., Inc.*, 878 F. Supp. 616, 619 (S.D.N.Y. 1995). The Supreme Court has emphasized that courts awarding attorneys' fees should exercise their "equitable discretion" in light of "'the need in particular circumstances to advance considerations of compensation and deterrence.'" *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 & n.19 (1994) (citation omitted). For example, another court in this District held that fee-shifting was inappropriate in a copyright case in part because the plaintiff's attorney had arguably engaged in the "dubious practice of copyright trolling." *Sands v. CBS Interactive Inc.*, No. 18-cv-7345-JSR, 2019 WL 1447014, at *7 (S.D.N.Y. Mar. 13, 2019).

Here, counsel's action (and inaction) in allowing massive fraud to jeopardize the settlement is likewise far from exemplary and not deserving of the windfall they request. The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 129 (2d Cir. 2009). As claims skyrocketed past any feasible number, Artsana repeatedly pleaded with counsel to agree to

reasonable measures to root out the fraud.  ECF 79 ¶ 15.  Counsel continuously refused.  *Id.*  Not only did this create more work for Artsana, but Plaintiffs' counsel now seek to *tax* Artsana with their own inefficient work that could have been avoided.

When Plaintiffs' counsel first sought final approval, they omitted any mention of fraud, claiming that they "should be rewarded" for an "exceptional settlement" and "excellent result."  ECF 62 at 14, 20.  Counsel also attempted to justify their request by saying there were "153,244 claims awaiting confirmation," *id.* at 16 n.6, even though Angeion had made perfectly clear that those claims were only "preliminarily" "eligible" and would be "subjected to final audits," ECF 60 ¶ 27 & n.1.  And now, with the final audit process complete, Angeion has reported there were only 52,648 valid claims. ECF 134 ¶ 45.  With the money to the class cut by two-thirds, Plaintiffs continue to tout the "exceptional benefits" and "excellent result" achieved.  ECF 128 at 1–2.

It was only this Court's insistence during the first final approval hearing on "cut[ting] through the baloney" to address the "truly unprecedented" fraud that finally forced Plaintiffs' counsel to abandon their effort to steamroll through the final approval process and refusal to face the fraud head on.  ECF 105 at 4–6.  After turning a blind eye to the fraud for so long, which only increased costs and harmed legitimate claimants by risking the settlement, Plaintiffs' counsel should not be awarded the maximum amount of fees permitted.  Equitable "considerations of compensation and deterrence" support a substantial reduction of the requested fees.

## B.    Both the Lodestar Method and the Percentage of the Fund Approach Justify a Substantial Reduction of the Fee Award

Counsel's fee request is far out of proportion with the work they performed and the result they achieved for the class.  In calculating fees and costs, courts in this Circuit may use either the lodestar method or a percentage of the class recovery.  *McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 417 (2d Cir. 2010).  Both methods reveal a $2.25 million award "exceed[s] what is 'reasonable' under the circumstances."  *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000).

### 1.    Plaintiffs' Counsel's Requested Fees Are Not Supported by the Lodestar Method

Plaintiffs' counsel's records do not justify their $2.16 million loadstar.  Given counsel's excessive and duplicative work, the Court should cut Plaintiffs' lodestar amount by at least two-thirds (66%).

The Court is not required to accept counsel's records at face value.  To the contrary, "'percentage cuts as a practical means of trimming fat from a fee application'" are a "recognized practice" in this Circuit.  *Torres v. Gristede's Operating Corp.*, 519 F. App'x 1, 4 (2d Cir. 2013) (citation omitted).  Courts are empowered "simply to deduct a reasonable percentage of the number of hours claimed" where warranted.  *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).  And "some instances of waste and inefficiency are so egregious that their inclusion in a motion for fees casts a shadow over all of the hours submitted to the Court."  *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 393 (S.D.N.Y. 2013).  For example, in *Martinez v. Paramount Country Club, LLC*, this Court affirmed the magistrate judge's ruling that an attorney's fee request "should be reduced [by 40%] in light of the number of attorneys staffed, the routine nature of the litigation, and the early resolution of [the plaintiff's] claim."  No. 18-cv-04668-VB-JCM, 2019 WL 2450856, at *4–5 (S.D.N.Y. Apr. 1, 2019), *report and recommendation adopted*, No. 18-cv-4668-VB, 2019 WL 2171109 (S.D.N.Y. May 20, 2019).

Another judge in this District considered a fee request based on a lodestar of $2.69 million but ruled that number should be cut due to (among other reasons) counsel's vague entries (such as "conv with [another attorney]"), time spent on unnecessary tasks, and the relative simplicity of the litigation. *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, No. 13-cv-214-RMB-RLE, 2017 WL 2559230, at *3 (S.D.N.Y. May 22, 2017).  The court trimmed the request to just $316,000, which represented a "'negative' lodestar multiplier of .12"—an 88% cut.  *Id.* at *4.

Here, the Court should reduce the requested lodestar because of (i) additional work created by

14

Plaintiffs' counsel's refusal to address the fraud, (ii) the minimal work required and completed, (iii) the overstaffing of this matter, and (iv) counsel's vague and unreliable entries.

i. <u>Additional work created by Plaintiffs' counsel's refusal to address the fraud</u>. Plaintiffs' counsel claims to have recorded 1,705 hours, accounting for over $836,000 of fees, *after* they filed their first motions for final approval and fees. *Compare* ECF 63 ¶ 46 (1,184.5 hours for $1,320,040.50), *with* ECF 136 ¶¶ 88–90 (2,889.5 hours for $2,156,471.30). A significant percentage of these hours were purportedly related to addressing the rampant fraud in this case, which counsel promoted by insisting on an easily gameable matrix and refusing to work with Artsana once the fraud became clear in the summer of 2023. *Supra* at pp. 4–5. For example, 168 of counsel's time entries discuss the deficiency process—a process made especially difficult given that over 9 million fraudulent claims were submitted. Smith Decl. ¶ 15. And a significant amount of time was spent discussing and addressing Angeion's analysis of fraudulent claims. *Id.* ¶ 18. Plaintiffs' counsel also seek fees for drafting two sets of motions for final approval and attorneys' fees—duplicative hours that could have been avoided had Plaintiffs' counsel recognized the overwhelming evidence of fraud in 2023.[2] Plaintiffs' counsel should not be awarded for "excessive time wasted in this litigation by uncooperative and contentious behavior." *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997).

ii. <u>Minimal work required and completed</u>. Any fee request should be compared with the work counsel actually performed in the case, which was scant here. *Goldberger*, 209 F.3d at 50. Courts have held that cases stayed early in their lifespan, like this one, are not good candidates for fee enhancements. For example, in *Varljen v. H.J. Meyers & Co.*, the court rejected a 1.6 multiplier "given

---

[2] One counsel avers he has "exercised billing discretion to eliminate the majority of time pertaining to Class Counsel's initial fee brief and have limited time related to Class Counsel's fee petition to approximately 45 hours" for the firm. ECF 136 ¶ 94. But no reduction was applied to the final approval motions, *id.*, and the other firms did not make similar cuts, ECF 129–30.

the fact that there has been no trial and not even full discovery." No. 97-cv-6742-DLC, 2000 WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000).

Here, the bulk of counsel's work consisted of preparing one complaint that largely relied on the House Report, a second complaint that varied from the first in style only, and a third complaint that combined the two previous ones. Counsel benefitted immensely from "the spadework done by federal authorities," *Goldberger*, 209 F.3d at 54—the House Report created a roadmap for counsel's legal theories and factual allegations. Milberg did draft one brief in opposition to a motion to dismiss the *Sayers* Complaint, but routine motion practice is merely one of the "general hurdles" of litigation. *Id.* And Milberg could leverage their opposition brief in another case, which they described as having "virtually identical claims." *Sayers*, ECF 27 at 9. Moreover, this case settled in principle *one week* after the *Jimenez* lawyers entered the fray, before any discovery or dispositive motion hearing had taken place. *Sayers*, ECF 32 (stay request).

iii. <u>Overstaffing</u>. Firms have discretion to staff their cases, but there are limits, and "[a]mple authority supports reduction in the lodestar figure for overstaffing as well as for other forms of duplicative or inefficient work." *Seigal v. Merrick*, 619 F.2d 160, 164 n.9 (2d Cir. 1980). Counsel must use "billing judgment" and cannot present records a reasonable paying client would not accept. *Hensley v. Eckerhart*, 461 U.S. 424, 434, 437 (1983). Here, using 33 timekeepers was a "disaster from a reasonable billing point of view" that no paying client would accept. *Ramirez v. Marriott Int'l*, No. 20-cv-02397-PMH, 2023 WL 2447398, at *5 (S.D.N.Y. Mar. 10, 2023) (citation omitted). In contrast, Artsana litigated with a core team of three to four lawyers at any given time, adding an associate only as needed for covering paternity leave or departures. Smith Decl. ¶ 19. This action did not need so many people to prosecute it.[3]

---

[3] It is true that some of the 33 timekeepers were support staff. But they too were overly staffed and charged out at rates courts find excessive: from $150 to $300. *See* ECF 130 at 3–4; *J.G. v.*

This duplication of effort resulted in excessive time. Innumerable hours were spent checking and re-checking work across firms, as exemplified by the drafting of the *Jimenez* Complaint. In *Kapoor v. Rosenthal*, the court concluded that employing "three attorneys in preparing a complaint with relatively straightforward issues [was] duplicative and/or excessive." 269 F. Supp. 2d 408, 414–15 (S.D.N.Y. 2003) (cutting fees). Here, even with the benefit of the House Report and the *Sayers* complaint (*i.e.*, with the legwork done), it took *six* attorneys (plus one additional timekeeper) across Vozzolo LLC and Bursor & Fisher to draft the complaint. ECF 79-3. In the last round of briefing, counsel argued they "independently drafted" each complaint and any similarity is due to basic facts (ECF 92 at 8 & n.10), but that's the point—both complaints draw from the same House Report, and even recite the same facts in recounting the history of car seats. *Compare* Sayers, ECF 1 ¶¶ 34–44, *with* Jimenez, ECF 1 ¶¶ 42–54.

iv. <u>Vague and unreliable records</u>. Counsel's records fall far short of the standard required in this Circuit for clarity and description. Records must specify "'the nature of the work done.'" *Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022) (citation omitted). "A party seeking attorney's fees bears the burden of properly documenting the hours worked, and this obligation is not satisfied by a vague entry such as 'conference with' or 'call to' a particular person." *Ambac Assurance Corp. v. Adelanto Pub. Util. Auth.*, No. 09-cv-5087-JFK, 2013 WL 4615404, at *3 (S.D.N.Y. Aug. 29, 2013). For example, entries "labeled 'misc email' do not convey the general subject matter of the work completed." *Id.*

The records here are replete with vague entries no client would approve. Even when a topic is provided—for example, "t/call with T Fisher re status update, litigation strategy," ECF 136-5 at 10— the broad descriptions do not provide the information needed to assess whether the fees were well-earned. Often counsel provides almost no context whatsoever. For example:

---

*New York City Dep't of Educ.*, 719 F. Supp. 3d 293, 310–11 (S.D.N.Y. 2024) (awarding $110 or $125 an hour for paralegals).

- Numerous entries include time for abstract and undifferentiated tasks like "Research re related/similar matters (1.40)," ECF 136-5 at 6, "fact research (1.30)," *id.*, and "Research re: pre-suit investigation" (2.6), ECF 129–1 at 3.

- One attorney entered four identical entries within one week that each read "Drafting complaint," for a total of 11.3 hours and $4,802.50. ECF 129-1 at 3.

- Another $495.30 for "call re settlement agreement" without identifying who the call was with. ECF 130 at 50.

The entries for one Milberg partner are illustrative of the problem. Claiming the right to $919/hour, this partner repeatedly had entries like "Emails with co-counsel re: settlement issues" (0.2) and "Work on settlement agreement and related issues" (1.7). This chart summarizes these entries:

| Date | Time | Description | Value |
|---|---|---|---|
| 11/10/2021 | 1.90 | Work on post mediation and settlement related issues | $1,746.10 |
| 11/15/2021 | 1.70 | Work on settlement agreement and related issues | $1,562.30 |
| 11/16/2021 | 0.90 | Work on matters related to post settlement issues | $827.10 |
| 12/6/2021 | 0.90 | Work on settlement agreement and related issues | $827.10 |
| 12/7/2021 | 0.90 | Work on preliminary approval and settlement agreement | $827.10 |
| 2/28/2022 | 1.30 | Work on settlement agreement | $1,194.70 |
| 5/5/2022 | 1.20 | Extensive work on settlement agreement in light of lengthy conference call and review | $1,102.80 |
| 6/3/2022 | 1.30 | Review settlement agreement and work on mediation prep. | $1,194.70 |
| 6/9/2022 | 0.30 | Work on continued mediation and related issues. | $275.70 |
| 6/10/2022 | 1.40 | Emails with co-counsel re mediation status and continued work on related issues for mediation. | $1,286.60 |
| 11/16/2022 | 1.20 | Work on prelim approval issues. | $1,102.80 |
| 11/21/2022 | 1.60 | Work on prelim approval issues. | $1,470.40 |
| | | TOTAL | $13,417.40 |

ECF 130 at 44–46.

When the entries *do* include specifics, they highlight inconsistencies that make the records unreliable. For example, for the November 2021 mediation, seven attorneys attended, including two senior partners from Milberg. ECF 79-1 at 2. Four recorded 4.8 hours, while another had 3.3 hours. But one of the Milberg partners recorded 7.0 hours. *Id.* Similarly, for the August 18, 2023 mediation, four attorneys reported 2.7 hours, 3.7 hours, 4.6 hours, and 6.0 hours, leaving the Court unable to

determine the appropriate amount (a fifth lawyer block billed, limiting the usefulness of his time entry). *Id.* at 3. The cumulative impact of these inconsistencies undermines the reliability of other time entries and "casts a shadow over all of the hours submitted to the Court—just as the thirteenth stroke of a clock calls into doubt whether any previous stroke was accurate." *Citigroup*, 965 F. Supp. 2d at 393.

After Artsana raised this issue, counsel claimed it "is not surprising that attorneys participating in full-day, virtual mediations would have to give attention to other matters at certain times and thus would have different hours allotted to those sessions." ECF 92 at 10. But only two attorneys for Artsana attended the November 8 mediation, those attorneys also work on several other matters, and they each recorded 3.7 hours. Smith Decl. ¶ 2. No client would pay fees reflecting counsel's inconsistency, and there is no basis to charge it to Artsana.

The inconsistencies and indiscretions in Plaintiffs' time records merit a significant cut to bring counsel's fees into proportion with the class recovery. If the lodestar figure exceeds a reasonable percentage of the amount that the class has benefited from the settlement, a large percentage cut is appropriate. *E.g.*, *Kirsch*, 148 F.3d at 172, 174 (73% cut). For example, in *Darby v. Sterling Home Care, Inc.*, the court imposed a "negative lodestar multiplier" of 88% because of the "lack of case complexity, early settlement, minimal risk, and vague billing entries" and the relatively low settlement value. No. 17-cv-5370-RMB, 2020 WL 29932, at *4 (S.D.N.Y. Jan. 2, 2020).

These same factors counsel a two-thirds (66%) reduction of counsel's lodestar, which would bring counsel's fees to roughly $725,000 and is in line with the fee award justified by the percentage-of-the-fund method discussed immediately below. Here, a reduction of that magnitude is justified by the same factors that have justified similar, or greater, cuts in other cases in this Circuit: "lack of case complexity, early settlement, minimal risk, and vague billing entries." *Darby*, 2020 WL 29932, at *4.

## 2.    Plaintiffs' Counsel's Requested Fees Are Similarly Not Supported by the Percentage of the Fund Approach

Employing the percentage-of-the-fund approach confirms a substantial reduction is necessary.

i.  <u>The value of the settlement should be based on verified claims</u>.  Plaintiffs' counsel again attempt to justify their $2.25 million fee request by arguing the "value obtained" for the class should include the total funds *made available* to class members, even if they were ***not*** claimed.  ECF 128 at 14–15.  During the first round of briefing, Plaintiffs' counsel could argue that because the claims period was still open, it was not yet clear how many class members would assert claims.  However, we now know for a fact that the monetary value of the settlement to class members is not $21.9 million dollars, but instead $2.39 million.  ECF 128 at 1, 16, 17 n.11.  The unclaimed $19.5 million is not "value" to class members under any reasonable definition of the term.

The law likewise does not support the fiction that those funds should be considered value conferred on the class.  Unlike common-fund settlements in which the defendant pays every dollar no matter how many claims there are, that is not true in a claims-made settlement.  Rather, defendants in claims-made settlements pay for *validated* claims.  *See McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 387–88 (S.D.N.Y. 2017).  Accordingly, courts in this Circuit have regularly rejected a hypothetical, 100%-participation assumption as a basis for awarding fees in claims-made settlements.  *Hart v. BHH, LLC*, No. 15-cv-4804-WHP, 2020 WL 5645984, at *8 (S.D.N.Y. Sept. 22, 2020); *McLaughlin v. IDT Energy*, 2018 WL 3642627, at *16 (E.D.N.Y. July 30, 2018); *Cunningham v. Suds Pizza, Inc.*, 290 F. Supp. 3d 214, 224–25 (W.D.N.Y. 2017); *Bodon v. Domino's Pizza, LLC*, 2015 WL 3889577, at *5 (E.D.N.Y. June 4, 2015); *Parker v. Time Warner Ent. Co.*, 631 F. Supp. 2d 242, 265–67 (E.D.N.Y. 2009), *aff'd*, 378 F. App'x 63 (2d Cir. 2010).

*Hart* is a good example because there, too, Bursor & Fisher tried to persuade a judge in this District to award fees in a claims-made settlement based on the fiction of a "100% response rate." 2020 WL 5645984, at *7.  But the court rejected this argument, because "[w]hen the parties agreed to

the settlement, none of them could have credibly believed that they would achieve a response rate of 100%—or, frankly, anywhere close to that number." *Id.* at *8.

This Court agreed in a case involving the Vozzolo firm.  In *Buffington v. Progressive Corp.*, the Court noted the requested fee award was 16% of the gross value of the settlement, but in the same breath it noted that figure was "19 percent of the estimated total class member recovery" (much less than half of the 44% Plaintiffs seek here), which was "consistent with awards in this Circuit." No. 20-cv-07408-VB, ECF 170 at 88–89 (S.D.N.Y. Sept. 6, 2024).   And this Court articulated its "disagreement with class counsel's argument that Second Circuit case law requires an allocation of fees on the basis of the hypothetical maximum recovery in a claims-made settlement." *Id.* at 89.

A few older cases adopted counsel's approach.  But Plaintiffs' reliance (ECF 92 at 4–5) on *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), a "common fund" case, is unavailing.  In *Boeing*, there was a "judgment awarding the class a sum certain" and Boeing "ha[d] no interest in any part of the fund." *Id.* at 478–81.  The analogous "sum certain" here is the $2.39 million class members will recover, not the $21.9 million they could have.  The other cases counsel cite rely on a misinterpretation of *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007).[4]  That case involved a $22

---

[4]  *Torres*, 519 F. App'x at 5 (2d Cir. 2013) (citing *Masters*); *Zink v. First Niagara Bank, N.A.*, 2016 WL 7473278, at *7–8 (W.D.N.Y. Dec. 29, 2016) (same); *Hart v. RCI Hosp. Holdings, Inc.*, No. 09-cv-3043-PAE, 2015 WL 5577713, at *17–18 (S.D.N.Y. Sept. 22, 2015) (same); *Behzadi v. Int'l Creative Mgmt. Partners, LLC*, No. 14-cv-4382-LGS, 2015 WL 4210906, at *2 (S.D.N.Y. July 9, 2015) (same); *In re Penthouse Exec. Club Comp. Litig.*, No. 10-cv-1145-KMW, 2014 WL 185628, at *11 (S.D.N.Y. Jan. 14, 2014) (same); *Velez v. Novartis Pharms. Corp.*, No. 04-cv-09194-CM, 22010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) (same); *Diaz v. E. Locating Serv. Inc.*, No. 10-cv-04082-JCF, 2010 WL 5507912, at *8 (S.D.N.Y. Nov. 29, 2010) (same); *Alleyne v. Time Moving & Storage Inc.*, 264 F.R.D. 41, 59 (E.D.N.Y. 2010) (same).  Plaintiffs cite five additional cases in their revised motion.  But two of them improperly rely on *Masters* and are unhelpful to Plaintiffs for other reasons as well.  In *Fleisher v. Phoenix Life Insurance Co.*, the court expressly noted that the settlement at issue was "Not *Claims Made*" and there was no reversion.  No. 11-cv-8405-CM, 2015 WL 10847814, at *1, 3, 16 n.10 (S.D.N.Y. Sept. 9, 2015). And *McGreevy v. Life Alert Emergency Response, Inc.* is distinguishable because the fees were paid out of a "common fund," and in any event the court recognized in typical claims-made settlements the "gross settlement amount seems inflated and illusory" given the "low participation rates."  258 F. Supp. 3d 380, 387–88 (S.D.N.Y. 2017).  In three older cases from this Court

million settlement fund that went toward paying claimants, with any excess funds going to a cy pres award. *Id.* at 430–32. In other words, the defendant was paying $22 million no matter what; it was just a question of how much was going to claimants and how much was going to charity. The Second Circuit held in that situation that fees should be based "on the entire Fund created"—*i.e.*, including the cy pres award—rather than solely "on the basis of claims made against the Fund." *Id.* at 436–37.

The cases cited by Plaintiffs' counsel mistakenly read this sound bite as a rule that counsel should be rewarded based on the total hypothetical value of a settlement, even in claims-made settlements where unclaimed funds—unlike the cy pres structure in *Masters*—revert to the defendant. But later courts have noticed the error and corrected course. For example, the court in *McLaughlin* explicitly disagreed with the previous cases and explained the 100% rule from *Masters* should apply where "an entire settlement fund is going to be paid out for the benefit of the class"—but *not* cases where unpaid funds simply revert back to the defendant. *McLaughlin*, 2018 WL 3642627, at *15–16. And more recent cases have agreed with this approach. *E.g.*, *Hart*, 2020 WL 5645984, at *8; *Cunningham*, 290 F. Supp. 3d at 224–25. That is because in cy pres cases, the class benefits from the entire award, but in claims-made settlements like this one, the class benefits only to the extent that claimants come forward. *McLaughlin* and similar cases recognize that class attorneys should benefit in proportion with the benefit actually obtained by the class, not an impossible hypothetical.

The issue has become even clearer since the last round of briefing. In *Kurtz v. Kimberly-Clark Corp.*, an objector argued "the denominator should not be the total amount that Defendant would have had to pay had the claims process yielded a 100% response rate, but rather the final actual settlement payout to the Class." 2024 WL 184375, at *11 (E.D.N.Y. Jan. 17, 2024). After noting several courts in this Circuit held "*Masters* does not apply to claims-made settlements" and some older decisions

---

Plaintiffs point to—*Adler v. Bank of America, N.A.*, *In re HIKO Energy LLC Energy Litig.*, and *In re: Scotts EZ Seed Litig.*—counsel incorrectly relied on *Masters*, and fees were uncontested.

took a different view, the court sided with the objector, reasoning there was a "huge disparity between the benefits that will actually be achieved for Class Members and the amount of funds that will revert to Defendant" because 95% of the "purported $20 million benefit is 'purely hypothetical'"—strikingly akin to the facts here. *Id.* at *11–12 (citation omitted). Because the "'theoretical benefit dwarfs any real benefit,'" "unclaimed funds should not be used when assessing the fee percentage." *Id.* at *12 (quoting *Hart*, 2020 WL 5645984, at *8). The Eleventh Circuit also rejected the argument it was "reasonable to award attorney's fees based on a percentage of the funds made available to the class, rather than what the class members actually receive." *Drazen v. Pinto*, 106 F.4th 1302, 1341 (11th Cir. 2024).

This Court should adopt the same approach as the more recent cases and follow its own reasoning in *Buffington*, by determining the "true value of the settlement" "[b]ased on the claims filed." *Cunningham*, 290 F. Supp. 3d at 225. The parties no longer need to estimate that figure: we know there are $2.39 million in verified claims. And we know Artsana is on the hook for $500,000 in administration costs[5] and $9,000 in incentive awards. The outstanding variable is the fee award.

ii. <u>The court should award no more than 20% of the settlement value</u>. In choosing a percentage to award, the Court can consider "empirical evidence of attorney's fees awarded in similar cases as a starting point." *Grice*, 363 F. Supp. 3d at 407. Accordingly, this Court should significantly reduce counsel's request for nearly 44%. *See In re Cal. Pizza Kitchen Data Breach Litig.*, --- F.4th ---, 2025 WL 583419, at *10 (9th Cir. Feb. 24, 2025) (reversing fee award in claims-made settlement accounting for 45% of settlement value). "Except in extraordinary cases, courts in this District have declined to award fees representing more than one-third of the total settlement amount." *Run Guo Zhang v. Lin Kumo Japanese Rest. Inc.*, No. 13-cv-6667-PAE, 2015 WL 5122530, at *4 (S.D.N.Y. Aug. 31, 2015).

---

[5] *But see In re Cal. Pizza Kitchen Data Breach Litig.*, --- F.4th ---, 2025 WL 583419, at *10 n.7 (9th Cir. Feb. 24, 2025) (courts need not "include notice and administration costs in their calculation of settlement value under the percentage-of-recovery method").

Indeed, 44% is 11% more than the "one-third benchmark" counsel claim is "used in the Second Circuit." ECF 128 at 22. And the cases Plaintiffs cite for that supposed "benchmark" do not support their position. In *Velez v. Novartis Pharmaceuticals Corp.*, before Judge McMahon, the parties settled after seven years of hard-fought litigation that culminated in a seven-week trial and verdict, yet the court found the fee award of "less than 22 percent of the Settlement value" to "strain[] the bounds of reasonableness." 2010 WL 4877852, at *1, 8, 22 (S.D.N.Y. Nov. 30, 2010). And *Zink*, which Plaintiffs rely on, cites several authorities for the proposition that 25% is the "'benchmark' fee request"—a far cry from 44%. 2016 WL 7473278, at *8.

Empirical studies reinforce that a 44% request is excessive. A 2010 study found a median recovery of 24.6% of the settlement value in consumer class actions. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Studs. 811, 835 (2010). Another analysis placed the median recovery for consumer cases at 20% and for all cases *in this District* at 22%. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical Legal Studs. 248, 259, 263 (2010); *see Grice*, 363 F. Supp. 3d at 407 (citing both studies); *Velez*, 2010 WL 4877852, at *21 (citing Eisenberg & Miller study).

Here, Plaintiffs' counsel should get no more than the median 20%. In fact, when circumstances merit it, courts have frequently reduced a percentage award to 15% or less. *E.g.*, *Longwei*, 2017 WL 2559230, at *3 ("four (routine) motions to dismiss" and "contentious settlement negotiations" were merely "the 'general hurdles' of litigation" and justify fees of no more than 15%). Given Plaintiffs' counsel's minimal pre-settlement work and the work they begrudgingly did to "address" the fraud, it

would be reasonable for this Court to award less than the 20% median, but it certainly should authorize no more than that, which would also result in a fee award of $725,000.[6]

### C.    Artsana Preserves Its Objection That There Is No Legal Basis to Award Fees

Given the Court's statements at the last hearing, Artsana understands the Court will award *some* attorneys' fees.  ECF 105 at 17.  However, Artsana preserves for appeal its objection that there is no legal basis for any award of fees, because the Court may grant fees "authorized by law or by the parties' agreement," Fed. R. Civ. P. 23(h), and neither basis exists here.

As before, Counsel's request relies on the "common fund" doctrine.  ECF 128 at 9.  A lawyer who creates a "common fund . . . is entitled to a reasonable attorney's fee from the fund"— otherwise, class members would be "unjustly enriched."  *Boeing*, 444 U.S. at 478.  But "[t]he common fund doctrine does not apply" when "fees are sought from the assets of the [defendant], and the fee award would not come from a common fund nor be assessed against persons who have derived benefit from the lawsuit."  *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir. 1996).  Here, counsel admit "this Settlement does not create a traditional 'common fund.'"  ECF 128 at 16.

Plaintiffs attempt to address this problem by arguing "this litigation involves both common law and statutory claims, some with fee shifting provisions."  ECF 128 at 9 n.6.  But as they admit, this action involves claims (*e.g.*, under Colorado, Florida, Illinois, Maryland, and Texas law) with no fee-shifting provisions.  And Plaintiffs make no effort to show they are entitled to fees under those few statutes that do permit fee shifting.  They cannot do so on reply.  *United States v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 160 (S.D.N.Y. 2015).  Accordingly, there is no basis to award fees.

---

[6]  Other than the fee amount, Artsana calculated this like Plaintiffs' counsel: $2,390,825 + $500,000 + $9,000 + 725,000 = $3,624,825.  $725,000 / $3,624,825 = 20.00%.

## IV.    CONCLUSION

The Court should award no more than $725,000, which is more than reasonable considering the early resolution and Plaintiffs' counsel's reluctance to stem the fraud.

Dated:  February 28, 2025                Respectfully submitted,

                                          GIBSON, DUNN & CRUTCHER LLP

                                          By:  */s/ Christopher Chorba*

                                          Christopher Chorba (*Pro Hac Vice*)
                                          CChorba@gibsondunn.com
                                          Jeremy S. Smith (*Pro Hac Vice*)
                                          JSSmith@gibsondunn.com
                                          333 South Grand Avenue
                                          Los Angeles, CA 90071-3197
                                          Tel.: (213) 229-7000

                                          Jason W. Myatt
                                          JMyatt@gibsondunn.com
                                          200 Park Avenue
                                          New York, NY 10166-0193
                                          Tel.: (212) 351-4000

                                          *Attorneys for Artsana USA, Inc.*

**ATTORNEY CERTIFICATION PURSUANT TO LOCAL RULE 7.1**

I, Chris Chorba, an attorney admitted pro hac vice to practice law before this Court, hereby certify that this Memorandum of Law complies with the word limit set forth in Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, because it contains 8,734 words, excluding the parts of the Memorandum of Law exempted by Rule 7.1.  In preparing this certification, I have relied on the word count of the word-processing system used to prepare this Memorandum of Law.

Dated: February 28, 2025

By: */s/ Christopher Chorba*
Christopher Chorba